UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

EMERSON ELECTRIC CO.,

                                        Plaintiff,

        -against-

CHARLES S. HOLMES and ASSET MANAGEMENT
ASSOCIATES OF NEW YORK, INC.,

                                        Defendants.

---

2:16-cv-01390-PKC-SIL

**PLAINTIFF'S LOCAL CIVIL
RULE 56.1(a) STATEMENT IN
SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT**

Plaintiff Emerson Electric Co. ("Emerson"), by its attorneys, Simon Lesser PC, submits

this statement pursuant to Local Civil Rule 56.1 in support of its motion for summary judgment

against defendants Charles S. Holmes ("Holmes") and Asset Management Associates of New

York, Inc. ("AMA")(collectively, the "Defendants").

Pursuant to Local Civil Rule 56.1(d), each statement of undisputed material fact set forth

herein is supported by citations to the record.

A.    **General Background**

1.      AMA is a New York corporation with its principal place of business located within

Holmes' residence at 26 Redcoats Lane, Sag Harbor, New York 11963.  (Complaint, Lesser Decl.

Ex. A ¶ 9); (Holmes Answer, Lesser Decl. Ex. B ¶ 9); (Lesser Decl. Ex. C, AMA Entity

Registration).[1]

2.      Emerson is the judgment-creditor of AMA in a judgment entered by this Court on

August 13, 2015 for $1,966,246.35 plus 9% post-judgment interest (the "8/13/15 Judgment") in

the underlying case *Emerson Electric Co. v. Asset Management Associates of New York, Inc.*, 08-

---

[1]      "Lesser Decl." refers to the Declaration of Leonard F. Lesser, Esq., dated September 14, 2018.

cv-1489 (E.D.N.Y.).  (Lesser Decl. Ex. A ¶ 1); (Lesser Decl. Ex. D, 08-cv-1489, ECF Dkt. No. 82).

      3.      Emerson is also the assignee and judgment-creditor of AMA in a separate judgment in favor of Emerson Telecommunication Products LLC ("ETP") entered by this Court on January 9, 2014 for $1,965,081.40 plus 9% post-judgment interest (the "1/9/14 Judgment"), in the related proceeding *Asset Management Associates of New York, Inc. v. Emerson Telecommunication Products, LLC*, 08-cv-2128. (Lesser Decl. Ex. A ¶ 2); (Lesser Decl. Ex. E, 08-cv-2128, ECF Dkt. No. 52).

      4.      No appeal was taken from the Judgments, nor was any motion made to vacate or modify them, and the Judgments are enforceable for 20 years pursuant to CPLR 211(b) and Fed. R. Civ. P. 69(a)(1).  (Lesser Decl. Ex. A ¶ 3).

      5.      By this action, Emerson seeks post-judgment relief, pursuant to Fed. R. Civ. P. 69 and CPLR § 5225(b) to "pierce the corporate veil" of judgment-debtor AMA, and to set aside fraudulent conveyances from AMA to sole owner, controller and insider, Holmes, under New York Debtor and Creditor Law §§ 273, 273-a, and 276.  (Lesser Decl. Ex. A ¶ 4).

**B.**     **The 8/13/15 Judgment in the Transition Services Litigation**

      6.      Emerson sued AMA on April 10, 2008 in this Court in the matter *Emerson Electric Co. v. Asset Management Associates of New York, Inc.*, 08-cv-1489 (E.D.N.Y.) for breach of contract and failure to pay for goods and services provided to AMA pursuant to the parties' Transition Services Agreement ("TSA") which covered manufacturing and support services Emerson provided to AMA.  (Lesser Decl. Ex. A ¶ 13); (Lesser Decl. Ex. F, 08-cv-1489 Compl., ECF Dkt. No. 1).

7.     On March 20, 2012, Judge Thomas C. Platt issued his Decision and Order awarding Emerson summary judgment as to liability against AMA on Emerson's breach of contract claims against AMA in addition to the reasonable attorneys' fees Emerson incurred in that lawsuit as provided for in the parties' contract.  (Lesser Decl. Ex. G, *Emerson Elec. Co. v. Asset Mgmt. Assocs.* , No. 08-cv-1489, 2012 U.S. Dist. LEXIS 39442 (E.D.N.Y. Mar. 20, 2012)); (Lesser Decl. Ex. A ¶ 14).

8.     The case was then transferred to Judge Leonard D. Wexler who conducted the damages trial on April 10, 2013, and the parties filed their post-trial submissions on May 10, 2013. (Lesser Decl. Ex. A ¶ 15)(08-cv-1489, ECF Dkt. Nos. 68-69).

9.     By Memorandum and Order and Amended Order dated July 28, 2015, Judge Wexler issued his Findings of Fact and Conclusions of Law in the Transition Services Litigation, directing the Clerk to enter judgment against AMA in the amount of $1,442,588.20, plus per diem interest of $159.68 from May 10, 2013 through the date judgment is entered, and $391,762.47 in attorneys' fees and costs.  (Lesser Decl. Ex. H, *Emerson Elec. Co. v. Asset Mgmt. Assocs.*, No. 08-cv-1489, 2015 U.S. Dist. LEXIS 98401 (E.D.N.Y. July 28, 2015).

10.     The Clerk then entered the 8/13/15 Judgment in favor of Emerson and against AMA in the amount of $1,966,246.35.  (Lesser Decl. Ex. D, 08-cv-1489, ECF Dkt. No. 82).

11.     The 8/13/15 Judgment is also subject to 9% post-judgment interest pursuant to CPLR §§ 5003 and 5004. (Lesser Decl. Ex. A ¶ 18).

**C.     The 1/9/14 Judgment in the Post-Closing Dispute**

12.     On November 8, 2006, AMA entered into a purchase agreement with ETP for all of the capital stock of Emerson Network Power Optical Connectivity Solutions, Inc., and certain assets of Emerson Network Power Connectivity Solutions, Inc. (Lesser Decl. Ex. A ¶ 19); *see*

3

*also* (Lesser Decl. Ex. G, *Emerson v. AMA,* 08-cv-1489, 2012 U.S. Dist LEXIS 39442 (E.D.N.Y. Mar. 20, 2012)).

13.     The businesses purchased by AMA from ETP were renamed CSI Technologies, Inc. ("CSI"), following the closing of the transaction.  (Lesser Decl. Ex. A ¶ 52); (Lesser Decl. Ex. G, *Emerson v. AMA,* 08-cv-1489, 2012 U.S. Dist. LEXIS 39442 *20 (E.D.N.Y. Mar. 20, 2012) ("[AMA] renamed Optical Connectivity as CSI pursuant to the Acquisition Agreement.")).

14.     The purchase price AMA paid ETP for CSI was $6 million, subject to post-closing adjustment. (Lesser Decl. Ex. DD, Acquisition Agreement §§ 2.2, 2.5); (Lesser Decl. Ex. I, *Asset Mgmt. Assocs. of N.Y., Inc. v. Emerson Telecom. Prods. LLC,* No. 08-cv-2506, 2011 U.S. Dist. LEXIS 9434, at *2-3 (E.D.N.Y. Jan. 25, 2011)).

15.     The Acquisition Agreement stipulates that: (1)  ETP would deliver its Statement of Closing Net Working Capital to AMA; (2) AMA would deliver a Notice of Dispute to ETP if it disputed the Closing Net Working Capital; (3) after receiving the Notice of Dispute, the parties would consult with each other in an effort to resolve the dispute; and (4) if the parties were unable to come to a resolution, the dispute would be submitted to binding arbitration. (Lesser Decl. Ex. A ¶ 21); (Lesser Decl. Ex. DD, Acquisition Agreement §§ 2.4-2.5).

16.     On January 14, 2007, ETP delivered its Closing Statement to AMA, seeking a purchase price adjustment and payment in ETP's favor from AMA in the amount of $1,082,922, plus contractual interest. (Lesser Decl. Ex. A ¶ 22).

17.     On February 26, 2007, AMA delivered its Notice of Dispute, demanding its own price adjustment challenging the value of the inventory it purchased.  (Lesser Decl. Ex. A ¶ 23); (Lesser Decl. Ex. J, *Asset Mgmt. Assocs. v. Emerson Telecom. Prods., LLC,* No. 08-cv-2128, 2010 U.S. Dist LEXIS 143855, at *1-3 (E.D.N.Y. Feb. 10, 2010)).

4

18.     Thereafter, from April 9, 2007 through April 1, 2008, the parties engaged in negotiations in an effort to resolve their dispute, but were unsuccessful in reaching a resolution. (Lesser Decl. Ex. A ¶ 24); (Lesser Decl. Ex. J, *Asset Mgmt. Assocs. v. Emerson Telecom. Prods. LLC,* No. 08-cv-2128, 2010 U.S. Dist LEXIS 143855, at *2-3 (E.D.N.Y. Feb. 10, 2010)).

19.     According to Holmes, by March 2007, it was "apparent that [litigation] was going to occur" concerning the parties' post-closing disputes.  (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan 17, 2018 at 159:22-160:7).

20.     As early as March 7, 2007, Holmes labeled the dispute between AMA and Emerson as the "Emerson Litigation" even though formal litigation had not yet commenced. (Lesser Decl. Ex. L, Reimbursement Agreement); (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 159:22-160:24).

