UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EMERSON ELECTRIC CO.,

                   Plaintiff,

    -against-

CHARLES S. HOLMES and ASSET MANAGEMENT
ASSOCIATES OF NEW YORK, INC.,

                   Defendants.

2:16-cv-01390-PKC-SIL

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

SIMON▪LESSER PC
355 Lexington Avenue, 10th Floor
New York, New York 10017
212.599.5455
*Attorneys for Plaintiff Emerson Electric Co.*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ii

INTRODUCTION ......................................................................................................... 1

SUMMARY OF UNDISPUTED FACTS ....................................................................... 3

A.    <u>Holmes, AMA and the Underlying Transactions and Litigations</u> ..................................... 3

B.    <u>During the Underlying Litigations, AMA Conveyed All of Its Income to Holmes</u> ........... 7

C.    <u>The Conveyances from AMA to Holmes Were Without Fair Consideration</u> ................... 9

ARGUMENT ............................................................................................................... 11

I.    <u>Emerson Is Entitled to a Default Judgment Against AMA</u> ............................................. 11

II.    <u>Emerson Is Entitled to Summary Judgment Against Holmes</u> ......................................... 11

A.    AMA's Conveyances to Holmes Are Fraudulent Under DCL § 273-a ...................... 12

B.    AMA's Conveyance of CSI to Holmes Is Fraudulent Under DCL §§ 273 and 274 .. 15

C.    AMA's Conveyances Were Fraudulent Under § 276 ................................................ 16

D.    Piercing AMA's Corporate Veil ............................................................................... 18

CONCLUSION ............................................................................................................ 26

## TABLE OF AUTHORITIES

**Cases**

*Americore Drilling & Cutting, Inc. v. EMB Contr. Corp.*,
 55 Misc. 3d 1207(A), 55 N.Y.S.3d 691, 2017 N.Y. Misc. LEXIS 1180 (N.Y. Sup. Apr. 3,
 2017) .................................................................................................................18, 19, 21, 22

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986).........................................................................................................12

*Asset Mgmt. Assocs. v. Emerson Elec. Co.*,
 08-cv-2506, 2011 U.S. Dist. LEXIS 9434 (E.D.N.Y. Jan. 25, 2011)..................................2

*Atlanta Shipping Corp. v. Chemical Bank*,
 818 F.2d 240, 249 (2d Cir. 1987) ..............................................................................10, 14

*Avelar v. Ed Quiros, Inc.*,
 13-cv-7017, 2015 U.S. Dist. LEXIS 33745 (E.D.N.Y. Feb. 26, 2015) ............................11

*Avelar v. Ed Quiros, Inc.*,
 13-cv-7017, 2015 U.S. Dist. LEXIS 33665 (E.D.N.Y. Mar. 18, 2015) ...........................11

*Baby Phat Holding, LLC v. Kellwood Co.*,
 123 A.D.3d 405, 997 N.Y.S.2d 67 (1st Dep't 2014) ........................................................22

*Bank of Communs. v. Ocean Dev. America, Inc.*,
 904 F. Supp. 2d 356 (S.D.N.Y. 2012) .......................................................................14, 15

*Bd. Mgrs. Of 369 Harman St. Condo. v. 369 Harman LLC*,
 Index No. 450346/2018, 2018 N.Y. Misc. LEXIS 3574 (N.Y. Sup. Aug. 20, 2018)........15

*Bogosian v. All American Concessions*,
 06-cv-01633, 2011 U.S. Dist. LEXIS 109082 (E.D.N.Y. Sept. 26, 2011) .......................18

*Broadridge Secs. Processing Sols., LLC v. Khashoggi*,
 507 F. App'x 57 (2d Cir. 2013)........................................................................................19

*Brown v. Marriot Int'l Inc.*,
 14-cv-5960, 2017 U.S. Dist. LEXIS 166442 (E.D.N.Y. Oct. 6, 2017) ............................25

*Brunswick Corp. v. Waxman*,
 599 F.2d 34 (2d Cir. 1979) ..............................................................................................25

*Cablevision Sys. New York City Corp. v. Lokshin*,
 980 F. Supp. 107 (E.D.N.Y. 1997) ..................................................................................11

*Caldwell v. Pesce*,
　　83 F. Supp. 3d 472 (E.D.N.Y. 2015) ...............................................................19

*Clomon v. Jackson*,
　　988 F.2d 1314 (2d Cir. 1993) .........................................................................16

*Dafeng Hengwei Textile Co. v. Aceco Indus.*,
　　13-cv-5829, 2017 U.S. Dist. LEXIS 49041 (E.D.N.Y. Mar. 30, 2017) .......................2, 22

*Emerson Elec. Co. v. Asset Mgmt. Assocs. of N.Y.*,
　　08-cv-1489, 2012 U.S. Dist. LEXIS 39442 (E.D.N.Y. Mar. 20, 2012) .......................3, 19

*Emerson Elec. Co. v. Asset Mgmt. Assocs. of N.Y.*,
　　08-cv-1489, 2015 U.S. Dist. LEXIS 98401 (E.D.N.Y. July 28, 2015) ..........................1, 7

*Fannie Mae v. Olympia Mortg.*,
　　724 F. Supp. 2d 308 (E.D.N.Y. 2010) ..............................................................22

*Fannie Mae v. Olympia Mortg. Corp.*,
　　792 F. Supp. 2d 645 (E.D.N.Y. 2011) ..............................................................17

*First Keystone Consultants, Inc. v. Schlesinger Elec. Contrs.*,
　　871 F. Supp. 2d 103 (E.D.N.Y. 2012) ..........................................................14, 22

*Fruitco S.A. de C. V. v. Bankers Trust Co.*,
　　833 F. Supp. 288 (S.D.N.Y. 1993) ..................................................................11

*Glenmore Distilleries Co. v. Seideman*,
　　267 F. Supp. 915 (E.D.N.Y. 1967) ..................................................................14

*Godwin Realty Assoc. v. CATV Enters.*,
　　275 A.D.2d 269, 712 N.Y.S.2d 39 (1st Dep't 2000) ...............................................24

*Grabois v. Jones*,
　　89 F.3d 97 (2d Cir. 1996) ............................................................................12

*Grammas v. Lockwood Assoc.*,
　　95 A.D.3d 1073, 944 N.Y.S.2d 623 (2d Dep't 2012) ..............................................22

*Hyland Meat Co. v. Tsagarakis*,
　　202 A.D.2d 552, 609 N.Y.S.2d 625 (2d Dep't 1994) .............................................22

*Interpool Ltd. v. Patterson*,
　　890 F. Supp. 259 (S.D.N.Y. 1995) ..................................................................14

*Khurana v. JMP USA, Inc.*,
> 14-cv-4448, 2017 U.S. Dist. LEXIS 52063 (E.D.N.Y. Apr. 5, 2017)...........................3, 11

*Lyman Commerce Solutions, Inc. v. Lung*,
> 12-cv-4398, 2015 U.S. Dist. LEXIS 51447 (S.D.N.Y. Apr. 20, 2015) ......................12, 13

*Marketplace LaGuardia Ltd. P'ship v. Harkey Enters., Inc.*,
> 07-cv-1003, 2008 U.S. Dist. LEXIS 25479 (E.D.N.Y. Mar. 31, 2008) ...........................21