21.     On April 11, 2008, ETP referred the parties' dispute to mandatory arbitration pursuant to the parties' arbitration agreement. (Lesser Decl. Ex. A ¶ 25).

22.     In response, on May 6, 2008, AMA filed its Petition to Stay Arbitration under Index No. 17496/2008, in the New York State Supreme Court, Suffolk County. (Lesser Decl. Ex. A ¶ 26).

23.     ETP removed the case to this Court on May 27, 2008, where it was assigned Docket No. 08-cv-2128 ("*AMA I*"). (Lesser Decl. Ex. A ¶ 26).

24.     On June 16, 2009, this Court denied AMA's petition to stay arbitration and granted ETP's cross-petition to compel arbitration.  (Lesser Decl. Ex. A ¶ 27)(08-cv-2128, ECF Dkt. No. 32).

25.     On February 10, 2010, this Court denied AMA's motion for reconsideration regarding his June 16, 2009 Order compelling arbitration. (Lesser Decl. Ex. A ¶ 28); (Lesser Decl. Ex. J, 2010 U.S. Dist LEXIS 143855).

26.     After filing its unsuccessful petition to stay arbitration, AMA filed a related plenary action, *Asset Management Associates of New York, Inc. v. Emerson Telecommunication Products, LLC*, No. 08-cv-2506 (E.D.N.Y.) ("*AMA II*"), in which it asserted claims based on the allegations it raised in the Notice of Dispute. (Lesser Decl. Ex. A ¶ 30).

27.     On August 29, 2008, ETP filed a motion to dismiss *AMA II* in favor of the pending arbitration that was ordered in *AMA I*. (Lesser Decl. Ex. A ¶ 31).

28.     The matter was heard by Judge Platt on November 7, 2008, and he granted ETP's motion to dismiss *AMA II* from the bench. (Lesser Decl. Ex. A ¶ 32); (Lesser Decl. Ex. M, *AMA II* Hearing Tr., Nov 7, 2008 at 6:1–7:6).

29.     On December 29, 2008, AMA sought leave to file an amended complaint in *AMA II*, seeking to add a claim for rescission of the Acquisition Agreement and arbitration provision. (Lesser Decl. Ex. A ¶ 33).

30.     By Order, dated September 30, 2009, the Court summarily denied AMA's motion for leave to amend. (Lesser Decl. Ex. A ¶ 34); (Lesser Decl. Ex. N, *AMA II* Order, ECF Dkt. No. 27).

31.     AMA appealed from that Order, and on October 6, 2010, the United States Court of Appeals for the Second Circuit remanded the matter "to give the District Court an opportunity either (1) to enter a new order justifying its decision to deny the motion for leave to file an amended complaint; or (2) to grant the motion." (Lesser Decl. Ex. O, *Asset Mgmt. Assocs. v. Emerson Telecomm. Prods., LLC*, 395 F. App'x 752, 753 (2d Cir. 2010)).

32.     Following supplemental briefing, through its Decision and Order dated January

25, 2011, the Court again denied AMA's motion to amend its complaint in *AMA II*. (Lesser

Decl. Ex. I, *Asset Mgmt. Assocs. v. Emerson Telecom. Prods., LLC,* No. 08-cv-2506, 2011 U.S.

Dist. LEXIS 9434, at *2-3 (E.D.N.Y. Jan. 25, 2011)).

33.     AMA did not appeal from the January 25, 2011 Decision and Order, and the

parties' agreed to submit their dispute to binding arbitration before a mutually selected arbitrator.

(Lesser Decl. Ex. A ¶ 38).

34.     On November 7, 2013, the arbitrator issued his Award granting ETP's post-

closing adjustment claim, and rejecting AMA's counterclaims.  (Lesser Decl. Ex. P, Arbitration

Award): (Lesser Decl. Ex. A ¶ 39).

35.     ETP thereafter moved the Court to confirm the Arbitration Award, which AMA

did not oppose, and which Judge Platt granted on December 17, 2013. (Lesser Decl. Ex. Q,

Letter Regarding AMA Lack of Opposition to Confirming the Arbitration Award); (Lesser Decl.

Ex. R, Order Confirming the Arbitration Award).

36.     As directed by the Court, the Clerk then entered the 1/9/14 Judgment against

AMA on the Court-confirmed Arbitration Award in the amount of $1,965,081.40, plus 9% post-

judgment interest pursuant to CPLR §§ 5003 and 5004. (Lesser Decl. Ex. E).

37.     Following entry of the 8/13/15 Judgment, ETP assigned the 1/9/14 Judgment to

Emerson for consolidation of its judgment and enforcement claims against AMA and Holmes.

(Lesser Decl. Ex. S, Assignment of Judgment); (Lesser Decl. Ex. A ¶ 42).

38.     No portion of the Judgments has been paid.

**D.      AMA Has Defaulted In This Judgment Enforcement Action**

39.     AMA has defaulted in this Action.  (Lesser Decl. Ex. T, Certificate of Default).

40.     As a result of AMA's default, the well pleaded allegations in the Complaint

concerning liability are deemed admitted as a matter of law as against AMA.  *See Dor Yeshurim,*

*Inc. v. A Torah Infertility Medium of Exch.,* No. 10-cv-2837 (JFB)(WDW), 2011 U.S. Dist.

LEXIS 153153 (E.D.N.Y. Aug. 10, 2011), *adopted,* 2012 U.S. Dist. LEXIS 17655 (E.D.N.Y.

Feb. 10, 2012)("A default constitutes an admission of all well-pleaded factual allegations in the

complaint, except those relating to damages."), *citing Greyhound Exhibitgroup, Inc. v. E.L.U.L.*

*Realty Corp.,* 973 F.2d 155, 158 (2d Cir. 1992).

**E.     Holmes, AMA and the Underlying Transactions and Litigations**

41.     In the underlying Transition Services Litigation, Judge Platt made the

determination that: "[AMA] is 100%-owned and -controlled by one person: Charles S. Holmes."

(Lesser Decl. Ex. G, *Emerson v. AMA,* 08-cv-1489 ECF Dkt. 57, 2012 U.S. Dist LEXIS 39442

*10).

42.     According to Holmes: "AMA is a New York corporation that, among other

things, purchases and restructures businesses for sale to others."  (Lesser Decl. Ex. U, Holmes'

Nov. 13, 2009 Declaration in the 08-cv-1489 Action ¶ 2).

43.     In a written memorandum that he authored and transmitted to ETP on June 12,

2006 in connection with AMA's purchase of CSI, Holmes described AMA and its history as

follows:

> Asset Management Associates ("AMA") was formed in 1973 as a registered
> broker/dealer to fund the real estate ventures of Joseph A. Frates and his family
> entities. Mr. Frates sold the Rigid Tool and Die division to Emerson Electric in
> the 1960's. With the sale he became a large shareholder of Emerson and served
> on its Board of Directors and Executive Committee. Mr. Holmes was a principle
> of AMA and his law firm represented the Frates.
>
> In the mid 1980-s AMA and the Frates family in a co-partnership successfully
> purchased and privatized several *Fortune Five Hundred* companies. In the late
> 1980's and through the 1990's Mr. Holmes, who was a chemical engineer by

training and now wholly-owned AMA, purchased multiple industrial companies principally involved in cryogenic air separation, storage and transportation. Several of these businesses were combined to form Chart Industries and with $200 million in sales, taken public in 1992.  Mr. Holmes sold his interests in Chart in 1997 when it had obtained a market capitalization of near $600 million.

In 1997, AMA purchased a controlling interest in NAI Technology, a troubled public defense contractor. NAI's main products included ruggedized computers for the military and the NSA. NAI was merged into DRS Technologies in 1999. Wilcom was a $30 million division of NAI which did not fit the DRS business plan and was sold to Holmes prior to the merger. Wilcom manufactures and sells copper line improvement, DSL treatment and fiber optic measurement devices to the telcoms. It has been highly profitable since the spinoff. The connectivity solutions business of Emerson, although slightly lower on the technology curve, will be a good fit with Wilcom as their products have similar technologies and they share the same customer base.

AMA has always been a family oriented operator and profit shares with its employees. In its history it never had a key employee terminate their relationship. We look forward to the opportunity to work with Emerson on this project.

(Lesser Decl. Ex. V, Memorandum from Holmes Regarding AMA).

44.    In another document prepared by Holmes and submitted to financial institutions in August 2006 for purposes of soliciting financing for AMA's purchase of the businesses from ETP, Holmes described AMA and the proposed transaction with ETP as follows:

In the latter months of 1999 AMA purchased Wilcom Inc., a Telecom equipment manufacturer, from NAI Industries, Inc. for $1.6 million. The sales history and profitability of Wilcom since AMA's ownership is depicted in Table VI:

\*        \*        \*

Wilcom's products are copper based telephone line treatment devices and fiber optic test meters that are sold to many of the same customers as the connectivity businesses of EMR. Wilcom was hemorrhaging $2-4 million of losses annually prior to AMA's purchase.  AMA's management completely restructured Wilcom while never experiencing a losing quarter of operations. ·This same management will oversee the EMR operations.

AMA was introduced to EMR by their industry analyst at Lehman Brothers. The principal owner of AMA [Holmes] has a long standing business relationship with one of the former Board Members at Emerson who sold EMR its profitable multi-

9

billion dollar Rigid Tool & Die division in the 1960's. The transfer of these divisions to AMA is a logical extension of Wilcom's expertise in these manufacturing pursuits.