*Matter of Mogil v. Bldg. Essentials, Inc.*,
> 129 A.D.3d 1378, 12 N.Y.S.3d 346 (3d Dep't 2015)......................................................17

*Matthews v. Schusheim*,
> 36 Misc. 2d 918, 235 N.Y.S.2d 973 (N.Y. Sup. 1962)....................................................17

*Matthews v. Schusheim*,
> 8 A.D.2d 719, 236 N.Y.S.2d 407 (2d Dep't 1962)..........................................................17

*Matthews v. Schusheim*,
> 13 N.Y.2d 756 (1963)....................................................................................................17

*Pae v. Chul Yoon*,
> 41 A.D.3d 681, 838 N.Y.S.2d 172 (2d Dep't 2007).........................................................22

*Pashaian v. Eccelston Props.*,
> 88 F.3d 77 (2d Cir. 1996) ...............................................................................................14

*Pedinol Pharmacal, Inc. v. Rising Pharms., Inc.*,
> 570 F. Supp. 2d 498 (E.D.N.Y. 2008) ............................................................................25

*Priestley v. Panmedix Inc.*,
> 18 F. Supp. 3d 486 (S.D.N.Y. 2014) ........................................................................12, 13

*Regent Ins. Co. v. Storm King Contracting, Inc.*,
> 06-cv-2879, 2008 U.S. Dist. LEXIS 16513 (S.D.N.Y. Feb. 27, 2008) ............................16

*Rotella v. Derner*,
> 283 A.D.2d 1026, 723 N.Y.S.2d 801 (2001).................................................................22

*Shelly v. Doe*,
> 249 A.D.2d 756, 671 N.Y.S.2d 803 (3d Dep't 1998).......................................................17

*Silver v. City Univ. of New York*,
> 947 F.2d 1021 (2d Cir. 1991) .........................................................................................12

*Thrift Drug, Inc. v. Universal Precription Adm'rs*,
    131 F.3d 95 (2d Cir. 1997) ........................................................................18

*TNS Holdings, Inc. v. MKI Sec. Corp.*,
    92 N.Y.2d 335, 680 N.Y.S.2d 891 (1998) .......................................................21

*United States v. McCombs*,
    30 F.3d 310 (2d Cir. 1994) .......................................................................14

*Williams v. Lovell Safety Mgt. Co., LLC*,
    71 A.D.3d 671, 896 N.Y.S.2d 150 (2d Dep't 2010).............................................18

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*,
    933 F.2d 131 (2d Cir. 1991) ..................................................................18, 19

## Statutes

CPLR § 5225(b)..........................................................................................2

DCL § 272 ...........................................................................................13, 14

DCL § 273 ...........................................................................................15, 16

DCL § 273-a ..........................................................................................12, 13

DCL § 274 ...........................................................................................15, 16

DCL § 276 ...........................................................................................16, 17

Fed. R. Civ. P. 55........................................................................................11

Fed. R. Civ. P. 56........................................................................................12

Fed. R. Civ. P. 69.........................................................................................2

Plaintiff Emerson Electric Co. ("Emerson") submits this Memorandum of Law in support of its motion for default and summary judgment against defendants Charles S. Holmes ("Holmes") and Asset Management Associates of New York, Inc. ("AMA").

**INTRODUCTION**

Emerson is the judgment-creditor of AMA in the Final Judgment entered by this court on August 13, 2015 for $1,966,246.35 ("8/13/15 Judgment") in the underlying action, *Emerson Elec. Co. v. Asset Mgmt. Assocs. of N.Y.,* 08-cv-1489 (E.D.N.Y.)(56.1(a) St. ¶ 2).[1] Emerson is also the assignee and judgment-creditor of AMA in the separate Final Judgment entered against AMA on January 9, 2014 for $1,965,081.40 ("1/9/14 Judgment") in favor of Emerson Telecommunication Products, LLC ("ETP") in the related proceeding, *Asset Mgmt. Assocs. of N.Y. v. Emerson Telecom. Prods. LLC*, 08-cv-2128 (E.D.N.Y.)(56.1(a) St. ¶ 3).

The 08-cv-1489 Final Judgment followed Judge Leonard D. Wexler's determination after bench trial on Emerson's claim for amounts owed for AMA's use of an Emerson facility in Mexico. (56.1(a) St. ¶¶ 8, 9); *see Emerson Elec. Co. v. Asset Mgmt. Assocs. of N.Y.,* 08-cv-1489, 2015 U.S. Dist. LEXIS 98401 (E.D.N.Y. July 28, 2015)(56.1(a) St. Ex. H).

The 08-cv-2128 Final Judgment followed Judge Thomas C. Platt's confirmation of the Arbitration Award awarding ETP a $1.02 million purchase price adjustment (plus interest) against AMA, and rejecting AMA's claims against ETP in their post-closing arbitration concerning the AMA/ETP November 8, 2006 Acquisition Agreement covering AMA's $6 million purchase of businesses it renamed CSI Technologies, Inc. ("CSI"). (56.1(a) St. ¶¶ 34-

---

[1] References designated "56.1(a) St." are to the numbered paragraphs in Emerson's Local Civil Rule 56.1(a) Statement and the exhibits attached thereto.

1

36); *see also Asset Mgmt. Assocs. v. Emerson Elec. Co.*, 08-cv-02506, 2011 U.S. Dist. LEXIS 9434 (E.D.N.Y. Jan. 25, 2011)(56.1(a) St. Ex. I).

In this supplemental proceeding, Emerson seeks judgment enforcement relief under Rule Fed. R. Civ. P. 69 and CPLR § 5225(b) to avoid conveyances made from AMA to its sole owner and insider, Holmes, and to pierce the corporate veil of AMA and obtain judgment against Holmes for the unpaid Judgments. The fraudulent conveyance claims concern millions of dollars in transfers to Holmes from AMA during the years of the underlying litigations that resulted in the unpaid Judgments. Holmes also directed AMA convey to him its ownership of CSI after AMA's $6 million purchase. The sole consideration for this insider transaction was his execution of an Assignment and Assumption Agreement promising to have CSI fund AMA's liabilities and obligations in connection with the underlying transactions with Emerson and ETP. Following entry of the Final Judgments, Holmes, as sole owner and controller of AMA and CSI, deliberately refused to enforce the Assignment and Assumption Agreement, thereby eviscerating the sole consideration for AMA's post-acquisition conveyance to him of CSI's stock, and rendering it a fraudulent conveyance.

Emerson's veil-piercing claim is based on Holmes' previously determined complete dominion and control over AMA, and his use of that dominion and control to breach its contractual obligations and corresponding duties of good faith to fund the Judgments and to otherwise divert all of AMA's assets and cash to himself rendering AMA judgment-proof. *See, e.g., Dafeng Hengwei Textile Co. v. Aceco Indus.*, 13-cv-5829, 2017 U.S. Dist. LEXIS 49041 *24 (E.D.N.Y. Mar. 30, 2017)("Under New York law, the diversion of funds to make a corporation judgment-proof constitutes a wrong for the purposes of determining whether the corporate veil should be pierced.").