(Lesser Decl. Ex. W, Proposal for the Financing of the Purchase of the EMR Cable Assembly

Business at CSH-EEC001649).

45.     The entity referenced in Holmes' June 12, 2006 memorandum and the August

2006 financing proposal, Wilcom, Inc. ("Wilcom"), is another company solely owned by

Holmes.  (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 16:8-14).

46.     When questioned about his preparation of the August 2006 financing proposal

and his reference to AMA's purchase of Wilcom, Holmes testified as follows:

> Q:     In the section regarding background of the transaction, the AMA that's referenced that purchased Wilcom, Inc. is Asset Management Associates of New York, Inc.?
>
> A:     Well, as I have explained to you before, that's just a generic thing, saying AMA purchased it because they say Charles Holmes, sole shareholder, purchased it.  It doesn't mean anything to them.  That's why I said that. **Trust me, everybody that saw this knew that AMA was Charles Holmes**."

(Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 32:25-33:11) (emphasis added).

47.     Holmes' friend Dennis McCarthy, who he installed as an officer of both AMA

and Wilcom, testified at deposition that:

> [AMA] I like to think of as a generic corporation of Charles Holmes that he uses for his business interests.

(Lesser Decl. Ex. X, McCarthy Dep. Tr., Oct. 13, 2009 at 14:4-7); *see also* (Lesser Decl. Ex. Y,

Holmes Dep. Tr., July 31, 2015 at 25:5-30:6) (wherein Holmes described his personal and

professional relationship with McCarthy, and McCarthy's various positions with Holmes' solely

owned companies).

48. Although AMA purchased CSI from ETP for $6 million, CSI reported over $40 million in total assets federal tax return following AMA's acquisition. *See* (Lesser Decl. Ex. Z, CSI 2007 Tax Return, prepared and signed by AMA's tax preparer Sanford Kirschenbaum ("Kirschenbaum") on December 10, 2015, reporting CSI's total assets for 2007 as $44,815.912 at CSH-EEC002497; CSI 2008 Tax Return, reporting CSI's total assets for 2008 as $44,244,994 at CSH-EEC002520; CSI 2009 Tax Return, reporting CSI's total assets for 2009 as $41,076,252 at CSH-EEC002545; and CSI 2010 Tax Return, reporting CSI's total assets for 2010 as $39,197,674 at CSH-EEC002570).

49. After AMA's November 7, 2006 purchase of CSI from ETP, Holmes directed that AMA voluntarily relinquish all the shares of common stock of CSI that AMA purchased from ETP, and executed a document dated November 15, 2006 as "sole director" of AMA documenting that relinquishment. (Lesser Decl. Ex. AA, Written Consent of Sole Director of AMA ¶ 1); (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 147:16-25) ("Q: By this consent, you are returning to CSI all of the shares of common stock owned by AMA, correct? A: Yes.").

50. Upon AMA's voluntary relinquishment of its ownership of CSI, that AMA had purchased for $6 million, Holmes then individually purchased full ownership of CSI for $50,000. (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 150:9-151:9); (Lesser Decl. Ex. BB, Holmes Nov. 15, 2016 Letter).

51. Holmes descried this transaction as follows:

Q: Were you in your personal capacity the buyer of the businesses [renamed CSI] or was AMA the buyer or was some other entity?

A: AMA contracted to buy these businesses, okay, but then **AMA sold the business and they sold it to me**, okay.

11

Q:      When did –

A:      They sold [the] right for me to buy the stock of CSI Technologies, all
right, which I did.

(Lesser Decl. Ex. CC, Holmes Dep. Tr., Oct. 7, 2009 at 24:23-25:9)(emphasis added).

52.     Discovery produced in this post-Judgment proceeding has revealed that Holmes

did not pay AMA cash or asset consideration for this transaction, but instead executed the sole-

shareholder consent directing AMA to voluntary relinquish its ownership of CSI.  (Lesser Decl.

Ex. AA, Written Consent of Sole Director of AMA ¶ 2)

53.     After assuming full ownership of CSI for $50,000, Holmes executed an

Assignment and Assumption Agreement, dated November 15, 2006, whereby AMA "assigned

all of its rights, interests and obligations under the ETP acquisition agreement to CSI."  (Lesser

Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 148:23-149:11).

54.     Holmes testified that "CSI, by taking assignment of all [AMA's] rights and

liabilities under the [AMA/ETP] acquisition agreement, would have to pay everything[,]

[w]hatever liabilities there were."  (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at

156:13-23).

55.     CSI's financial obligations to AMA under the November 15, 2006 Assignment

and Assumption Agreement included funding of all AMA's obligations associated with the

litigations that resulted in the unpaid Judgments, including all legal and arbitration fees and

expenses.  *See* (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 156:13-157:2).

56.     Notwithstanding Holmes' unilateral assignment of AMA's obligations to ETP and

Emerson under the parties' respective agreements, those agreements mandated that no AMA

assignment would relieve it of its direct financial obligations to Emerson and ETP.

57.     Section 17 of the Transition Services Agreement provides that:

> This Agreement and various . . . obligations arising hereunder shall inure to the
> benefit of and be binding upon the Parties hereto and their successors and
> permitted assigns. Neither this Agreement nor any of the . . . obligations
> hereunder shall be . . . assigned . . . except that [AMA] shall have the right to . . .
> assign its *rights* hereunder to any entity which is controlled by [AMA] or by
> [AMA's] Affiliates . . . . *No such assignment shall relieve [AMA] of any liability
> or obligation hereunder*.

(Lesser Decl. Ex. G, *Emerson v. AMA,* 08-cv-1489 ECF Dkt. No. 57, 2012 U.S. Dist LEXIS

39442, at *16).

58.     Similarly, Section 8.4 of the ETP/AMA Acquisition Agreement provides that:

"Neither this Agreement nor any of the rights, interests, or obligations hereunder shall be

transferred, delegated, or assigned by either Party hereto without the prior written consent of the

other Party (which consent shall not be unreasonably withheld), except that [AMA] shall have

the right to transfer and assign its rights hereunder to any entity which is controlled by [AMA] or

by Affiliates of [AMA].  No such assignment shall relieve [AMA] of any liability or obligation

hereunder." (Lesser Decl. Ex. DD, Acquisition Agreement § 8.4).

59.     Judge Platt made the following determination regarding Section 17 of the

Transition Agreement and its effect on the assignment between AMA and CSI:

> By the clear terms of the TSA, therefore, CSI is [AMA's] affiliate and under
> common control with [AMA]. Further, [AMA] may not, under section 17, assign
> its TSA liabilities or obligations. The TSA could not have been written any more
> clearly on the assignment issue. **[AMA] remained liable for its TSA
> obligations, even if [AMA] assigned its TSA rights**.

(Lesser Decl. Ex. G, *Emerson v. AMA,* 08-cv-1489 ECF Dkt. No. 57, 2012 U.S. Dist LEXIS

39442, at *20)(emphasis added).

60.     Holmes later had AMA's attorneys prepare a Reimbursement Agreement, dated

March 5, 2007 under which CSI reconfirmed its duty to "pay everything[,] [w]hatever liabilities

there were," in "connection with the litigation that has evolved from the Emerson Agreements

13

and the transactions contemplated thereby," which the Reimbursement Agreement defines as the "Emerson Litigation." (Lesser Decl. Ex. L, Reimbursement Agreement); (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 153:2-156:23).

61.     Holmes' purpose for having this March 5, 2007 Reimbursement Agreement prepared was to document CSI's obligation to fund AMA's obligations and liabilities, including its legal fees and expenses incurred in connection with AMA's litigations with Emerson and ETP that resulted in the unpaid Judgments. *See* (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 158:25-159:6)("Q: Is that one of the reasons that you wanted this reimbursement agreement between AMA and CSI, because there was some disputes now [between AMA and Emerson] and you wanted to make sure that it was clear that CSI had the obligation to pay the legal fees? A: That's a fair statement.").

62.     The Reimbursement Agreement also granted CSI a share of any recovery AMA obtained against Emerson or ETP in the underlying litigations. (Lesser Decl. Ex. L, Reimbursement Agreement).

63.     It is undisputed by Holmes that in accordance with the November 15, 2006 Assignment and Assumption Agreement, CSI funded all of AMA's legal and arbitration fees and expenses in connection with the litigations that resulted in the unpaid Judgments. *See* (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 161:13-161:25); *see also* (Lesser Decl. Ex. EE, all legal fee invoices and payments in connection with the underlying litigations that resulted in the unpaid Judgments).

64.     In the underlying Transition Services Litigation, Judge Platt made the determination that: "[AMA] is 100%-owned and -controlled by one person: Charles S. Holmes.

Following the closing, Holmes also owned and controlled CSI in its entirety." (Lesser Decl. Ex.

G, *Emerson v. AMA,* 08-cv-1489, 2012 U.S. Dist. LEXIS 39442, at *10).

65.     Holmes testified that he directed CSI to fund all of AMA's obligations and

liabilities during the underlying litigations, including all legal and arbitrator fees and expenses,

pursuant to the November 15, 2006 Assignment and Assumption Agreement. (Lesser Decl. Ex.