2

Significantly, AMA, which is owned and operated solely by Holmes, has defaulted in this Action and therefore, the well-pleaded allegations in the Complaint as to liability are deemed admitted as against AMA. *See, e.g., Khurana v. JMP USA, Inc.,* 14-cv-4448 (SIL), 2017 U.S. Dist. LEXIS 52063 * 6 (E.D.N.Y., Apr. 5, 2017)("Where a default occurs, the well-pleaded factual allegations set forth in a complaint concerning liability are deemed true.").

## SUMMARY OF UNDISPUTED FACTS

### A.    Holmes, AMA and the Underlying Transactions and Litigations

According to Holmes: "AMA is a New York corporation that, among other things, purchases and restructures businesses for resale to others."  (56.1(a) St. ¶ 42).  In the underlying litigation, Judge Platt made the determination that: "[AMA] is 100%-owned and -controlled by one person: Charles S. Holmes." (56.1(a) St. ¶ 41); *Emerson Elec. Co. v. Asset Mgmt. Assocs. of N.Y.,* 08-cv-1489, 2012 U.S. Dist LEXIS 39442 *10 (E.D.N.Y, Mar. 20, 2012).

AMA paid ETP $6 million for CSI, subject to post-closing adjustment under the Acquisition Agreement, ultimately determined in the Court-Confirmed Arbitration Award, and reduced to Final Judgment in the 08-cv-2128 proceeding.  (56.1(a) St. ¶ 14).  In the years following AMA's purchase, the total assets reported for CSI in its federal tax returns was more than $40 million.  (56.1(a) St. ¶ 48).

After AMA's November 7, 2006 purchase of CSI from ETP, Holmes directed that AMA convey its ownership of all the shares of common stock of CSI to CSI, and executed a document dated November 15, 2006 as "sole director" of AMA regarding this conveyance to CSI.  (56.1(a) St. ¶ 49).  Holmes then offered to purchase full ownership of CSI for $50,000, which he directed CSI to accept.  (56.1(a) St. ¶ 50).  Holmes testified:

3

Q:     Were you in your personal capacity the buyer of the businesses
       [renamed CSI] or was AMA the buyer or was some other entity?

A:     AMA contracted to buy these businesses, okay, but then AMA sold the
       business and they sold it to me, okay.

Q:     When did –

A:     They sold [the] right for me to buy the stock of CSI Technologies, all
       right, which I did.

(56.1(a) St. ¶ 51).

Significantly, Holmes did not pay AMA *any* cash or asset consideration for this

transaction. (56.1(a) St. ¶ 52). Rather, the only putative consideration given to AMA for this

conveyance was an Assignment and Assumption Agreement, dated November 15, 2006 Holmes

had prepared, whereby AMA "assigns, sells, transfers and sets over to [CSI] all of [AMA's]

rights, interests and obligations under the [AMA/ETP] Acquisition Agreement," and whereby

CSI "accepts the Assignment and assumes and agrees to observe and perform all of the duties,

obligations, terms, provisions and covenants with respect to the Contractual Liabilities."

(56.1(a) St. ¶ 53). Holmes testified that "CSI, by taking assignment of all [AMA's] rights and

liabilities under the [AMA/ETP] acquisition agreement, would have to pay everything[,]

[w]hatever liabilities there were." (56.1(a) St. ¶ 54).[2]

CSI's payment obligations to AMA under the November 15, 2006 Assignment and

Assumption Agreement included funding of all AMA's liabilities and obligations associated

with the litigations that resulted in the unpaid Judgments, including all legal and arbitration fees

and expenses. (56.1(a) St. ¶ 55). Notwithstanding Holmes' unilateral assignment to CSI of

AMA's liabilities and obligations to ETP and Emerson under the parties' respective agreements,

---

[2]     Holmes first produced the documents reflecting these November 15, 2006 post-acquisition
conveyances in this judgment enforcement proceeding in April, 2017. (56.1(a) St. ¶ 170).

those agreements mandated that no AMA assignment would relieve it of its direct financial obligations to Emerson and ETP. (56.1(a) St. ¶ 56). Indeed, Judge Platt determined:

> [AMA] may not, under section 17, assign its TSA liabilities or obligations. The TSA could not have been written any more clearly on the assignment issue. [AMA] remained liable for its TSA obligations, even if [AMA] assigned its TSA rights.

(56.1(a) St. ¶ 59).

Holmes later had AMA's attorneys prepare a Reimbursement Agreement, dated March 5, 2007 under which CSI reconfirmed its duty to "pay everything[,] [w]hatever liabilities there were," including funding AMA's legal fees and expenses "in connection with the litigation that has evolved from the Emerson Agreements and the transactions contemplated thereby," defined in the document as the "Emerson Litigation." (56.1(a) St. ¶ 60).

It is undisputed by Holmes that in accordance with the November 15, 2006 Assignment and Assumption Agreement, he directed CSI to fund all of AMA's legal and arbitration fees and expenses in connection with the litigations that resulted in the unpaid Judgments. (56.1(a) St. ¶ 63). As the sole owner and controller of AMA and CSI, and consistent with the November 15, 2006 Assignment and Assumption Agreement, Holmes also had the ability to direct CSI to fund the Judgments just as he directed CSI to fund AMA's legal fee liabilities and obligations in connection with the underlying litigation that resulted in the Judgments. (56.1(a) St. ¶ 66). Holmes, however, deliberately refused to direct CSI to the fund the Judgments because, in his view, "they weren't legitimate." (56.1(a) St. ¶ 67).

By refusing to direct CSI to fund the Judgments pursuant to AMA's rights under the November 15, 2006 Assignment and Assumption Agreement, Holmes invalidated AMA's only consideration for his insider conveyance to himself of CSI's stock, thereby rendering that insider transaction void of any consideration, let alone fair consideration. (56.1(a) St. ¶ 68).

Holmes also made representations and warranties on behalf of AMA in the Acquisition Agreement promising in § 4.5, entitled "Funds," that: "[AMA] has, and at all times will have, sufficient funds on hand or available pursuant to unconditional commitments to pay the Purchase Price *and any adjustments thereof*." (56.1(a) St. ¶ 69)(emphasis added). Holmes testified that although he ensured that AMA had sufficient funds on hand or pursuant to unconditional commitments (i.e., the AMA/CSI Assignment Agreement) to pay AMA's legal and arbitration fee obligations during the numerous years of AMA's motions, appeals and multiple proceedings, only after AMA lost on the merits did he declare that the Judgments need not be paid because he unilaterally decided at that point that "AMA had no future." He testified:

Q:   Did AMA have funds on hand, or available pursuant to unconditional commitments, to pay the purchase price and any adjustments thereof in 2006?

A:   They didn't agree in any one of those dates you said, up to the time of the arbitration ruling, to pay any money because money was owed to them.

Q:   The money was owed to whom?

A:   AMA.

Q:   According to the allegations of AMA?

A:   Yes. And they were true.

Q:   The arbitrator ultimately rejected that.

A:   The arbitrator had his own agenda.

Q:   The court confirmed with arbitration [award]?

A:   Yes.

Q;   There was no appeal of [that]?

A:   I understand.

MR. KAZAN: Is there a question? Answer the question. This isn't a debate.

Q:   Is the reason that AMA didn't pay the judgment on the arbitration award because you disagreed with what the arbitrator did?