K, Holmes Dep. Tr., Jan. 17, 2018 at 171:14-173:4).

66.     As the sole owner and controller of AMA and CSI, and consistent with the

November 15, 2006 Assignment and Assumption Agreement, Holmes had the ability to direct

CSI to fund the Judgments just as he directed CSI to fund the underlying litigation that resulted

in the Judgments.  (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 171:14-173:4).

67.     Holmes testified that he deliberately refused to direct CSI to the fund the

Judgments because, in his view, "they weren't legitimate":

> Q:     After the judgments were entered against AMA, why didn't you have CSI
>        pay the judgments as part of its obligations under the assignment to fund
>        the obligations of AMA?
>
> A:     As far as we were concerned, they weren't legitimate.
>
> Q:     What wasn't legitimate?
>
> A:     The obligations.
>
> Q:     The obligations that were reduced to judgment?
>
> A:     Yes.

(Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 210:22-211:8).

68.     By refusing to direct CSI to fund the Judgments pursuant to AMA's rights under

the November 15, 2006 Assignment and Assumption Agreement, Holmes invalidated AMA's

only consideration for his insider conveyance to himself of CSI's stock, thereby rendering that

insider transaction void of any consideration, let alone fair consideration.  (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 156:13-23).

69.     Holmes also made representations and warranties on behalf of AMA in the Acquisition Agreement between AMA and ETP promising in § 4.5, entitled "Funds," that: "Buyer has, and at all times will have, sufficient funds on hand or available pursuant to unconditional commitments to pay the Purchase Price *and any adjustment thereof*."  (Lesser Decl. Ex. DD, Acquisition Agreement § 4.5)(emphasis added).

70.     Holmes testified that although he ensured that AMA had sufficient funds on hand or pursuant to unconditional commitments (i.e., AMA/CSI Assignment Agreement) to pay AMA's legal and arbitration fee obligations during the numerous years of AMA's motions, appeals and multiple proceedings, it was only after AMA lost on the merits that he decided not to pay the Judgments because, at that point, he decided "AMA had no future." (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 228:13-229:14).

71.     Holmes testified as follows:

Q:      Did AMA have funds on hand, or available pursuant to unconditional commitments, to pay the purchase price and any adjustments thereof in 2006?

A:      They didn't agree in any one of those dates you said, up to the time of the arbitration ruling, to pay any money because money was owed to them.

Q:      The money was owed to whom?

A:      AMA.

Q:      According to the allegations of AMA?

A:      Yes.  And they were true.

Q:      The arbitrator ultimately rejected that.

A:      The arbitrator had his own agenda.

16

Q:      The court confirmed with arbitration [award]?

A:      Yes.

Q;      There was no appeal of [that]?

A:      I understand.

MR. KAZAN: Is there a question?  Answer the question.  This isn't a debate.

Q:      Is the reason that AMA didn't pay the judgment on the arbitration award
        because you disagreed with what the arbitrator did?

A:      There was no future in AMA.

(Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 228:13-229:14).

72.     Following entry of the 1/9/14 Judgment and AMA's failure to pay, on January 25,

2014, ETP issued post-Judgment discovery demands on AMA for its books, records and

information regarding the location of AMA's accounts and assets, as well as a subpoena to

Holmes for his books and records and for testimony regarding his transactions with AMA.

(Lesser Decl. Ex. A ¶ 43).

73.     On February 19, 2014, a few days before AMA was required to respond to ETP's

post-Judgment discovery demands, Holmes, on behalf of AMA, filed a voluntary Petition for

liquidation of AMA under Chapter 7 of Title 11 of the United States Code in the United States

Bankruptcy Court for the District of New Jersey (Case No. 14-12849-NLW) (the "Bankruptcy

Action"); (Lesser Decl. Ex. A ¶ 44).

74.     Holmes directed AMA's lawyers to file AMA's bankruptcy petition in New

Jersey because that is where his secretary's personal residence is located, and she kept copies of

AMA's records in her basement.  (Lesser Decl. Ex. FF, *In re Asset Mgmt. Assocs. of N.Y., Inc.*,

No. 14-12849 (NLW), AMA Opp. to Mot. to Change Venue (Bankr. E.D.N.Y. Mar. 31, 2014));

(Lesser Decl. Ex. VV, Transcript of Holmes May 8, 2014 Sworn testimony at the 341 Hearing at 6:23-9:6).

75.     Emerson was the sole non-insider creditor of AMA in the bankruptcy proceeding. (Lesser Decl. Ex. GG, *In re Asset Mgmt. Assocs. of N.Y., Inc.*, No. 14-12849 (NLW), Petition (Bankr. E.D.N.Y. Feb. 19, 2014)); (Lesser Decl. Ex. VV, Transcript of Holmes May 8, 2014 Sworn testimony at the 341 Hearing at 24:19-23).

76.     On April 8, 2014, on Emerson's motion, the AMA bankruptcy proceeding was transferred to the Bankruptcy Court for the Eastern District of New York, the venue of Holmes' estate and the principal place of AMA's business.  (Lesser Decl. Ex. A ¶ 45); (Case No. 14-41729-CDC).

77.     By Order dated October 10, 2014, on Emerson's subsequent motion, the AMA Bankruptcy petition was dismissed *for cause* pursuant to Bankruptcy Code §707(a). (Lesser Decl. Ex. A ¶ 46); (Lesser Decl. Ex. DDD, Case No. 14-41729-CDC, ECF Dkt. No. 45).

78.     After the bankruptcy stay resulting from AMA's bankruptcy petition was lifted, Judge Wexler issued his post-trial Findings of Fact and Conclusions of Law in the Transition Services Litigation, 08-cv-1489, and directed the Clerk to enter judgment against AMA in the amount of $1,442,588.20, plus per diem interest of $159.68 from May 10, 2013 through the date judgment is entered, plus $391,762.47 in attorneys' fees and costs. *See* (Lesser Decl. Ex. H, *Emerson v. AMA*, No. 08-cv-1489, 2015 U.S. Dist. LEXIS 98401 (E.D.N.Y. July 28, 2015)); (Lesser Decl. Ex. A ¶ 16).

**F.**   **During the Underlying Litigations, AMA Conveyed All of Its Income to Holmes**

79.     Wilcom is another company solely owned by Holmes.  (Lesser Decl. Ex. K,

Holmes Dep. Tr., Jan. 17, 2018 at 16:8-14); *see also* (Lesser Decl. Ex. Y, Holmes Dep. Tr., July

31, 2015 at 55:19-21) ("Q: And Wilcom is a company that you own 100 percent? A: Correct.").

80.     Wilcom is also a client of AMA.  *See* (Lesser Decl. Ex. Y, Holmes Dep. Tr., July

31, 2015 at 55:9-11) ("Q: Wilcom was a client or customer of AMA? A: It was a client.").

81.     Holmes testified that up until the end of 2009, AMA was providing "heavy duty

consulting for [Wilcom] and spending a lot of time."  (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan.

17, 2018 at 105:13-25).

82.     Holmes described AMA's management and consulting work for Wilcom to

include consulting he provided on Wilcom's "environmental clean up" for its plant that was sold

to Holmes as part of the Wilcom acquisition.  (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17,

2018 at 97:8-98:15).

83.     Holmes described AMA's environmental consulting work for Wilcom to cover a

"reclamation" project that spanned "six-or seven year[s]" and "started before 2007."  (Lesser

Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 103:4-15).

84.     It is undisputed by Holmes that AMA issued numerous invoices to Wilcom for

the management and consulting services which were performed by AMA while it was a

defendant in the underlying litigations that resulted in the unpaid Judgments.  (Lesser Decl. Ex.

HH, AMA Invoices to Wilcom); *see also* (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at

85:6-9) ("Q: And the invoices that were issues by AMA to Wilcom for those services, as far as

you were concerned, were completely legitimate?  A: Of course they were legitimate.").

85.     Holmes testified that all cash received by AMA from Wilcom was for management/consulting services provided by him through AMA.  (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 80:20-23).

86.     Holmes directed the payments from Wilcom to AMA in consideration for AMA's consulting services, and was the one that came up with the numbers. (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 85:7-12, 87:3-5); (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 96:10-15).

87.     Holmes, however, could not explain how the amounts of management and consulting fees charged by AMA to Wilcom were derived and did not prepare time sheets to document his alleged work.  (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 86:7-87:5).

88.     Holmes identified three "employees" of AMA: himself, whom he had paid a salary of $60,000 per year; his "girlfriend" Diane Holmes, who Holmes described as his "assistant in [his] home office"; and his secretary, Teresa Cassadonte, who worked out of her home in New Jersey.  (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 49:15-53:13).

89.     Holmes testified that he took himself, his girlfriend, and Ms. Cassadonte off AMA's payroll in December, 2009 because he unilaterally decided at that time to discontinue AMA's consulting operations.  (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 53:20-55:8).

90.     Holmes testified as follows in this regard:

Q:      Why were these employees, including yourself, off payroll as of December 2009?

A:      Because the business discontinued its operations at that point.

Q:      What do you mean the business discontinued its operations at that point?

20

A:  I didn't feel, as the president, it was a viable entity anymore to offer investment banking services and consulting services to others. We'd become a litigation support group.

Q:  When you refer to litigation, you're talking about the litigation that brings us here today?

A:  Correct.