A:   There was no future in AMA.

(56.1(a) St. ¶ 71).

6

Following entry of the 1/9/14 Judgment, Holmes filed a Petition for liquidation of AMA under Chapter 7 of Title 11 of the U.S. Code in the United States Bankruptcy Court for the District of New Jersey. (56.1(a) St. ¶ 72).  Holmes directed AMA's lawyers to file AMA's bankruptcy petition in New Jersey because that is where his secretary's personal residence is located.  (56.1(a) St. ¶ 73). Emerson was the sole non-insider creditor of AMA in the bankruptcy proceeding.  (56.1(a) St. ¶ 75).  On April 8, 2014, on Emerson's motion, the AMA bankruptcy proceeding was transferred to this District.  (56.1(a) St. ¶ 76). On October 10, 2014, on Emerson's subsequent motion, the AMA Bankruptcy petition was dismissed *for cause* pursuant to Bankruptcy Code §707(a). (56.1(a) St. ¶ 77).

After the bankruptcy stay was lifted, on July 28, 2015, Judge Wexler issued his post-trial rulings in the 08-cv-1489 action, and directed the Clerk to enter judgment against AMA in the amount of $1,442,588.20, plus interest, in addition to $391,762.47 in attorneys' fees and costs. (56.1(a) St. ¶ 78); *Emerson,* 2015 U.S. Dist. LEXIS 98401.  The Clerk entered Judgment against AMA for $1,966,246.35 on August 13, 2015.  (56.1(a) St. ¶ 78). This supplemental Judgment enforcement proceeding was filed on March 24, 2016.

**B.**   **During the Underlying Litigations, AMA Conveyed All of Its Income to Holmes**

Wilcom is another company solely owned by Holmes. (56.1(a) St. ¶ 79).  Holmes also characterized Wilcom as a "client" of AMA which, solely through him, provided "management and consulting services." (56.1(a) St. ¶ 80).  Holmes testified that through the end of 2009, AMA was providing "heavy duty consulting for [Wilcom] and spending a lot of time" doing so. (56.1(a) St. ¶ 81).  AMA issued numerous invoices to Wilcom for the management and consulting services performed by Holmes.  (56.1(a) St. ¶ 84).  Holmes directed the conveyances from Wilcom to AMA in consideration for AMA's consulting services, and was the one "that

7

came up with the numbers." (56.1(a) St. ¶ 86). Holmes, however, could not explain how the amounts of management and consulting fees charged by AMA were derived and did not prepare time sheets for his "management and consulting" work. (56.1(a) St. ¶ 87).

In December, 2009, Holmes took himself, his girlfriend Diane Holmes, and his assistant Teresa Casadonte, off AMA's payroll and placed them on the payroll of the new company he formed in 2010 called Churchill Investments, LLC ("Churchill"), which he characterized as "a family office corporation" to "operate the family business and take care of family members." (56.1(a) St. ¶¶ 89, 92). The "family businesses" that Churchill operated after December 2009 were Wilcom and CSI, companies solely owned by Holmes that were historically operated through AMA's "management and consulting services" performed by Holmes that generated substantial income for AMA. (56.1(a) St. ¶ 95).

Although Holmes characterized AMA as "discontinuing" its business operations as of December 2009, he otherwise testified that AMA's consulting work for Wilcom continued, including consulting on the AMA litigations with Emerson and ETP. (56.1(a) St. ¶¶ 97, 98). According to Holmes, Wilcom continued to pay AMA consulting fees in connection with consulting advice performed by Holmes for Wilcom regarding the AMA litigations with Emerson and ETP because Wilcom "put up their assets" for CSI's business loan and Wilcom wanted "protection of their collateral." (56.1(a) St. ¶ 98).

Between 2008 and 2011, while AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments, AMA recorded income from Wilcom of $2,083,850. (56.1(a) St. ¶ 99). During this same period 2008 through 2011, Holmes directed AMA to convey $1,847,500 of that income to him. (56.1(a) St. ¶ 100).

During this same period 2008 through 2011, AMA conveyed an additional $507,712 to Holmes in the form of payments made by AMA for his personal expenditures on his AMA corporate American Express card.  (56.1(a) St. ¶ 101).  Holmes' personal spending dominated AMA's American Express credit line with items such as food, entertainment, shopping, gardening and landscaping expenses. (56.1(a) St. ¶ 102).  During this same period 2008 through 2011, AMA conveyed an additional $82,801 in "salary" to Holmes. (56.1(a) St. ¶ 104).

The total amount of conveyances from AMA to Holmes during the period 2008 through 2011 while AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments, is $2,438,013. (56.1(a) St. ¶ 105). Holmes authorized, and does not dispute receiving, these $2,438,013 in conveyances from AMA during the time AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments.  (56.1(a) St. ¶ 106).

**C.      The Conveyances from AMA to Holmes Were Without Fair Consideration**

Holmes testified that he directed the cash conveyances of $1,847,500 from AMA's account to himself during the underlying litigations "for interest on my debt." (56.1(a) St. ¶ 107).  Holmes further concedes that AMA's payments of $507,712 to American Express during 2008 and 2009 for Holmes personal expenses was "applied against Holmes' loans from shareholders' account, thereby reducing the amount owed to him."  (56.1(a) St. ¶ 108).

There are no contemporaneous loan documents supporting the classification of the conveyances from AMA to Holmes, or American Express on behalf of Holmes, as repayment on alleged insider loans.  (56.1(a) St. ¶ 109).  Holmes testified that "as far as I remember, there was a loan agreement," but "nobody's got a copy of it." (56.1(a) St. ¶ 111).  Holmes could not even remember when this purported loan document was executed. (56.1(a) St. ¶ 112).  Holmes otherwise testified that he instructed Casadonte to convey to his personal

9

account all income received by AMA in excess of AMA's monthly expenses, and make those conveyances as "interest payments" to Holmes in $10,000 increments.  (56.1(a) St. ¶ 113).

In March 2009, a year following commencement of the underlying litigations, Holmes had a document dated March 25, 2009 prepared entitled "Demand Promissory Note," whereby AMA promised to pay Holmes $15 million with twelve (12%) interest.  (56.1(a) St. ¶ 114). This attempt to belatedly document purported insider debt is to no avail because even if Holmes could legitimately support his labeling the conveyances as "repayment" or "interest" on alleged insider loans, they lacked fair consideration as a matter of law. (56.1(a) St. ¶ 117); *see, e.g., Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 249 (2d Cir. 1987) ("[R]epayment [of loan] constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor.").

Holmes otherwise claimed that as supposed consideration for these admitted insider conveyances, he made "more loans back to AMA" which he claimed amounted to "over $2 million" for the "legal expenses" in the underlying litigation. (56.1(a) St. ¶¶ 118, 119). However, according to Holmes, he no longer considered those legal expenses as AMA's obligations, but instead CSI's obligations pursuant to the November 15, 2006 AMA/CSI Assignment and Assumption Agreement that Holmes prepared and executed as the only purported consideration for AMA's unilateral conveyance of its ownership of CSI.  (56.1(a) St. ¶ 122).  Indeed, Holmes executed on behalf of himself and CSI, a July 12, 2007 Subordination Agreement with CSI's Senior Lender, acknowledging that this $2 million in alleged "additional loans" were made to CSI, and not AMA.  (56.1(a) St. ¶ 123).