Q:  So it is your testimony that AMA ceased as an operating business as of December 2009?

MR. KAZAN: Objection to form.

A:  It depends on what your definition of operating is, but other than supporting litigation efforts and dealing with lawyers, yes.

Q:  Did [AMA] have any clients?

A:  No.

Q:  No clients after December 2009?

A:  They had outstanding billings that [AMA] was collecting, but no clients.

Q:  What were the outstanding billing that [AMA] was collecting after December 2009?

A:  There were various consulting arrangements that they had entered into that were still being paid out.

Q:  With what entities and individuals?

A:  It was with Wilcom, I believe.

(Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 53:20-55:11).

91.    Holmes further testified that "AMA is not operating after 2009." (Lesser Decl.

Ex. Y, Holmes Dep. Tr., July 31, 2015 at 196:4-5).

92.    After taking Diane Holmes and Ms. Cassadonte off AMA's payroll in December,

2009, Holmes placed them on the payroll of the new company he formed in the beginning of

2010 called Churchill Investments, LLC ("Churchill"), which he formed to "operate the family

21

business and take care of family members." (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 180:16-184:8); (Lesser Decl. Ex. II, Churchill NY Dept. of State Entity Information).

93.    Holmes gave sworn testimony at the May 8, 2014 Hearing in the AMA bankruptcy proceeding as follows:

> THE TRUSTEE: Since 2009, has there been any transfers of any of the business assets to anybody?
> THE WITNESS: We entered into, in the beginning of 2010, a lease and purchase arrangement with Churchill Investments, which is a family office corporation and LLC that I formed, and we leased equipment for two years and then purchased it under the agreement for $6,000.
>
> THE TRUSTEE: And who works for Churchill Investments?
>
> THE WITNESS: Myself and Teresa Casadonte.
>
> THE TRUSTEE: And what's the nature of the business of Churchill Investments?
>
> THE WITNESS: It's just a family corporation that looks after the family's taxes and, you know, any investments we have.

(Lesser Decl. Ex. VV, Transcript of Holmes May 8, 2014 Sworn testimony at the 341 Hearing at 14:20-15:9).

94.    Holmes owns 95% of Churchill and operates it from his residence with the same equipment and in the same manner that he operated AMA; his son-in-law owns the other 5%. (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 180:16-25; 182:21-24).

95.    The "family businesses" that Churchill operated after December 2009 were Wilcom and CSI, Holmes solely owned companies he historically operated through AMA. (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 184:17-22) ("Q: Does Churchill operate – amongst the family businesses that Church operates, does that include Wilcom? A: Yes. Q: Does that include CSI? A: Yes.").

96.     Churchill also took over paying for AMA's office equipment.  (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 183:15-18).

97.     Although Holmes characterized AMA as "discontinuing" its business operations as of December, 2009, he otherwise testified that AMA's consulting work for Wilcom continued, including consulting on the AMA litigations with Emerson and ETP.  (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 112:7-114:17).

98.     According to Holmes, Wilcom continued to pay AMA consulting fees in connection with consulting advice performed by Holmes for Wilcom regarding the underlying AMA litigations with Emerson and ETP because Wilcom "put up their assets" for CSI's business loan and Wilcom wanted "protection of their collateral."   (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 112:7-114:17).

99.     During the period 2008 through 2011, while AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments, AMA recorded income from Wilcom and Churchill, of $2,083,850.  (Lesser Decl. Ex. JJ, Lazzara Report ¶ 12); (Lesser Decl. Ex. KK, bank records evidencing the transfers from Wilcom and Churchill to AMA); (Lesser Decl. Exs. LL, MM, NN and OO, AMA Tax Returns for 2008, 2009, 2010 and 2011 reflecting $2,083,850 in AMA income reported during that time period).

100.    During this same period 2008 through 2011, while AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments, AMA conveyed $1,847,500 in cash transfers from AMA's accounts to Holmes' accounts.  (Lesser Decl. Ex. JJ, Lazzara Report ¶ 28); (Lesser Decl. Ex. KK, bank records evidencing the transfers from AMA to Holmes).

101.    During this same period 2008 through 2011, while AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments, AMA conveyed an additional

$507,712 to Holmes in the form of payments made by AMA for Holmes' personal expenditures on his AMA corporate American Express card. (Lesser Decl. Ex. JJ, Lazzara Report ¶ 12); (Lesser Decl. Ex. PP, American Express records evidencing the payment by AMA of Holmes' personal American Express expenditures).

102.    Holmes' personal spending dominated AMA's American Express credit line with items such as food, entertainment, shopping, and gardening and landscaping expenses. (Lesser Decl. Ex. A ¶ 81).

103.    According to AMA's accounting records, Holmes' personal spending accounted for $320,920.62 out of $326,357.06 (or 98%) of AMA's American Express bills in 2008, and $186,791.17 out of $204,750.63 (or 91%) of AMA's American Express bills in 2009. (Lesser Decl. Ex. A ¶ 82).

104.    During this same period 2008 through 2011, while AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments, AMA conveyed an additional $82,801 in "salary" to Holmes.  (Lesser Decl. Ex. JJ, Lazzara Report ¶ 12).

105.    The total amount of conveyances from AMA to Holmes during the period 2008 through 2011 while AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments, is $2,438,013.  (Lesser Decl. Ex. JJ, Lazzara Report ¶ 12).

106.    Holmes authorized, and does not dispute receiving, these $2,438,013 in conveyances from AMA during the time AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments.   (Lesser Decl. Ex. A ¶¶ 93, 104, 120); (Lesser Decl. Ex. B ¶¶ 93, 104, 120); (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 112:4-15).

24

**G.**     **The Conveyances from AMA to Holmes Were Without Fair Consideration**

107.     Holmes testified that he directed the conveyances from AMA's account to himself "for interest on my debt." (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 132:2-9).

108.     Holmes' proffered expert report further concedes that AMA's payments of $507,712 to American Express during 2008 and 2009 for Holmes' personal expenses was "applied against Holmes' loans from shareholders' account, thereby reducing the amount owed to him." (Lesser Decl. Ex. QQ, Ashe Report p. 15).

109.     There are no contemporaneous loan documents or other evidence supporting the classification of the payments by AMA to Holmes, or American Express on behalf of Holmes, as repayment on an antecedent debt. (Lesser Decl. Ex. JJ, Lazzara Report ¶ 14).

110.     Kirschenbaum, Holmes' and his solely owned businesses' accountant, testified at deposition that he has never requested, nor seen, any loan documents from Holmes. (Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 38:25-39:16).

111.     Holmes testified that "as far as I remember, there was a loan agreement," but "nobody's got a copy of it." (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 202:11-203:9).

112.     Holmes could not remember when any loan document was executed. (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 203:8-9).

113.     Holmes otherwise testified that he instructed Cassadonte to convey to his personal account all funds received by AMA in excess of AMA's monthly expenses, and make those conveyances to Holmes in $10,000 increments. *See* (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 89:3-7) ("[M]y instructions to Teresa was when you have enough money to make

whatever your monthly expenses are, if you have excess, then pay that in a round number, do it in $10,000 increments to my loan for interest.").

114.    In March 2009, about a year into the underlying litigations with Emerson and ETP, Holmes had a document prepared dated March 25, 2009 entitled "Demand Promissory Note," whereby AMA agreed to pay Holmes $15 million with twelve (12%) interest.  (Lesser Decl. Ex. SS, Demand Promissory Note).

115.    The March 25, 2009 "Demand Promissory Note" does not reference any prior loan agreement entered into between Holmes and AMA.  (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 214:5-14).

116.    The "Demand Promissory Note" is dated one year after AMA became a defendant in the litigation that resulted in the unpaid Judgments.  (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 54:3-7, 72:20-23, 196:4-5).

117.    To the extent that the conveyances from AMA to Holmes, and to American Express for Holmes personal expenses, were recorded or considered as "interest" payments to Holmes (which they were not), they lacked fair consideration as a matter of law because they were conveyances to a corporate insider on alleged antecedent loans. (Lesser Decl. Ex. A ¶ 111); (Lesser Decl. Ex. JJ, Lazzara Report ¶ 46); *see, e.g., Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 249 (2d Cir. 1987) ("[R]epayment [of loan] constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor.").

118.    Holmes suggested that in consideration for these conveyances, he made "more loans back to AMA" which he claimed amounted to "over $2 million." (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 132:10-21, 134:14-18).

119.   Holmes testified as follows:

Q:   So you believe that you, from 2006 to February of 2014, that you funded
     from your personal funds, approximately $2 million to AMA?

A:   Yes, it was over $2 million.

Q:   Over $ 2 million, for what, operational expenses of AMA?

A:   For most of the legal expense.

(Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 134:14-21).

120.   AMA's only "operating expenses" were salaries for Holmes, his girlfriend Diane

Holmes, and his assistant Teresa Cassadonte.  (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31,

2015 at 135:5-136:7).

121.   According to Holmes, "AMA was not an operating company that required

capitalization" and "only required working capital to cover its payroll." (Lesser Decl. Ex. QQ,

Ashe Report, p. 14).