10

## ARGUMENT

### I.   Emerson Is Entitled to a Default Judgment Against AMA

Having defaulted in this supplemental proceeding, the factual allegations set forth in the

Complaint, which are supported by the undisputed record, are deemed admitted as against AMA.

*See Khurana,* 2017 U.S. Dist. LEXIS 52063 *6 ("Where a default occurs, the well-pleaded factual

allegations set forth in a complaint concerning liability are deemed."); *see also Avelar v. Ed*

*Quiros, Inc.,* 13-cv-7017, 2015 U.S. Dist. LEXIS 33745 *5 (E.D.N.Y., Feb. 26, 2015), *adopted,*

2015 U.S. Dist. LEXIS 33665 (E.D.N.Y., Mar. 18, 2015)("It is an ancient common law axiom that

a defendant who defaults thereby admits all well-pleaded factual allegations in the complaint,

except for those relating to damages."); *see also Cablevision Sys. New York City Corp. v. Lokshin*,

980 F. Supp. 107, 111 (E.D.N.Y. 1997)(holding that a default "effectively constitutes an admission

that the damages were proximately caused by the defaulting party's conduct . . .").

As demonstrated in Emerson's 56.1(a) Statement and below, the allegations set forth in the

Complaint establish Emerson's right to default Judgment against AMA pursuant to Fed.R.Civ.P.

55, including for all relief available to Emerson based on the undisputed record.  *See Khurana,*

2017 U.S. Dist. LEXIS 52063 *6 (issuing default judgment against defaulting corporate defendant

after finding that "plaintiff's allegations establish liability as a matter of law.").

### II.   Emerson Is Entitled to Summary Judgment Against Holmes

Summary judgment motions are "an integral part of the Federal Rules of Civil Procedure

and facilitate the overall purpose of the Rules as stated in Rule I, namely, to secure a just, speedy

and inexpensive determination of every action." *Fruitco S.A. de C. V. v. Bankers Trust Co.,* 833

F. Supp. 288, 296 (S.D.N.Y. 1993).  Summary judgment should be granted "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

11

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Silver v. City Univ. of N.Y.,* 947 F.2d 1021, 1022 (2d Cir. 1991).

"The moving party bears the [initial] burden of establishing the absence of any genuine issue." *Grabois v. Jones,* 89 F.3d 97, 99-100 (2d Cir. 1996). In opposition, the opponent "may not rest upon the mere allegations or denials" of its pleadings; rather, its response must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . ." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986).

## A.    AMA's Conveyances to Holmes Are Fraudulent Under DCL § 273-a

Pursuant to DCL § 273-a, AMA's conveyances to Holmes during the underlying litigations are fraudulent as a matter of law. The statute provides:

> Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

DCL § 273-a. Thus, to prevail on a claim under § 273-a, a plaintiff must establish that: "(1) [the conveyance was] made without fair consideration; (2) the [transferor] [was] a defendant in an action for money damages or a judgment in such action had been docketed against him; and (3) after final judgment for the plaintiff, the defendant fails to satisfy the judgment." *Priestley v. Panmedix Inc.,* 18 F. Supp. 3d 486, 497 (S.D.N.Y. 2014). "The defendant's intent is irrelevant [under DCL § 273-a]." *Lyman Commerce Solutions, Inc. v. Lung,* 12-cv-4398, 2015 U.S. Dist. LEXIS 51447 *18 (S.D.N.Y. Apr. 20, 2015).

The purpose of DCL § 273-a is "to provide a remedy for a creditor who has brought an action for money damages against a party who, after being named a defendant in that action, conveys assets to a third party for less than fair consideration leaving the ultimate judgment unpaid." *Id.* In evaluating a transaction under § 273-a, it must be examined in its full context; "where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications." *Priestley,* 18 F. Supp. 3d at 502.

The total amount of undisputed conveyances made from AMA to Holmes during the period 2008 through 2011 while AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments, is $2,438,013, comprised of: $1,847,500 in cash conveyances; $507,712 in payments for Holmes' personal American Express charges; and $82,801 in "salary." (56.1(a) St. ¶¶ 100-105). Holmes authorized, and does not dispute receiving, these insider conveyances from AMA during the time AMA was a defendant in the underlying litigations that resulted in the unpaid Judgments. (56.1(a) St. ¶ 106).

Holmes characterized these conveyances as "repayment" and/or "interest payments" on his alleged antecedent insider loans to AMA. (56.1(a) St. ¶ 107). There is no objective evidence supporting Holmes' characterization. Yet, even accepting Holmes' self-serving characterization, these insider conveyances lack fair consideration as a matter of law.

Under DCL § 272, "[f]air consideration is given for property, or obligation,"

a. When in exchange for such property, or obligation, as a fair equivalent therefore, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

13

DCL § 272; *see also U.S. v. McCombs*, 30 F.3d 310, 326 n.1 (2d Cir. 1994)("[F]air consideration

requires not merely that the value of the consideration be roughly equivalent to the property in

issue but also that there be good faith on the part of the parties involved in that conveyance.").

As a matter of law, however, preferential transfers to corporate insiders lack good faith and

are without fair consideration. *See Pashaian v. Eccelston Props.*, 88 F.3d 77, 86 (2d Cir.

1996)("[P]references to a debtor corporation's shareholders, officers, or directors are deemed not

to be transfers for fair consideration."). This rule of New York law unmistakably applies to

AMA's conveyances to Holmes that he labeled as insider loan repayments and interest. *See*

*Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 249 (2d Cir. 1987)("[R]epayment [of

loan] constitutes fair consideration unless the transferee is an officer, director, or major shareholder

of the transferor."); *First Keystone Consultants, Inc. v. Schlesinger Elec. Contrs.*, 871 F. Supp. 2d

103, 118 (E.D.N.Y. 2012) ("Under New York law, such conveyances from [company] to its

officers and sole shareholder, even as repayments of a pre-existing debt, are deemed to lack fair

consideration as a matter of law."). This rule of law also applies to conveyances made by AMA to

Holmes for alleged "salary." *See, e.g., Glenmore Distilleries Co. v. Seideman,* 267 F. Supp. 915,

919 (E.D.N.Y. 1967)("The court cannot find that payments of annual salaries of $25,000 to each

respondent, under the circumstances, were made with fair consideration. Rather, the court finds

that the payments under scrutiny were without fair consideration and are fraudulent. . .").

The only situation where a preferential transfer to a corporate insider is not deemed

lacking in fair consideration and does not create a presumption of bad faith occurs where "a

corporate insider purchases an asset from an insolvent company at a fair price, because . . .

creditors can be repaid from the proceeds of the transaction." *Bank of Communs. v. Ocean Dev.*

*America, Inc.,* 904 F. Supp.2d 356, 361 (S.D.N.Y. 2012); *see also Interpool Ltd. v. Patterson,*

14

890 F. Supp. 259, 266-68 (S.D.N.Y. 1995)(the "existence of a fair exchange must be determined from the perspective of creditors rather than from the vantage point of the debtor . . . in determining whether a conveyance is fraudulent, the touchstone is the unjust diminution of the estate of the debtor that otherwise would be available to the creditors.").