122.   With respect to any alleged "loans" Holmes made to cover the legal and

arbitration fees and expenses incurred by AMA in connection with the underlying litigations,

those obligations were CSI's obligations pursuant to the November 15, 2006 AMA/CSI

Assignment and Assumption Agreement Holmes prepared and executed as purported

consideration for his unilateral conveyance of AMA's ownership of CSI following its $6 million

purchase to himself for $50,000. *See supra,* ¶¶ 41-77 (discussion of Assignment & Assumption

Agreement, etc.).

123.   Holmes executed on behalf of himself and CSI, a Subordination Agreement with

CSI's Senior Lender, acknowledging that this $2 million in alleged "additional loans" were made

to CSI, and not AMA.  (Lesser Decl. Ex. GGG, Second Amended Credit Agreement and

attached Subordination Agreement and exhibits).

**H.      Holmes Deliberately Omitted Material Information to His Attorney-In-Fact
         In Connection with the IRS Audit of AMA, Which Was Never Corrected**

124.      It is undisputed that pursuant to the AMA/CSI Assignment and Assumption

Agreement and Reimbursement Agreement, CSI is obligated to fund all of AMA's legal fees

incurred in connection with the litigations that resulted in the unpaid Judgments.

125.      Notwithstanding that the AMA/CSI Assignment and Assumption Agreement and

Reimbursement Agreement obligated CSI to fund AMA's legal expenses, Kirschenbaum

testified that CSI treated such payments as a loan to Wilcom on its tax returns.  (Lesser Decl. Ex.

RR, Kirschenbaum Dep. Tr., April 26, 2017 at 147:21-148:8).

126.      Kirschenbaum testified:

Q:      And how did CSI treat the payments it made to the legal fee vendors on its
        tax returns?

A:      Probably as a loan.

Q:      A loan from who?

A:      A loan from CSI to Wilcom.

Q:      Why a loan from CSI to Wilcom?

A:      Because they thought it was a Wilcom expense.

Q:      CSI thought it was a Wilcom expense?

A:      Yes.  That's why Wilcom claimed it on their tax returns.

(Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 147:21-148:8).

127.      Kirschenbaum testified that when he was preparing the 2010 Wilcom tax return

he noted an "exorbitant amount of legal fees," and was informed that those fees were in

connection with AMA's litigation that led to the unpaid Judgments, and recommended that

AMA's 2010 tax return amended to treat the legal fees as a "distribution to Holmes."  *See*

(Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 85:22-86:9) ("When I did finish the Wilcom tax return and it was filed, I asked John Helenek, because there was an exorbitant amount of legal fees, and he explained to me it was for AMA, and I said who is the defendant, Wilcom or AMA, and he explained it was AMA, and I said the deduction won't stand up on your tax return, it has to be amended. And it was treated as a distribution. The amended return treated it as a distribution to Charles Holmes, and it was deducted on AMA's return.").

128.   The IRS audited the Amended 2010 AMA tax return that reclassified the legal fees incurred in the AMA litigations. (Lesser Decl. Ex. TT, IRS Audit Report).

129.   Holmes granted Kirschenbaum power-of-attorney to act as his and AMA's attorney-in-fact in connection with the IRS audit. (Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 139:21-140:4) ("Q: And when you received a copy of this [IRS audit letter] from the taxpayer, Mr. Holmes, what did you say to him? MR. KAZAN: Objection. A: That I needed a power of attorney to contact the IRS. Q: And he provided that to you? A: No. I prepared it and he signed it.").

130.   Kirschenbaum represented to the IRS that it was AMA's obligation to fund the legal fees in connection with the Emerson and ETP litigations, notwithstanding that those legal fees had been paid by CSI. (Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 152:10-12).

131.   The IRS accepted Kirschenbaum's representations in its audit findings and permitted AMA to reclassify the legal fees paid by CSI. *See* (Lesser, Decl. Ex. TT, IRS Audit Report at CSH-EEC001503) ("The Government accepts the records of the taxpayer as accurately reflecting the legal expenses and payments of those legal expenses.").

132.     Holmes did not advise Kirschenbaum of the existence of the November 15, 2006

Assignment and Assumption Agreement, and the AMA/CSI Reimbursement Agreement, which

clearly reflected that it was CSI's obligation to fund the AMA legal fees and expenses in

connection with AMA's conveyance of CSI to Holmes as it has consistently been doing since

that conveyance.  (Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 152:23-

155:23).

133.     Kirschenbaum testified as follows:

Q:      Have you ever seen any documents exchanged or signed between AMA
        and CSI that reflect whose responsibility it is to pay the legal fees
        associated with the Emerson litigation?

A:      No.

Q:      Did Mr. Holmes . . . ever tell you, in sum or substance, that there was an
        agreement between AMA and CSI that reflects who's responsible to pay
        the legal fees?

A:      No.

                        *        *        *

Q:      Should you have been provided, as the attorney-in-fact for AMA, the
        agreement between AMA and CSI that reflects whose responsibilities
        those legal fees were?

A:      Only if I knew it existed and if I requested it.

Q:      What about if Mr. Holmes knew it existed and knew that he was signing a
        power of attorney making you the attorney-in-fact for AMA, don't you
        think you should have been advised about that?

MR. KAZAN: Object to the form.

A:      I can't speak for Mr. Holmes.

(Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 152:23-155:23).

30

134.     It is undisputed that the IRS was not informed about, or provided copies of, the November 15, 2006 Assignment and Assumption Agreement and the AMA/CSI Reimbursement Agreement that both reflect that it is CSI's obligation to fund AMA's legal fees and expenses in connection with AMA's conveyance of CSI to Holmes.  (Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 164:14-166:8).

135.     It is undisputed that after Kirschenbaum was advised of the existence of the November 15, 2006 Assignment and Assumption Agreement and the AMA/CSI Reimbursement Agreement, he chose not to advise the IRS of their existence because, in his opinion, the IRS "wouldn't revisit it because it's a closed year."  *See* (Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 166:9-15) ("Q: It's your belief, sitting here today, that there's no obligation to supply this [Reimbursement Agreement] to the IRS now so that a proper, informed, and accurate conclusion to the audit could be revisited?  MR. KAZAN: Object to the form.  A: They wouldn't revisit it, because it's a closed year.").

**I.     Holmes Had Kirschenbaum Create Records Regarding His Undocumented Insider "Loans" In Connection with the IRS Audit of AMA's 2010 Tax Returns**

136.     As part of the IRS' audit of AMA's 2010 tax return, the IRS "wanted proof of the loans" Holmes claimed he gave AMA.  *See* (Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 33:7-11) ("Q: What was your understanding of the genesis of that audit? A: The IRS was trying to prove that Mr. Holmes had basis or not basis to claim losses for the entity over the years."); *see also* (Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 34:18-22) ("Q: And what was the substance of [the IRS audit notice], sitting here today, if you recall? A: They wanted proof of the shareholder loans and proof of the deductions for legal expenses.").

137.     Kirschenbaum testified that he has never seen any loan documentation regarding Holmes' claimed loans to AMA, and never requested them.  *See* (Lesser Decl. Ex. RR,

Kirschenbaum Dep. Tr., April 26, 2017 at 38:25-39:3) ("Q: Did you ever see any loan documentation?  A: No. . . . Q: What were the repayment terms?  A: I never saw the loan documents, so I can't remember.").

138.   Instead, Kirschenbaum testified that he assisted in preparing a document he called "Officer Loans Schedule," in connection with the IRS's audit of AMA's 2010 tax returns, which purports to record and characterize the funds Holmes allegedly invested into AMA as "shareholder loans." (Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 105:6-20); (Lesser Decl. Ex. UU, AMA Officer Loans Schedule).

139.   The so-called "Officer Loans Schedule" was first prepared in connection with the IRS's audit of AMA's 2010 tax returns while AMA was a defendant in the underlying litigations with Emerson and ETP.  (Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 105:6-20); (Lesser Decl. Ex. UU, AMA Officer Loans Schedule).

140.   The so-called "Officer Loans Schedule" was not maintained contemporaneously with the alleged interest payments to Holmes because it was first created in connection with the IRS's 2010 audit of AMA. (Lesser Decl. Ex. RR, Kirschenbaum Dep. Tr., April 26, 2017 at 105:6-20); (Lesser Decl. Ex. UU, AMA Officer Loans Schedule); (Lesser Decl. Ex. JJ, Lazzara Report ¶ 27).

141.   The so-called "Officer Loans Schedule" disregards any form of interest calculations or the accrual/collection activity of loan interest, but it includes atypical activity such as periodic loan repayments identified as coming from Holmes' personal expenses, which were funded through AMA's corporate American Express account.  (Lesser Decl. Ex. JJ, Lazzara Report ¶ 34).

142.     The only other document that was provided to the IRS to substantiate Holmes'
alleged insider "loans" to AMA was the March 25, 2009 "Demand Promissory Note."  (Lesser
Decl. Ex. SS, Demand Promissory Note); (Lesser Decl. Ex. TT, IRS Audit Report at CSH-
EEC001512).

143.     The March 25, 2009 "Demand Promissory Note" does not reference any alleged
prior loan agreement or note between Holmes and AMA.  (Lesser Decl. Ex. SS, Demand
Promissory Note); (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 214:5-14).

144.     The March 25, 2009 "Demand Promissory Note" is dated one year after AMA
became a defendant in the Emerson litigation and at a time when Holmes claimed AMA's
business operations had ceased and the company was operating solely as a "litigation support
group." (Lesser Decl. Ex. SS, Demand Promissory Note); (Lesser Decl. Ex. Y, Holmes Dep. Tr.,
July 31, 2015 at 54:3-7, 72:20-23, 196:4-5).