Holmes also testified that in consideration for these conveyances, he made "more loans back to AMA." (56.1(a) St. ¶ 118). Although Holmes testified that these "additional loans" covered AMA's "operational expenses and legal fees," he admitted that "AMA was not an operating company that required capitalization" and "only required working capital to cover its payroll" to him, his girlfriend Diane, and his secretary Cassadonte. (56.1(a) St. ¶¶ 119-121). With respect to any alleged "additional loans" Holmes made to cover the legal and arbitration fees and expenses incurred in the underlying litigations, those were CSI's obligations pursuant to the November 15, 2006 Assignment and Assumption Agreement that Holmes prepared and executed as the only purported consideration for the insider conveyance to him of AMA's ownership of CSI. (56.1(a) St. ¶ 122). Because Holmes deliberately refused to direct the funding of the unpaid Judgments in compliance with the AMA/CSI Assignment and Assumption Agreement, AMA did not receive "commensurate value" for the insider conveyance to Holmes such that "creditors can be repaid from the proceeds of the transaction." *Bank of Communs.*, 904 F. Supp.2d at 361.

**B.    AMA's Conveyance of CSI to Holmes Is Fraudulent Under DCL §§ 273 and 274**

DCL §§ 273 and 274 are constructive fraudulent conveyance statutes that apply to conveyances irrespective of the transferor's status as a litigation defendant, where the debtor: "(1) made a conveyance; (2) without fair consideration; (3) that depleted the debtor's assets." *Bd. Mgrs. Of 369 Harman St. Condo. v. 369 Harman LLC,* Index No. 450346/2018, 2018 N.Y. Misc. LEXIS 3574 *13 (N.Y. Sup. Aug. 20, 2018). It is undisputed that Holmes

15

directed AMA to convey its ownership of CSI that AMA purchased from ETP for $6 million to CSI, and then purchased those shares from CSI for $50,000. (56.1(a) St. ¶¶ 49, 50). Holmes did not pay AMA any cash or asset consideration for this transaction, but instead had CSI agree to take assignment of all of AMA's liabilities and obligations under its agreements with Emerson and ETP. (56.1(a) St. ¶ 52). Holmes testified that "CSI, by taking assignment of all [AMA's] rights and liabilities under the [AMA/ETP] acquisition agreement, would have to pay everything[,] [w]hatever liabilities there were." (56.1(a) St. ¶ 54).

Upon entry of the final Judgments, however, Holmes deliberately refused to direct CSI to the fund the Judgments pursuant to its obligations under the Assignment and Assumption Agreement he executed as the sole consideration for AMA's conveyance of its ownership of CSI to Holmes. (56.1(a) St. ¶ 67). By refusing to direct CSI to fund the Judgments pursuant to the November 15, 2006 Assignment and Assumption Agreement, Holmes invalidated AMA's only consideration for his insider conveyance to himself of CSI's stock (AMA's only asset), thereby rendering that insider transaction void of any consideration and fraudulent under DCL §§ 273 and 274 at that point in time.[3]

C.    **AMA's Conveyances Were Fraudulent Under § 276**

Under DCL § 276, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or

---

[3]    The Complaint did not assert a discrete fraudulent conveyance claim regarding this conveyance because the documents reflecting this transaction were first produced by Holmes in discovery in this proceeding. (56.1(a) St. ¶ 170). Emerson respectfully requests that the Court consider this conveyance on this motion. *See, e.g., Clomon v. Jackson*, 988 F.2d 1314, 1323 (2d Cir. 1993)("[T]he undisputed facts as presented on the summary judgment motion served as a basis to deem the complaint amended to conform with the proof pursuant to Fed. R. Civ. P.15(b)."); *Regent Ins. Co. v. Storm King Contracting, Inc.*, 06-cv-2879, 2008 U.S. Dist. LEXIS 16513 *13-14 (S.D.N.Y. Feb. 27, 2008) (permitting amendment of pleading at the summary judgment stage to conform pleading to additional evidence revealed through discovery).

future creditors, is fraudulent as to both present and future creditors." DCL § 276. "Because direct proof of a debtor's intent to hinder his creditors is rare, creditors may rely on 'badges of fraud' to establish an inference of fraudulent intent." *Shelly v. Doe*, 249 A.D.2d 756, 758, 671 N.Y.S.2d 803 (3d Dep't 1998). "These badges of fraud may include (*inter alia*): a close relationship between the parties to the alleged fraudulent transaction; . . . inadequacy of the consideration; . . . and retention of control of the property by the transferor after the conveyance." *Id.* "The existence of multiple badges of fraud constitute the requisite clear and convincing evidence of actual intent to defraud." *Fannie Mae v. Olympia Mortg.*, 792 F. Supp. 2d 645, 654 (E.D.N.Y. 2011).

Here, the requisite intent is established based on the undisputed numerous badges of fraud arising from AMA's conveyances to its sole insider Holmes, including: (i) a close relationship between the parties to the transaction; (ii) a transfer outside the usual course of business; (iii) inadequacy of consideration; (iv) the transferor's knowledge of the creditor's (Emerson's) claim and AMA's inability to pay it; and (v) Holmes' retention of control of the AMA property conveyed to Holmes after the insider conveyances. *See Matter of Mogil v. Bldg. Essentials, Inc.*, 129 A.D.3d 1378, 12 N.Y.S.3d 346 (3d Dep't 2015) (holding that in unsatisfied judgment creditors' action, requisite intent was shown by the debtor's and owner's pattern shortly after the underlying action was commenced of purposefully depleting the debtor's assets); *Matthews v. Schusheim*, 36 Misc. 2d 918, 235 N.Y.S.2d 973 (N.Y. Sup. 1962)("A conveyance made without consideration raises the presumption that the conveyance was made with an intent to cheat and defraud the grantor's creditors."), *rev'd on other grounds*, 18 A.D.2d 719, 236 N.Y.S.2d 407 (2d Dep't 1962), *appeal dismissed*, 13 N.Y.2d 756 (1963).

17

## D.    Piercing AMA's Corporate Veil

"Piercing the corporate veil is an equitable concept that allows a claimant or creditor to disregard a corporation and to hold its controlling shareholders personally liable for corporate debts or other liabilities." *Americore Drilling & Cutting, Inc. v. EMB Contr. Corp.,* 55 Misc. 3d 1207(A), 55 N.Y.S.3d 691, 2017 N.Y. Misc. LEXIS 1180 *16 (N.Y. Sup. Apr. 3, 2017). "[T]he corporate veil will be pierced to achieve equity, even absent fraud, when a corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego." *Id., quoting Williams v. Lovell Safety Mgt. Co., LLC,* 71 AD3d 671, 672, 896 N.Y.S.2d 150 (2d Dep't 2010); *see also Bogosian v. All American Concessions,* 06-cv-01633, 2011 U.S. Dist. LEXIS 109082 *17 (E.D.N.Y. Sept. 26, 2011)("Where a corporation's owners, however, through their domination, abuse [] the privilege of doing business in the corporate form to perpetrate a wrong or injustice against [a] party . . . a court in equity will intervene.").