145.     AMA's conveyances to Holmes during the period of time it was a defendant in
the underlying litigations that resulted in the unpaid Judgments do not conform to the interest
rates set forth in the March 25, 2009 "Demand Promissory Note."  (Lesser Decl. Ex. JJ, Lazzara
Report ¶¶ 25-26).

**J.**     **Piercing the Corporate Veil**

    **(i)**     **Complete Domination of AMA by Holmes**

146.     AMA is so completely dominated and controlled by Holmes that AMA is merely
an alter ego of Holmes and has no separate existence apart from Holmes. (Lesser Decl. Ex. A ¶
50); (Lesser Decl. Ex. JJ, Lazzara Report ¶¶ 49-58).

147.     In the underlying Transition Services Litigation, Judge Platt made the
determination that: "[AMA] is 100%-owned and -controlled by one person: Charles S. Holmes.

Following the closing, Holmes also owned and controlled CSI in its entirety." (Lesser Decl. Ex. G, *Emerson v. AMA,* 08-cv-1489, 2012 U.S. Dist. LEXIS 39442, at *10).

148.    Holmes testified in his January 17, 2018 deposition: "Trust me, everybody…knew that *AMA was Charles Holmes*." (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 36:11-12)(emphasis added).

149.    Holmes testified at deposition that: "I'm a person and I control AMA and I'm a person and I control CSI because I own both of them – the stock of them, they're *my affiliate*." (Lesser Decl. Ex. CC, Holmes Dep. Tr., Oct. 7, 2009 at 23:17-20) (Lesser Decl. Ex. A ¶ 53)(emphasis added).

150.    The only other officer of AMA at any time was Dennis McCarthy, who Holmes asked to be AMA's "secretary/treasurer." (Lesser Decl. Ex. X, McCarthy Dep. Tr., Oct. 13, 2009 at 11:6-9).

151.    McCarthy has never been paid any compensation whatsoever for this title as "secretary/treasurer" of AMA. (Lesser Decl. Ex. X, McCarthy Dep. Tr., Oct. 13, 2009 at 23:22-24:3).

152.    Holmes also installed McCarthy as President of Wilcom and President of CSI. *See* (Lesser Decl. Ex. X, McCarthy Dep. Tr., Oct. 13, 2009 at 12:8-12)("Q: How was it that you attained that title or position?  A: Charlie Holmes bought Wilcom, Inc. and then asked me to be the president of Wilcom."); *see also id*. at 10:7-15 ("Q: Do you hold any other titles or positions, other than president of Wilcom? . . . A: I'm the president of CSI Technologies."); *see also id.* at 13:8-6 ("Q: How was it that you became president of CSI at the acquisition?  A: Charlie Holmes asked me to be.").

153.    McCarthy testified in the underlying litigation as follows:

34

A:     What is the business of Asset Management Associates of New York that you're a secretary and treasurer of?

A:     It's – that's a good question.  Asset Management Associates of New York I like to think as a generic corporation of Charles Holmes that he uses for his business interests.

*     *     *

Q:     What do you mean by generic corporation [of Charles Holmes]?

A:     I mean, it's Asset Management Associates of New York.  I see it – as a title.  It's an entity that Charlie has for his own – for his own purposes, along with a number of other business interests that he might – that he might have that's why I see it as a generic.  That's just my – my feeling.

(Lesser Decl. Ex. X, McCarthy Dep. Tr., Oct. 13, 2009 at 14:4-7, 18:5-15); (Lesser Decl. Ex. A ¶ 56); (Lesser Decl. Ex. JJ, Lazzara Report ¶ 55).

154.    When asked about AMA's acquisition of CSI, McCarthy testified that: "If you tell me it was AMA, Asset Management Associates worked out the acquisition and then it turned into CSI, but as far as I'm concerned, Charlie Holmes bought it."  (Lesser Decl. Ex. X, McCarthy Dep. Tr., Oct. 13, 2009 at 26:13-17).

155.    Following AMA's acquisition of CSI, Holmes appointed McCarthy as AMA's designated representative under the TSA.  (Lesser Decl. Ex. EEE, Transition Services Agreement § 9); (Lesser Decl. Ex. CC, Holmes Dep. Tr., Oct. 7, 2009 at 31:25-32:14, 37:12-25).

156.    With respect to his role as AMA's designated representative under the TSA, McCarthy testified as follows:

Q:     I take it as the AMA representative designated in the Transition Services Agreement, if there was an amendment, you'd be aware of it?

MR. MASELLA:  Objection.  You may answer.

A:     I – I appreciate that you keep saying AMA, AMA, AMA, but, you know, I never thought of myself as an AMA representative involved in this transaction.  I saw – I saw myself as, if anything, president of Wilcom,

35

> Inc. that worked for Charlie Holmes, that we were getting another
> business in a telecommunications area and would have – that would be
> helpful to each other, so I never saw myself as a representative of AMA.

(Lesser Decl. Ex. X, McCarthy Dep. Tr., Oct. 13, 2009 at 62:13-63:6).

157.   AMA's principal place of business until 2011 was Holmes' residence, 117 Whites

Lane, Southampton, New York, until it was sold in 2011.  (Lesser Ex. WW, AMA Complaint,

08-cv-2506 ECF Dkt. No. 1 ¶ 1).

158.   It was reported in 2011 that Holmes sold his residence 117 Whites Lane,

Southampton, New York, known as the "Ballyshear Estate," to Michael Bloomberg.  (Lesser

Decl. Ex. XX, News Articles).

159.   Since Holmes sold the Ballyshear Estate, AMA's principal place of business of

business has been listed as Holmes' new residence at 26 Redcoats Lane, Sag Harbor, New York

11963.  (Lesser Decl. Ex. A ¶ 9); (Lesser Decl. Ex. B ¶ 9); (Lesser Decl. Ex. C, AMA Entity

Information from the New York Dep't of State).

160.   Since the commencements of the litigations that resulted in the unpaid Judgments,

AMA has been kept in a perpetual state of undercapitalization recording income only from other

entities that are also solely owned and controlled by Holmes, which were then funneled to

Holmes' personal accounts.  (Lesser Decl. Ex. A ¶ 57).

161.   According to Holmes, the conveyances to him labeled as "interest" payments was

part of Holmes' "Tax minimization strategy."  (Lesser Decl. Ex. QQ, Ashe Report p. 4).

162.   As a result of recording Holmes alleged investment of approximately $15,000,000

as a purported loan to AMA, a tax minimization structure was created whereby AMA's revenue

from Holmes' alleged consulting for his other solely owned entities was then recast as "interest"

payments, as opposed to taxable earnings, which would be the case if the alleged invested monies had been recorded as equity. (Lesser Decl. Ex. JJ, Lazzara Report ¶¶ 25-26).

163.    Because the funds conveyed to Holmes were largely generated by AMA's consulting services billed to Wilcom, the absence of the re-characterization form "consulting" to "interest" revenue would have resulted in the disbursements being recorded and taxed as consulting income. (Lesser Decl. Ex. JJ, Lazzara Report ¶ 40).

164.    The characterization of AMA's conveyances to Holmes also served to benefit Holmes personally in his tax minimization strategy and at the expense of AMA's only non-insider creditor, Emerson. (Lesser Decl. Ex. JJ, Lazzara Report ¶ 37).

165.    After Holmes had AMA voluntarily relinquish its ownership of CSI, the cash Holmes directed AMA to transfer to his personal accounts and to pay American Express for his personal expenditures, were the only assets sufficient to pay AMA's obligations to Emerson and ETP. (Lesser Decl. Ex. A ¶ 132).

166.    Since the commencements of the litigations that resulted in the unpaid Judgments, AMA has been kept in a perpetual state of undercapitalization, solely recording income from other entities that are also solely owned and controlled by Holmes, which were then funneled to Holmes' personal accounts. (Lesser Decl. Ex. JJ, Lazzara Report ¶ 52).

167.    AMA's balance sheets report negative equity following the commencement of the underlying litigation in 2008, due to the conveyances made by AMA to Holmes of all the cash available in the AMA accounts received from income and receipts from its operations. (Lesser Decl. Ex. JJ, Lazzara Report ¶ 52).

### (ii)   Holmes' Use of AMA to Commit a Wrong Against Emerson

168.   Holmes directed that AMA voluntarily relinquish its ownership of all the shares of common stock of CSI that AMA purchased from ETP for $6 million, and executed a document dated November 15, 2006 as "sole director" of AMA to document the relinquishment. (Lesser Decl. Ex. AA ¶ 1); (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 147:16-25)("Q: By this consent, you are returning to CSI all of the shares of common stock owned by AMA, correct?  A: Yes.").

169.   Upon AMA's voluntary relinquishment of its ownership of CSI that AMA had purchased for $6 million, Holmes then sold to himself full ownership of CSI for $50,000. (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 150:9-151:9); (Lesser Decl. Ex. BB, Holmes Nov. 15, 2016 letter).