"Under New York law, a party seeking to pierce the corporate veil must make a two-pronged showing: (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Bogosian,* 2011 U.S. Dist. LEXIS 109082 *17-18, *quoting Thrift Drug, Inc. v. Universal Precription Adm'rs,* 131 F.3d 95, 97 (2d Cir. 1997).  Here, the undisputed record establishes both.

### (i)    Holmes Maintains Total Domination and Control Over AMA

New York courts have promogulated a series of factors to determine whether the first prong of the analysis, domination of the corporation, has been satisfied. *See Wm. Passalacqua*

*Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)[4]; *see also Americore Drilling,* 2017 N.Y. Misc. LEXIS 1180 * 18 ("When determining whether the owners abused the corporate form, the following factors are considered: a failure to adhere to corporate formalities, inadequate capitalization, use of corporate funds for personal purpose, overlap in ownership and directorship, or common use of office space and equipment.").

"No single factor is decisive" to "determine whether complete control exists." *Broadridge Secs. Processing Sols., LLC v. Khashoggi*, 507 F. App'x 57, 57-58 (2d Cir. 2013).

Here, Judge Platt already determined that Holmes' complete domination and control over AMA exists, holding: "[AMA] is 100%-owned and -controlled by one person: Charles S. Holmes. Following the closing, Holmes also owned and controlled CSI in its entirety." (56.1(a) St. ¶ 147); *Emerson,* 2012 U.S. Dist. LEXIS 39442 *10. This determination is *res judicata* as against AMA and its "privies," including Holmes. *See, e.g., Caldwell v. Pesce,* 83 F.Supp.3d 472, 481 (E.D.N.Y. 2015)("A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.").

Holmes also repeatedly admitted that he is the alter ego of AMA. Indeed, Holmes testified that in connection with AMA's financing proposal for its acquisition of CSI: "Trust me, everybody…knew that *AMA was Charles Holmes*." (56.1(a) St. ¶¶ 46, 148). Holmes also

---

[4]     The *Passalacqua* factors are: "(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." *Wm. Passalacqua Builders, Inc.*, 933 F.2d at 139.

testified: "I'm a person and I control AMA and I'm a person and I control CSI because I own

both of them – the stock of them, they're *my affiliate*." (56.1(a) St. ¶ 149).

AMA's only other officer was Dennis McCarthy, who received no compensation for

his role, and was installed by Holmes as an officer of Holmes' other solely owned companies,

Wilcom and CSI, on an hourly fee basis. (56.1(a) St. ¶¶ 150-152). McCarthy testified:

> Q:   What is the business of Asset Management Associates of New York that
>      you're a secretary and treasurer of?
>
> A:   It's – that's a good question. Asset Management Associates of New York
>      I like to think as a generic corporation of Charles Holmes that he uses for
>      his business interests.
>
> *      *      *
>
> Q:   What do you mean by generic corporation [of Charles Holmes]?
>
> A:   I mean, it's Asset Management Associates of New York. I see it – as a
>      title. It's an entity that Charlie has for his own – for his own purposes,
>      along with a number of other business interests that he might – that he
>      might have that's why I see it as a generic. That's just my – my feeling.

(56.1(a) St. ¶ 153). When asked about AMA's acquisition of CSI, McCarthy testified that: "If

you tell me it was AMA, Asset Management Associates worked out the acquisition and then it

turned into CSI, but as far as I'm concerned, Charlie Holmes bought it." (56.1(a) St. ¶ 154).

AMA's principal place of business until 2011 was Holmes' residence, 117 Whites

Lane, Southampton, New York, until it was sold in 2011. (56.1(a) St. ¶ 157). It was reported

in 2011 that Holmes sold his residence 117 Whites Lane, Southampton, New York, known as

the "Ballyshear Estate," to Michael Bloomberg. (56.1(a) St. ¶ 158). After Holmes sold his

Ballyshear Estate, AMA's principal place of business has been listed as Holmes new

residence at 26 Redcoats Lane, Sag Harbor, New York 11963. (56.1(a) St. ¶ 159).

20

Aside from his personal assistants (his girlfriend Diane Holmes and Ms. Cassadonte), Holmes is AMA's sole "employee." (56.1(a) St. ¶ 88). Holmes also admitted that all management and consulting services performed by AMA for its clients (which are his other solely owned companies Wilcom and CSI) were performed by him. (56.1(a) St. ¶ 85).

AMA's tax returns also reflect that since the commencements of the litigations that resulted in the unpaid Judgments, AMA has been kept in a perpetual state of undercapitalization recording income only from other entities that are also solely owned and controlled by Holmes, which were then conveyed to Holmes' personal accounts. (56.1(a) St. ¶¶ 166, 178). According to Holmes, these insider conveyances were labeled as "interest" payments as part of his personal "tax minimization strategy." (56.1(a) St. ¶ 164).

### (ii)  Holmes' Use of AMA to Commit a Wrong Against Emerson

The second prong of veil piercing requires a showing that Holmes, "through [his] domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against [Emerson] such that a court in equity will intervene." *Marketplace LaGuardia Ltd. P'ship v. Harkey Enters., Inc.*, 07-cv-1003, 2008 U.S. Dist. LEXIS 25479 *12 (E.D.N.Y. Mar. 31, 2008). In satisfaction of this second prong, "[a] claimant can prevail without proving fraud if the claimant can identify some non-fraudulent wrong attributable to the defendant's complete domination [of the debtor]." *Americore Drilling,* 2017 N.Y. Misc. LEXIS 1180 *19; *accord TNS Holdings, Inc. v. MKI Sec. Corp.,* 92 N.Y.2d 335, 340, 680 N.Y.S.2d 891 (1998)(holding that the second prong is met where the defendant misused "the corporate form for [his] personal ends so as to commit a fraud *or wrong doing or avoid any of its obligations*.")(emphasis added).

For example, evidence that "corporate funds were purposefully diverted to make it judgment proof or that a corporation was dissolved without making appropriate reserves for

contingent liabilities' satisfy the pleading requirement of wrongdoing." *Americore Drilling,* 2017 N.Y. Misc. LEXIS 1180 *20, *quoting Baby Phat Holding, LLC v. Kellwood Co.,* 123 A.D.3d 405, 407, 997 N.Y.S.2d 67 (1st Dep't 2014) and *Grammas v. Lockwood Assoc.,* 95 A.D.3d 1073, 1075, 944 N.Y.S.2d 623 (2d Dep't 2012); *see also Rotella v. Derner,* 283 A.D.2d 1026, 723 N.Y.S.2d 801, 802 (2001)("Where, as here, an undercapitalized corporation is unable to pay a judgment debt and there has been disregard of corporate formalities and personal use of corporate funds, ... [there is] sufficient evidence of wrongdoing to justify piercing the corporate veil.'"); *see also First Keystone,* 871 F. Supp. 2d at 127 ("Under New York law, the diversion of funds to make a corporation judgment-proof constitutes a wrong for the purposes of determining whether the corporate veil should be pierced."); *Fannie Mae v. Olympia Mortg.*, 724 F. Supp. 2d 308, 320 (E.D.N.Y. 2010)(same); *Dafeng Hengwei,* 2017 U.S. Dist. LEXIS 49041 at *24 (same).