170.   Holmes first produced the documents reflecting AMA's November 15, 2006 conveyance of its ownership of CSI to himself for $50,000 in connection with his document production in this judgment enforcement proceeding.  (Lesser Decl. Ex. FFF, April 4, 2017 letter that documents responsive to Plaintiff's Second and Third Requests for Production of Documents will be sent overnight); (Lesser Decl. Ex. BB, Holmes Nov. 15, 2016 letter at CSH-EEC001526).

171.   The only Assignment and Assumption Agreement ever produced to Emerson before April 4, 2017 was an Assignment and Assumption Agreement, dated November 8, 2006, signed by Holmes on behalf of AMA and CSI which only assigned AMA's rights (but not liabilities or obligations) under certain delineated executory contracts of CSI in connection with the acquisition.  (Lesser Decl. ¶ 29); (Lesser Decl. Ex. HHH, 08-cv-1489 ECF Dkt. 44-4).

172.   During the period 2008 through 2011, while AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments, AMA recorded income from

Wilcom and Churchill, of $2,083,850.  (Lesser Decl. Ex. JJ, Lazzara Report ¶ 12); (Lesser Decl. Ex. KK, bank records evidencing the transfers from Wilcom and Churchill to AMA); (Lesser Decl. Exs. LL, MM, NN and OO, AMA Tax Returns for 2008, 2009, 2010 and 2011 reflecting $2,083,850 in AMA income reported during that time period).

173.    During this same period 2008 through 2011, while AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments, AMA conveyed $1,847,500 in cash transfers from AMA's operating account to Holmes' bank account.  (Lesser Decl. Ex. JJ, Lazzara Report ¶ 28); (Lesser Decl. Ex. KK, bank records evidencing the transfers from AMA to Holmes).

174.    During this same period 2008 through 2011, while AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments, AMA conveyed an additional $507,712 to Holmes in the form of payments made by AMA for Holmes personal expenditures made on his AMA corporate American Express card.  (Lesser Decl. Ex. JJ, Lazzara Report ¶ 12); (Lesser Decl. Ex. PP, American Express records evidencing the payment by AMA of Holmes' personal American Express expenditures).

175.    During this same period 2008 through 2011, while AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments, AMA conveyed an additional $82,801 in "salary" to Holmes.  (Lesser Decl. Ex. JJ, Lazzara Report ¶ 12).

176.    The total amount of conveyances from AMA to Holmes during the period 2008 through 2011, while AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments, is $2,438,013.  (Lesser Decl. Ex. JJ, Lazzara Report ¶ 12).

177.    Holmes authorized, and does not dispute receiving, these $2,438,013 in conveyances from AMA during the time AMA was a defendant in the underlying litigations that

39

resulted in the unpaid Judgments.   (Lesser Decl. Ex. A ¶¶ 93, 104, 120); (Lesser Decl. Ex. B ¶¶ 93, 104, 120); (Lesser Decl. Ex. Y, Holmes Dep. Tr., July 31, 2015 at 112:4-15).

178.   AMA also conveyed an additional $200,000 to Holmes in 2007 before it was sued by Emerson in April, 2008, but while AMA was admittedly on notice that litigation was certain to occur. (Lesser Decl. Ex. JJ, Lazzara Report, pg. 8, fn. 3).

179.   Since the commencements of the litigations that resulted in the unpaid Judgments, AMA has been kept in a perpetual state of undercapitalization recording income only from other entities that are also solely owned and controlled by Holmes, which were then funneled to Holmes' personal accounts.  (Lesser Decl. Ex. JJ, Lazzara Report ¶¶ 42-44); (Lesser Decl. Exs. LL, MM, NN, OO, AMA Tax Returns reflecting undercapitalization).

180.   The only consideration given for AMA's conveyance of its ownership of CSI to Holmes was $50,000 and execution of the AMA/CSI Assignment and Assumption Agreement, whereby AMA "assigned all of its rights, interests and obligations under the ETP acquisition agreement to CSI."  (Lesser Decl. Ex. AA, Written Consent of Sole Director of AMA ¶ 2); (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 148:23-149:11).

181.   Holmes testified that "CSI, by taking assignment of all [AMA's] rights and liabilities under the [AMA/ETP] acquisition agreement, would have to pay everything[,] [w]hatever liabilities there were."  (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 156:13-23).

182.   Holmes directed that CSI fund AMA's legal fees and expenses in the litigations that resulted in the unpaid Judgments in accordance with the AMA/CSI Assignment Agreement during the numerous years of AMA's motions, appeals and multiple proceedings.  (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 228:13-229:14).

183.    As the sole owner and controller of AMA and CSI, and consistent with the AMA/CSI Assignment and Assumption Agreement, Holmes could have directed CSI to fund the Judgments as AMA unilaterally assigned its financial obligations to Emerson and ETP to CSI in consideration for its relinquishment of its ownership in CSI.  (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 171:14-173:4).

184.    Holmes made the deliberate decision not to enforce CSI's obligations to AMA to fund AMA's liabilities to Emerson on the unpaid Judgments.  (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 210:22-211:8).

185.    Instead, Holmes decided that "AMA had no future," filed a bankruptcy liquidation proceeding for AMA which was dismissed *for cause*, and established a new entity, Churchill, to operate his solely owned businesses, Wilcom and CSI, which had been operated through AMA.  (*Supra*, ¶¶ 41-77).

186.    Holmes also made representations and warranties on behalf of AMA in the Acquisition Agreement between AMA and ETP promising in § 4.5, entitled "Funds," that: "Buyer has, and at all times will have, sufficient funds on hand or available pursuant to unconditional commitments to pay the Purchase Price *and any adjustments thereof*."  (Lesser Decl. Ex. DD, Acquisition Agreement § 4.5)(emphasis added).

187.    In breach of that contractual commitment, representation and warranty, Holmes systematically stripped AMA of its assets (i.e., its ownership of CSI) and all cash during the litigations that resulted in the unpaid Final Judgments, and refused to fund AMA's purchase price adjustment obligations as determined by the Arbitrator and reduced to final Judgment. (Lesser Decl. Ex. K, Holmes Dep. Tr., Jan. 17, 2018 at 210:22-211:8).

**(iii)    Emerson's Motion to Strike Holmes Unclean Hands and Estoppel Defenses**

188.    Notwithstanding Holmes' admissions concerning the insider conveyances he made to himself during the course of the underlying litigations which rendered AMA judgment proof, his Answer asserts several affirmative defenses, including two conclusory equitable defenses labeled as "unclean hands" and "estoppel." (Lesser Decl. Ex. B, Holmes Answer).

189.    On November 11, 2017, Plaintiff moved to strike the "unclean hands" and "estoppel" defenses to its alter-ego claim. (Lesser Decl. Ex. YY, Memorandum of Law in Support of Motion to Strike).

**Unclean Hands Defense**

190.    Holmes putative unclean hands defense is limited to his pleasing of the words "unclean hands" in its Answer.  (Lesser Decl. Ex. B, Answer).

191.    There is nothing pleaded or stated by Holmes other than the words "unclean hands." (Lesser Decl. Ex. ZZ, Motion to Strike Reply p. 6).

192.    Emerson's Interrogatories sought the basis for Holmes' conclusory "unclean hands" defense, but his Interrogatory Responses failed to provide any response, let alone a sufficiently stated and sworn Interrogatory response.  (Lesser Decl. Ex. BBB, Interrog. Resp. No. 18).

193.    Holmes has acknowledged that his Interrogatory responses fail to describe in any manner his "unclean hands" defense, and called the omission an "obvious typo" and the response "was simply cut off."  (Lesser Decl. Ex. ZZ, Motion to Strike Reply); (Lesser Decl. Ex. AAA, Motion to Strike Opposition p. 8).

194.    Significantly, Holmes was advised of this omission in Emerson's June 15, 2017 pre-motion letter, which was filed nearly seven (7) months before Holmes' January 11, 2018 opposition to this Motion was served.  (Lesser Decl. Ex. CCC, ECF Dkt. No. 22).

195.    Holmes admittedly made no effort whatsoever after June 15, 2017 to correct this alleged "obvious typo" and either provide a legitimate basis for his "unclean hands" defense or drop it.  (Lesser Decl. Ex. AAA, Motion to Strike Opposition p. 8).

196.    Holmes has not legitimately alleged that Emerson has engaged in any form of "truly unconscionable and brazen behavior," required for legitimately pleading an "unclean hands" defense. (Lesser Decl. Ex. AAA, Motion to Strike Opposition); (Lesser Decl., Ex. ZZ, Motion to Strike Reply p. 6).

**Estoppel Defense**

197.    Holmes' putative "estoppel" defense is based solely on the inclusion of the word "estoppel" in his Answer. (Lesser Decl. Ex. B, Holmes Answer p. 19); (Lesser Decl. Ex. ZZ, Motion to Strike Reply p. 4).

198.     Holmes has argued that his "estoppel" defense is that "Plaintiff received precisely what it bargained for, and it did not bargain for or contemplate the individual liability of Mr. Holmes which it now seeks to enforce," relying on the decision in *Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d Cir. 1979) (Lesser Decl. Ex. AAA, Motion to Strike Opposition at pg. 2, 14).

Dated: New York, New York
September 14, 2018

SIMON•LESSER PC

By: _____
    Leonard F. Lesser, Esq.
355 Lexington Avenue
New York, New York 10017
T: 212.599.5455
*Attorneys for Plaintiff Emerson Electric Co.*