The requisite wrongful conduct can also include a sole owner's use of his dominion and control to deliberately dishonor the corporation's financial obligations. *See Pae v. Chul Yoon,* 41 A.D.3d 681, 682, 838 N.Y.S.2d 172 (2d Dep't 2007)("[The] testimony at trial established that the plaintiff and the appellant's corporation entered into a valid agreement for the sale and purchase of goods, and that the appellant, the sole owner of the corporation, dominated the corporation and *was solely responsible for the wrongful failure of the corporation to pay the plaintiff*.")(emphasis added); *see also Hyland Meat Co. v. Tsagarakis,* 202 A.D.2d 552, 553, 609 N.Y.S.2d 625 (2d Dep't 1994)(finding satisfaction of the wrongful conduct element of veil piercing where the sole shareholders and operators of the company "used their control of the [company's] restaurant to induce the plaintiff to continue making deliveries [] for which it was not paid.").

Here, it is undisputed that Holmes used his complete domination and control over AMA to convey all of AMA's assets and cash to himself, thereby rendering AMA judgment-

proof.  First, Holmes directed that AMA convey its ownership of all the shares of common

stock of CSI that AMA purchased from ETP for $6 million to CSI, and executed a document

dated November 15, 2006 as "sole director" of AMA documenting the conveyance to CSI.

(56.1(a) St. ¶ 49).  Holmes then sold to himself full ownership of CSI for $50,000.  (56.1(a)

St. ¶ 50).  Holmes did not pay AMA any consideration for this transaction, but instead, had

CSI agree to take assignment of all of AMA's liabilities and obligations under its agreements

with Emerson and ETP.  (56.1(a) St. ¶ 52).

Holmes testified that "CSI, by taking assignment of all [AMA's] rights and liabilities

under the [AMA/ETP] acquisition agreement, would have to pay everything[,] [w]hatever

liabilities there were." (56.1(a) St. ¶ 54).  However, Holmes has deliberately refused to direct

CSI to the fund the Judgments pursuant to its obligations under the Assignment and

Assumption Agreement.  (56.1(a) St. ¶ 67).  Instead, Holmes decided that the Judgments

"weren't legitimate" and that "AMA had no future." (56.1(a) St. ¶ 67).  Holmes filed a

bankruptcy liquidation proceeding for AMA which was dismissed *for cause*, and established a

new entity, Churchill, to operate his solely owned businesses, Wilcom and CSI, which had

been managed through AMA's "management and consulting services" that generated

substantial income for AMA.  (56.1(a) St. ¶¶ 77, 92, 95).  By failing to direct CSI to fund the

Judgments pursuant to AMA's rights under the November 15, 2006 Assignment and

Assumption Agreement, Holmes invalidated AMA's only consideration for his insider

conveyance to himself of CSI stock, thereby rendering that insider transaction lacking any

consideration whatsoever.  (56.1(a) St. ¶ 68).

Second, Holmes used his dominion and control to convey $2,438,013 from AMA to

himself between 2008 and 2011 during the underlying litigations, comprised of: $1,847,500 in

23

cash conveyances; $507,712 in payments for Holmes' personal American Express charges; and $82,801 in "salary." (56.1(a) St. ¶¶ 100-105). AMA also conveyed an additional $200,000 to Holmes in 2007 before it was sued by Emerson in April, 2008, but while AMA was admittedly on notice that litigation was certain to occur. (56.1(a) St. ¶ 178); *see Godwin Realty Assoc. v. CATV Enters.,* 275 A.D.2d 269, 712 N.Y.S.2d 39, 41 (1st Dep't 2000)("Although no action had been commenced at the time of liquidation, there was evidence that defendant was nonetheless on notice of the presently asserted claims [at the time of conveyances].").

Third, Holmes breached the representations and warranties he made on behalf of AMA in the Acquisition Agreement between AMA and ETP following entry of the final Judgments, and AMA's corresponding duties of good faith and fair dealing. In § 4.5 of that Acquisition Agreement, entitled "Funds," Holmes represented and warranted that: "[AMA] has, *and at all times will have*, sufficient funds on hand or available pursuant to unconditional commitments to pay the Purchase Price *and any adjustments thereof*." (56.1(a) St. ¶ 69). In violation of that representation, warranty and commitment, Holmes systematically stripped AMA of its assets and cash during the litigation, and then refused to fund AMA's purchase price adjustment obligations as determined by the Arbitrator and reduced to final Judgment.

**(iii)    Emerson's Motion to Strike Holmes' Putative Equitable Defenses**

Emerson previously moved to strike Holmes' two conclusory equitable defenses asserted in his Answer, labeled as "unclean hands" and "equitable estoppel," which was fully submitted on January 31, 2018. (56.1(a) St. ¶ 189)(ECF Dkt. 37). Emerson incorporates by reference its briefing on its Motion to Strike. (ECF Dkt. Nos. 37-39, 42-43); (56.1(a) Exs. YY, ZZ). In sum, Holmes' "unclean hands" and "estoppel" defenses are facially deficient and manifestly groundless under any stretch of the applicable law.

24

The putative "unclean hands" defense must be based upon a plaintiff's "truly unconscionable and brazen behavior." *Pedinol Pharmacal, Inc. v. Rising Pharms., Inc.,* 570 F. Supp. 2d 498, 505 (E.D.N.Y. 2008).  No such "truly unconscionable and brazen behavior" was pleaded by Holmes, nor could it have legitimately been pleaded, much less shown.

Holmes' putative "estoppel" defense consisted solely of the word "estoppel," and did not plead any of the required elements of the equitable defense which is "invoked sparingly and only under exceptional circumstances." *Brown v. Marriot Int'l Inc.,* 14-cv-5960, 2017 U.S. Dist. LEXIS 166442 *41. (E.D.N.Y., Oct. 6, 2017).  Instead, Holmes relies on *Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d Cir. 1979) and contends that his "estoppel" defense is essentially that "Plaintiff received precisely what it bargained for, and it did not bargain for or contemplate the individual liability of Mr. Holmes which it now seeks to enforce."  (56.1(a) ¶ 198).  There was, however, no allegation or showing in *Brunswick* of any type of wrongdoing resulting from the dominion and control exercised by the owner.  Moreover, unlike in *Brunswick,* here the parties' underlying Acquisition Agreement mandates in § 4.5 that: "[AMA] has, and at all times will have, sufficient funds on hand or available pursuant to unconditional commitments to pay the Purchase Price *and any adjustments thereof*." (56.1(a) St. ¶ 69). In deliberate breach of that contractual commitment, Holmes systematically stripped AMA of its cash during the litigations, and then deliberately refused the fund the purchase price adjustment through its "unconditional commitments" ultimately determined by the Arbitrated, confirmed by Judge Platt, and reduced to final Judgment.  As a result of Holmes' deliberate conduct, Emerson most certainly did not obtain what it bargained for in the Acquisition Agreement.

25

## CONCLUSION

For the foregoing reasons, Emerson respectfully requests that the Court grant its Motion

for Default and Summary Judgment in its entirety, along with such other and further relief as this

Court deems just and proper.

Dated: New York, New York
September 14, 2018

Respectfully submitted,

SIMON•LESSER PC

By:_____

Leonard F. Lesser, Esq.
355 Lexington Avenue
New York, New York 10017
212.599.5455

*Attorneys for Plaintiff Emerson Electric Co.*