UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EMERSON ELECTRIC CO.,

               Plaintiffs,

  -against-

CHARLES S. HOLMES and ASSET MANAGEMENT
ASSOCIATES OF NEW YORK, INC.,

               Defendants.

16 Civ. 01390 (PKC) (SIL)

**[PROPOSED]**
**AMENDED COMPLAINT**

Plaintiff Emerson Electric Co. ("Emerson"), as and for its Amended Complaint against

defendants Charles S. Holmes ("Holmes") and Asset Management Associates of New York, Inc.

("AMA") (collectively, the "Defendants"), alleges and states as follows:

## NATURE OF ACTION

1.      Emerson is the judgment-creditor of AMA in a judgment entered by this Court on

August 13, 2015 for $1,966,246.35 plus 9% post-judgment interest (the "8/13/15 Judgment"), in

the case *Emerson Electric Co. v. Asset Management Associates of New York, Inc.*, 08-cv-1489

(E.D.N.Y.).  A copy of the 8/13/15 Judgment is attached hereto as Exhibit A.

2.      Emerson is also the assignee and judgment-creditor of AMA in a separate

judgment in favor of Emerson Telecommunication Products LLC ("ETP") entered by this Court

on January 9, 2014 for $1,965,081.40 plus 9% post-judgment interest (the "1/9/14 Judgment"), in

the case *Asset Management Associates of New York, Inc. v. Emerson Telecommunication

Products, LLC*, 08-cv-2128 (E.D.N.Y.).  A copy of the 1/9/14 Judgment is attached hereto as

Exhibit B, and a copy of the Assignment of the 1/9/14 Judgment is attached as Exhibit C.

3.      No appeal was taken from the Judgments, nor was any motion made to vacate or modify them, and the Judgments are enforceable for 20 years pursuant to CPLR 211(b) and Fed.R.Civ.P. 69 (a)(1).

4.      By this action, Emerson seeks post-judgment relief, pursuant to Fed. R. Civ. P. 69 and CPLR § 5225(b) to "pierce the corporate veil" of judgment-debtor AMA, and to avoid fraudulent conveyances from AMA to its president, sole owner, and sole insider, Holmes, under New York Debtor and Creditor Law §§ 273-a and 276.

5.      During the many years of litigation in this Court that resulted in the unpaid Judgments, Holmes methodically stripped AMA of its assets by disregarding corporate formalities for the purpose of avoiding collection on the Judgments.  The systematic control and domination of AMA and the manipulation of its assets by Holmes constitutes an abuse of the privilege of doing business in the corporate form to further Holmes' personal interests and to cause harm to AMA's non-insider creditors, including Emerson and ETP.

6.      During the course of the litigations in this Court that resulted in the unpaid Judgments, Holmes also caused AMA to fraudulently transfer assets and substantial cash to his personal bank accounts, all without fair consideration, and which otherwise were intended to hinder, delay and defraud its creditors, including Emerson and ETP.

## THE PARTIES

7.      Emerson is a Missouri corporation, with its principal place of business in St. Louis, Missouri.

8.      Holmes is an individual residing at 26 Redcoats Lane, Sag Harbor, New York 11963.

9.     AMA is a New York corporation with its principal place of business located within

Holmes' residence at 26 Redcoats Lane, Sag Harbor, New York 11963.

### JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that

there is complete diversity of citizenship between the parties and the amount in controversy,

exclusive of interest and costs, exceeds the sum of $75,000.

11.     This Court also has jurisdiction over the subject matter of this action by reason of

this Court's enforcement jurisdiction over the subject Judgments entered by this Court.

12.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §§

1391(a) and (c) because AMA and Holmes are both subject to personal jurisdiction in this

District.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

*The 8/13/15 Judgment*

13.     Emerson sued AMA on April 10, 2008 in this Court in the matter *Emerson*

*Electric Co. v. Asset Management Associates of New York, Inc.*, 08-cv-1489 (E.D.N.Y.)

("*Emerson v. AMA*"), for breach of contract and failure to pay for goods and services provided to

AMA pursuant to the parties' Transition Services Agreement which covered manufacturing and

support services AMA obtained from Emerson following AMA's purchase of two businesses

from ETP.

14.     On March 20, 2012, the Court issued its Decision and Order awarding Emerson

summary judgment as to liability against AMA on Emerson's breach of contract claims against

AMA in addition to the reasonable attorneys' fees Emerson incurred in that lawsuit.  *See*

(*Emerson v. AMA*, 08-cv-1489, ECF Docket No. 57); *Emerson v. AMA*, No. 08-cv-1489, 2012 U.S. Dist. LEXIS 39442 (E.D.N.Y. Mar. 20, 2012).

15.     The Court conducted a damages trial on April 10, 2013, and the parties filed their post-trial submissions on May 10, 2013.

16.     By Memorandum and Order and Amended Order dated July 28, 2015, the Court directed the Clerk to enter judgment against AMA in the amount of $1,442,588.20, plus per diem interest of $159.68 from May 10, 2013 through the date judgment is entered, plus $391,762.47 in attorneys' fees and costs. (*Emerson v. AMA*, 08-cv-1489, ECF Docket No. 79, at 10); (*Emerson v. AMA*, 08-cv-1489, ECF Docket No. 80).

17.     Judgment was entered by the Clerk of this Court in favor of Emerson and against AMA on August 13, 2015 in the amount of $1,966,246.35. (Ex. A hereto).

18.     The 8/13/15 Judgment is also subject to 9% post-judgment interest pursuant to CPLR §§ 5003 and 5004.

*The 1/9/14 Judgment*

19.     On November 8, 2006, AMA entered into a purchase agreement with ETP for all of its capital stock of Emerson Network Power Optical Connectivity Solutions, Inc., and certain assets of Emerson Network Power Connectivity Solutions, Inc.

20.     The parties' Acquisition Agreement provided the process by which a post-closing adjustment would be made to the purchase price if it was later determined that the financial position of the businesses acquired by AMA, at the time of closing, differed from what was reflected in the purchase price.

21.     The parties' Acquisition Agreement stipulated that: (1) within a specified time after closing, ETP would deliver to AMA its Statement of Closing Net Working Capital; (2) if

AMA disputed the ETP Closing Statement, AMA would deliver a Notice of Dispute to ETP; (3) upon receipt of the Notice of Dispute, the parties were then to consult with each other in efforts to resolve the dispute; and (4) if the parties were unable to come to a resolution, the dispute would be submitted to binding arbitration.

22.     On January 14, 2007, ETP delivered its Closing Statement to AMA, seeking a purchase price adjustment and payment in ETP's favor from AMA in the amount of $1,082,922, plus contractual interest.

23.     On February 26, 2007, AMA delivered its Notice of Dispute of ETP's Closing Statement disputing ETP's demand for a purchase price adjustment and payment of $1,082,922, plus contractual interest, and challenging, among other things, the parties' stipulated value of inventory.

24.     Thereafter, from April 9, 2007 through April 1, 2008, the parties engaged in negotiations in an effort to resolve their dispute, but were unsuccessful in reaching a resolution.

25.     On April 11, 2008, ETP referred its claim against AMA for $1,082,922, plus interest to mandatory arbitration as stipulated by the parties' arbitration agreement.

26.     In response, on May 6, 2008, AMA filed its Petition to Stay Arbitration in New York State Supreme Court, Suffolk County under Index No. 17496/08, which ETP removed to this Court on May 27, 2008, and assigned Docket No. 08-cv-2128 ("*AMA I*").

27.     On June 16, 2009, this Court denied AMA's application to stay the arbitration and granted ETP's cross-motion to compel arbitration.  (*AMA I*, No. 08-cv-2128, ECF Doc. No. 32).

28.     On February 10, 2010, this Court denied AMA's motion for reconsideration of the Court's June 16, 2009 Order compelling arbitration.  (*AMA I*, No. 08-cv-2128, ECF Docket No.

40); *Asset Mgmt. Assocs. of N.Y. Inc. v. Emerson Telecomm. Prods.,* 2010 U.S. Dist. LEXIS 143855 [E.D.N.Y. Feb. 10, 2010]).

29.     After AMA filed its unsuccessful May 6, 2008 Petition to Stay Arbitration of its dispute of ETP's Closing Statement, including its inventory allegations, AMA filed a separate lawsuit in this Court against ETP on June 23, 2008.

30.     In that related proceeding, *Asset Management Associates of New York, Inc. v. Emerson Telecommunication Products LLC*, 08-cv-2506 (E.D.N.Y.) ("*AMA II*"), AMA asserted claims premised on the inventory allegations raised in its Notice of Dispute of ETP's claims for a purchase price reduction and payment from AMA in the amount of $1,082,922, plus interest.

31.     On August 29, 2008, ETP filed its motion to dismiss AMA's claims in *AMA II* in favor of the arbitration ordered in *AMA I*.

32.     The matter was heard by the Court on November 7, 2008, and the Court granted ETP's motion to dismiss *AMA II* from the bench. (*AMA II*, 08-cv-2506, ECF Docket No. 30 at 6:1–7:6).

33.     On December 29, 2008, AMA moved for leave to file a proposed amended complaint in *AMA II*, including a proposed new claim for rescission of the November 8, 2006 Acquisition Agreement and arbitration provision.

34.     By Order, dated September 30, 2009, the Court summarily denied AMA's motion for leave to amend.  (*AMA II*, No. 08-cv-2506, ECF Docket No. 27).

35.     AMA appealed from that Order, and on October 6, 2010, the United States Court of Appeals for the Second Circuit remanded the matter "to give the District Court an opportunity either (1) to enter a new order justifying its decision to deny the motion for leave to file an

amended complaint; or (2) to grant the motion." *Asset Mgmt. Assocs. of N.Y. Inc. v. Emerson Telecomm. Prods. LLC*, 395 F. App'x 752, 753 (2d Cir. 2010).

36.     Following supplemental briefing, by its Decision and Order dated January 25, 2011, the Court again denied AMA's motion to amend its complaint in *AMA II*.  (*AMA II*, No. 08-cv-2506, ECF Docket No. 40); *Asset Mgmt. Assocs. of N.Y. Inc. v. Emerson Telecomm. Prods.*, 2011 U.S. Dist. LEXIS 9434 [E.D.N.Y. Jan. 25, 2011]).

37.     In that Decision and Order, the Court again made clear that ETP's claim against AMA for $1,082,922, plus interest, as well as AMA's Notice of Dispute of that claim, were for the arbitrator to determine.

38.     AMA did not appeal from the January 25, 2011 Decision and Order, and instead, by mutual agreement, the parties' dispute was arbitrated in 2012 and 2013 before an arbitrator mutually selected by the parties.

39.     On November 7, 2013, the Arbitrator issued his Award finding in favor of ETP on its claim against AMA, and rejecting AMA's counterclaims.  (Award, *AMA I*, 08-cv-2128, Docket No. 49-4).

40.     ETP thereafter moved the Court to confirm the Arbitration Award, which AMA did not oppose, and which the Court granted on December 17, 2013.  (*AMA I*, 08-cv-2128, Docket Nos. 50, 51).

41.     On January 9, 2014, the Court entered the 1/9/14 Judgment against AMA on the Court-confirmed Arbitration Award in the amount of $1,965,081.40, plus 9% post-judgment interest pursuant to CPLR §§ 5003 and 5004.  (Ex. B hereto).

42.     By assignment dated December 21, 2015, ETP assigned the 1/9/14 Judgment to Emerson.  (Ex. C hereto).

7

*AMA's Failure to Pay the Judgments*

43.     Following entry of the 1/9/14 Judgment and AMA's failure to pay, on January 25, 2014, ETP issued post-Judgment discovery demands on AMA demanding its books, records and information regarding the location of AMA's accounts and assets, as well as a subpoena to Holmes for his books and records and for testimony regarding his transactions with AMA.

44.     On February 19, 2014, a few days before AMA was required to respond to ETP's post-Judgment discovery demands, Holmes, on behalf of AMA, filed a voluntary Petition for liquidation of AMA under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of New Jersey (Ch. 7, Case No. 14-12849-NLW) (the "Bankruptcy Action").

45.     On April 8, 2014, the Bankruptcy Action was transferred to the Bankruptcy Court for the Eastern District of New York (Ch. 7, Case No. 14-41729 (CEC)).

46.     By Order dated October 10, 2014, the AMA Bankruptcy petition was dismissed for cause pursuant to Bankruptcy Code §707(a).

47.     Following the dismissal of the AMA Bankruptcy petition, Holmes was produced for a sworn deposition on July 31, 2015 in response to the subpoena ETP issued to Holmes on January 25, 2014.

48.     Holmes' deposition testimony on July 31, 2015 revealed his complete domination and control of AMA and his other affiliated entities through which Holmes engaged in his insider transactions, and that he directed fraudulent conveyances from AMA's accounts to himself during the pendency of the litigations that resulted in the unpaid Judgments.

## FIRST CAUSE OF ACTION
(Alter Ego / Piercing the Corporate Veil)

49.     Emerson repeats and realleges the allegations set forth above.

50.     As particularized in detail herein, AMA is so completely dominated and controlled by Holmes that AMA is merely an alter ego of Holmes and has no separate existence apart from Holmes.

*Overlap in Ownership, Officers, Directors, and Personnel*

51.     Holmes is the sole owner and operator of AMA, which he operated from his personal residences, 117 Whites Lane, Southampton, New York, and 26 Redcoats Lane, Sag Harbor, New York.

52.     Holmes is also the sole owner of CSI Technologies, Inc. ("CSI"), the entity purchased by AMA from ETP that was the subject of the underlying litigations that resulted in the unpaid Judgments.

53.     Holmes testified at deposition that: "I'm a person and I control AMA and I'm a person and I control CSI because I own both of them – the stock of them, they're my affiliate." (08-cv-1489 ECF Docket No. 40-6 at 23:17-20).

54.     Holmes is the sole owner, "executive chairman," and chairman of the board of directors of Wilcom, Inc. ("Wilcom"), an entity that transferred over $2 million to AMA during the litigations that resulted in the unpaid Judgments, which Holmes then transferred from AMA's accounts and placed in his own personal accounts.

55.     Dennis McCarthy is the secretary and treasurer of AMA, president of Wilcom, and was the president of CSI until April 2014.

56.     McCarthy testified at deposition in the litigation that resulted in the 8/13/15 Judgment that: "[AMA] I like to think of as a generic corporation of Charles Holmes that he uses for his business interests." (08-cv-1489 ECF Docket No. 40-7 at 14:4-7).

*Inadequate Capitalization of AMA*

57.     Since the commencements of the litigations that resulted in the unpaid Judgments, AMA has been kept in a perpetual state of undercapitalization recording income from other entities that are also solely owned and controlled by Holmes, which were then funneled to Holmes' personal accounts.

58.     After paying making these payments to Holmes, AMA's bank account balances would be undercapitalized.

59.     During the course of AMA's litigations with Emerson and ETP, AMA received over $2 million in transfers from Wilcom that were labeled as fees for "consulting services."

60.     These transfers were erratic in schedule, and each time AMA received such a transfer from Wilcom for "consulting services," it was quickly transferred to one of Holmes' personal bank accounts at Holmes' direction, again leaving AMA undercapitalized.

61.     During the litigations with Emerson and ETP that resulted in the Judgments, Holmes operated AMA in a manner so as to give the appearance that AMA had the financial resources to mount years of expensive litigation against Emerson and ETP.

62.     Notwithstanding the appearances Holmes sought to portray of AMA being a legitimately capitalized business entity, Holmes, in fact methodically stripped AMA of all of its cash and assets so that it operated as an undercapitalized corporate shell whose sole purpose was to litigate against Emerson and ETP.

63.     At his July 31, 2015 deposition, Holmes took the position that AMA ceased all business operations by the end of December 2009, and was operated as a "litigation support group" solely in connection with the litigations against Emerson and ETP that resulted in the unpaid Judgments.

64.     At the same time Holmes decided to cease the ongoing business operations of AMA in December, 2009, he formed a new entity, Churchill Investments, LLC ("Churchill"), to take over AMA's business operations from Holmes' personal residences.

65.     Upon information and belief, Teresa Cassadonte is Holmes' "administrative assistant" who was on AMA's payroll through December 2009, and was put on Churchill's payroll starting in 2010.

66.     Upon information and belief, Diane G. Holmes is Holmes' "personal assistant" who was on AMA's payroll through December 2009, and was put on Churchill's payroll starting in 2010.

67.     Upon information and belief, Holmes shut down AMA's business operations shortly after Churchill was formed to assume the business operations that Holmes had previously operated through AMA.

*Lack of Corporate Formalities*

68.     AMA failed to follow proper corporate formalities in its operations.

69.     Although Holmes testified that he made cash contributions to AMA which he considered to be insider "loans," no formal loan documents were ever prepared.

70.     Holmes also directed CSI to make cash contributions to AMA that were recorded on AMA's tax returns as "shareholder loans," and that were not formally documented through any loan agreements.

71.     AMA also failed to follow proper corporate formalities with respect to the "consulting fees" that it received from Wilcom and that Holmes transferred from the MA accounts to his personal accounts.

72.     There is no contract or agreement by which AMA provided alleged consulting services to Wilcom.

73.     There are no minutes or shareholder agreements documenting any decision to provide consulting services to Wilcom.

74.     At his July 31, 2015 deposition, Holmes characterized the transfers from Wilcom to AMA as being "profit distributions" intended for Holmes.

75.     Instead of receiving the funds directly from Wilcom, however, Holmes testified that he directed Wilcom to send the money to AMA under the label of "management consulting fees."

76.     AMA reported these incoming funds from Wilcom as "gross receipts or sales" on its federal tax returns.

77.     Holmes transferred the funds from AMA's bank accounts that were received from Wilcom and reported as "gross receipts or sales," to his personal accounts.

78.      AMA also failed to follow proper corporate formalities with respect to its dealings with Churchill.

79.     Holmes testified that after he formed Churchill to take over the business he had been conducting through AMA, Churchill agreed to lease the AMA's office equipment located in Holmes' personal residences for $1,000 per month to be paid on the first day of each month.

80.     Although Holmes directed Cassadonte to make lease payments from Churchill's accounts to AMA's accounts, the last such payment was made in April 2012, but Churchill still continues to operate at Holmes' personal residence using AMA's equipment.

*Use of AMA's Funds for Holmes' Personal Purposes*

81.     Holmes' personal spending dominated AMA's American Express credit line with items such as food, entertainment, shopping, and gardening and landscaping expenses.

82.      According to AMA's own accounting records, Holmes' personal spending accounted for $320,920.62 out of $326,357.06 (or 98%) of AMA's American Express bills in 2008, and $186,791.17 out of $204,750.63 (or 91%) of AMA's American Express bills in 2009.

83.     Upon information and belief, Holmes also used AMA's funds to pay for his personal and household expenses, including the expenses of his personal residences in South Hampton and Sag Harbor where Holmes resides and which serves as AMA's principal place of business.

*Common Office Space, Address and Telephone Numbers*

84.     Holmes has always operated AMA from his personal residences at 117 Whites Lane, Southampton, New York, and 26 Redcoats Lane, Sag Harbor, New York.

85.     AMA has always shared common office space, address and telephone numbers with Holmes' personal residence.

*Other Indicia of Holmes' Domination of AMA*

86.     AMA has never exercised business discretion independent of Holmes, and is merely a corporate shell used by Holmes to conduct his personal business and affairs.

87.     Upon information and belief, Holmes did not deal at arm's length with AMA.

88.     At no time after April 2008 has AMA acted an independent profit center, as AMA had no source of income, let alone profit, independent of Holmes or one of his other wholly owned and controlled entities, Wilcom and CSI.

89.     Holmes used the property of AMA as if it were his own.

13

90.     During the litigations that resulted in the unpaid Judgments, Holmes operated AMA in a manner so as to give the appearance that AMA had the financial resources to mount years of expensive litigation against Emerson and ETP.

91.     Notwithstanding the appearances Holmes sought to portray of AMA being a legitimate business entity, Holmes, in fact methodically stripped AMA of all of its cash and assets so that it operated as an undercapitalized corporate shell whose sole purpose was to litigate against Emerson and ETP, but that would be unable to satisfy its payment obligations on the Judgments that resulted from the litigations.

*Wrongful Conduct*

92.     Holmes used his complete domination and control over AMA to improperly transfer assets away from and to leave undercapitalized AMA, thereby hindering, delaying, and/or defrauding Emerson and ETP of the ability to collect on the Judgments.

93.     During the time that AMA was a defendant in the litigations that resulted in the Judgments, AMA conveyed over $2 million to Holmes, the total amount to be determined in discovery.

94.     These conveyances were made without fair consideration.

95.     These conveyances were also made with the intent to hinder, delay and frustrate collection by Emerson and ETP on the Judgments that resulted from the litigations that commenced in 2008.

96.     Although AMA purchased CSI from ETP for $6 million, CSI reported over $40 million in total assets on its federal tax return following AMA's acquisition.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 48).

97.     After AMA's November 7, 2006 purchase of CSI from ETP, Holmes directed that AMA voluntarily relinquish all the shares of common stock of CSI that AMA purchased from ETP, and executed a document dated November 15, 2006 as "sole director" of AMA documenting that relinquishment.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 49).

98.     Upon AMA's voluntary relinquishment of its ownership of CSI, that AMA had purchased for $6 million, Holmes then individually purchased full ownership of CSI for $50,000. (ECF Dkt. No. 56, 56.1(a) St. ¶ 50).

99.     Discovery produced in this post-Judgment proceeding revealed that Holmes did not pay AMA cash or asset consideration for this transaction, but instead executed the sole-shareholder consent directing AMA to voluntary relinquish its ownership of CSI.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 52).

100.    The only Assignment and Assumption Agreement ever produced to Emerson before April 4, 2017 was an Assignment and Assumption Agreement, dated November 8, 2006, signed by Holmes on behalf of AMA and CSI which only assigned AMA's rights (but not liabilities or obligations) under certain delineated executory contracts of CSI in connection with the acquisition.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 171).

101.    After assuming full ownership of CSI for $50,000, Holmes executed an Assignment and Assumption Agreement, dated November 15, 2006, whereby AMA "assigned all of its rights, interests and obligations under the ETP acquisition agreement to CSI."  (ECF Dkt. No. 56, 56.1(a) St. ¶ 53).

102.    Holmes testified that "CSI, by taking assignment of all [AMA's] rights and liabilities under the [AMA/ETP] acquisition agreement, would have to pay everything[,] [w]hatever liabilities there were."  (ECF Dkt. No. 56, 56.1(a) St. ¶ 54).

103.    CSI's financial obligations to AMA under the November 15, 2006 Assignment and Assumption Agreement included funding of all AMA's obligations associated with the litigations that resulted in the unpaid Judgments, including all legal and arbitration fees and expenses.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 55).

104.    Notwithstanding Holmes' unilateral assignment of AMA's obligations to ETP and Emerson under the parties' respective agreements, those agreements mandated that no AMA assignment would relieve it of its direct financial obligations to Emerson and ETP.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 56).

105.    Holmes later had AMA's attorneys prepare a Reimbursement Agreement, dated March 5, 2007 under which CSI reconfirmed its duty to "pay everything[,] [w]hatever liabilities there were," in "connection with the litigation that has evolved from the Emerson Agreements and the transactions contemplated thereby," which the Reimbursement Agreement defines as the "Emerson Litigation."  (ECF Dkt. No. 56, 56.1(a) St. ¶ 60).

106.    Holmes' purpose for having this March 5, 2007 Reimbursement Agreement prepared was to document CSI's obligation to fund AMA's obligations and liabilities, including its legal fees and expenses incurred in connection with AMA's litigations with Emerson and ETP that resulted in the unpaid Judgments.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 61).

107.    The Reimbursement Agreement also granted CSI a share of any recovery AMA obtained against Emerson or ETP in the underlying litigations.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 62).

108.    In accordance with the November 15, 2006 Assignment and Assumption Agreement, CSI funded all of AMA's legal and arbitration fees and expenses in connection with the litigations that resulted in the unpaid Judgments.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 63).

109.    In the underlying Transition Services Litigation, Judge Platt made the determination that: "[AMA] is 100%-owned and-controlled by one person: Charles S. Holmes. Following the closing, Holmes also owned and controlled CSI in its entirety."  (ECF Dkt. No. 56, 56.1(a) St. ¶ 64).

110.    Holmes directed CSI to fund all of AMA's obligations and liabilities during the underlying litigations, including all legal and arbitrator fees and expenses, pursuant to the November 15, 2006 Assignment and Assumption Agreement.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 65).

111.    As the sole owner and controller of AMA and CSI, and consistent with the November 15, 2006 Assignment and Assumption Agreement, Holmes had the ability to direct CSI to fund the Judgments just as he directed CSI to fund the underlying litigation that resulted in the Judgments.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 66).

112.    Holmes made the deliberate decision not to enforce CSI's obligations to AMA to fund AMA's liabilities to Emerson on the unpaid Judgments.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 184).

113.    Holmes testified that he refused to direct CSI to the fund the Judgments because, in his view, "they weren't legitimate."  (ECF Dkt. No. 56, 56.1(a) St. ¶ 67).

114.    Instead, Holmes decided that "AMA had no future," filed a bankruptcy liquidation proceeding for AMA which was dismissed far cause, and established a new entity, Churchill, to operate his solely owned businesses, Wilcom and CSI, which had been operated through AMA.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 185).

115.    By refusing to direct CSI to fund the Judgments pursuant to AMA's rights under the November 15, 2006 Assignment and Assumption Agreement, Holmes invalidated AMA's

only consideration for his insider conveyance to himself of CSI's stock, thereby rendering that insider transaction void of any consideration, let alone fair consideration.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 68).

116.    Notwithstanding that the AMA/CSI Assignment and Assumption Agreement and Reimbursement Agreement obligated CSI to fund AMA's legal expenses, Kirschenbaum testified that CSI treated such payments as a loan to Wilcom on its tax returns.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 125).

117.    Kirschenbaum testified that when he was preparing the 2010 Wilcom tax return he noted an "exorbitant amount of legal fees," and was informed that those fees were in connection with AMA's litigation that led to the unpaid Judgments, and recommended that AMA's 2010 tax return be amended to treat the legal fees as a "distribution to Holmes."  (ECF Dkt. No. 56, 56.1(a) St. ¶ 127).

118.    The IRS audited the Amended 2010 AMA tax return that reclassified the legal fees incurred in the AMA litigations.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 128).

119.    Holmes granted Kirschenbaum power-of-attorney to act as his and AMA's attorney-in-fact in connection with the IRS audit.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 129).

120.    Kirschenbaum represented to the IRS that it was AMA's obligation to fund the legal fees in connection with the Emerson and ETP litigations, notwithstanding that those legal fees had been paid by CSI.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 130).

121.    The IRS accepted Kirschenbaum's representations in its audit findings and permitted AMA to reclassify the legal fees paid by CSI.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 131).

122.    Holmes did not advise Kirschenbaum of the existence of the November 15, 2006 Assignment and Assumption Agreement, and the AMA/CSI Reimbursement Agreement, which

clearly reflected that it was CSI's obligation to fund the AMA legal fees and expenses in connection with AMA's conveyance of CSI to Holmes as it has consistently been doing since that conveyance.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 132).

123.    The IRS was not informed about, or provided copies of, the November 15, 2006 Assignment and Assumption Agreement and the AMA/CSI Reimbursement Agreement that both reflect that it is CSI's obligation to fund AMA's legal fees and expenses in connection with AMA's conveyance of CSI to Holmes.  (ECF Dkt. No. 56, 56.1(a) St. ¶ 134).

124.    After Kirschenbaum was advised of the existence of the November 15, 2006 Assignment and Assumption Agreement and the AMA/CSI Reimbursement Agreement, he chose not to advise the IRS of their existence because, in his opinion, the IRS "wouldn't revisit it because it's a closed year."  (ECF Dkt. No. 56, 56.1(a) St. ¶ 135).

125.    Holmes also made representations and warranties on behalf of AMA in the Acquisition Agreement between AMA and ETP promising in § 4.5, entitled "Funds," that: "Buyer has, and at all times will have, sufficient funds on hand or available pursuant to unconditional commitments to pay the Purchase Price and any adjustments thereof."  (ECF Dkt. No. 56, 56.1(a) St. ¶ 186).

126.    In breach of that contractual commitment, representation and warranty, Holmes systematically stripped AMA of its assets (i.e., its ownership of CSI) and all cash during the litigations that resulted in the unpaid Final Judgments, and refused to fund AMA's purchase price adjustment obligations as determined by the Arbitrator and reduced to final Judgment. (ECF Dkt. No. 56, 56.1(a) St. ¶ 187).

96.127.    The lack of any independent corporate governance or separateness among Holmes and AMA allowed Holmes and AMA to perpetrate a wrongful act against Emerson and ETP and unjustly deprive Emerson and ETP of the ability to enforce the Judgments.

97.128.    Emerson's inability to collect on the Judgments is an inequitable consequence that was directly and proximately caused by the unjust conduct of Holmes and AMA and which will continue if Holmes is not held personally responsible for the debt owed on the unpaid Judgments.

98.129.    Piercing the corporate veil and imposing liability, jointly and severally, on Holmes for the payment of all amounts owed on the unpaid Judgments is necessary to achieve equity, and Holmes should be held responsible for the unpaid debts owed by AMA on the Judgments.

## SECOND CAUSE OF ACTION
(Fraudulent Conveyances – Debtor & Creditor Law § 273-a)

99.130.    Emerson repeats and realleges the allegations set forth above.

100.131.    Emerson is the judgment creditor of AMA on the Judgment docketed against AMA on August 13, 2015 at the end of the lengthy litigation which was commenced on April 10, 2008 in which AMA was a defendant on claims seeking monetary damages

101.132.    Emerson is also the judgment creditor of AMA and the assignee of the Judgment docketed against AMA and in favor of ETP on January 9, 2014 that was entered at the end of lengthy arbitration proceedings which began on April 11, 2008 in which AMA was a respondent on claims seeking monetary damages.

102.133.    No appeal was taken from the Judgments, nor was any motion made to vacate or modify them, and the Judgments are final enforceable for 20 years pursuant to CPLR 211(b) and Fed.R.Civ.P. 69 (a)(1).

103.134.        AMA failed to pay any amount on the Judgments which remain wholly
unsatisfied.

104.135.        During the time that AMA was a defendant and respondent in the
litigations and arbitration proceedings that resulted in the Judgments, Holmes directed AMA to
convey at least $2,182,000 to his personal accounts, the total amount to be determined in
discovery.

105.136.        These conveyances were all made without fair consideration and resulted
in Emerson and ETP being unable to collect on the Judgments docketed following years of
protracted litigation with AMA at Holmes' direction and control.

106.137.        Defendants had knowledge of Emerson's and ETP's claims for monetary
relief against AMA in litigations and arbitration proceedings wherein AMA was a defendant and
respondent, and where AMA's risk of liability to Emerson and ETP was apparent:

- Defendants knew that on January 14, 2007, ETP delivered its Closing Statement to AMA seeking payment of $1,082,922 from AMA, which led to AMA serving its Notice of Dispute of ETP's Closing Statement on February 26, 2007;

- Defendants created a so-called "reimbursement agreement" with CSI as early as March 5, 2007, for CSI to "pay the expenses of AMA in connection with the . . . Emerson Litigation," in anticipation of formal litigation against Emerson;

- Defendants knew that, from April 9, 2007 through April 1, 2008, the parties engaged in negotiations in an effort to resolve their disputes, but were unsuccessful in reaching a resolution;

- Defendants knew that it had been sued by Emerson on April 11, 2008 in *Emerson v. AMA*, 08-cv-1489 (E.D.N.Y.), for breach of contract and failure to pay for goods and services sold to AMA in connection with transition services Emerson agreed to provide to AMA in the year after it purchased the ETP businesses;

- Defendants knew that on April 11, 2008, ETP referred its claims for payment from AMA of a purchase price reduction of $1,082,922 to mandatory arbitration;

- Defendants knew that on June 16, 2009, this Court granted ETP's cross-motion to compel arbitration in *AMA I*, and that on February 10, 2010, this Court denied

21

AMA's Motion for Reconsideration of the Court's June 16, 2009 Order. *See AMA I*, No. 08-cv-2128, 2010 U.S. Dist. LEXIS 143855 (E.D.N.Y. Feb. 10, 2010);

- Defendants knew after the Decision and Order of this Court dated January 25, 2011 in *AMA II* that it could not avoid arbitration of its claims arising from the post-closing dispute. *See AMA II*, No. 08-cv-2506, 2011 U.S. Dist. LEXIS 9434 (E.D.N.Y. Jan. 25, 2011);

- Defendants knew that on March 20, 2012, the Court issued its Decision and Order awarding Emerson summary judgment as to liability against AMA on Emerson's breach of contract claim against AMA in addition to the reasonable attorneys' fees Emerson incurred in that lawsuit. *See Emerson v. AMA*, No. 08-cv-1489, 2012 U.S. Dist. LEXIS 39442 (E.D.N.Y. Mar. 20, 2012);

- Defendants knew that on November 7, 2013, the Arbitrator issued his Award rejecting AMA's claims and finding in favor of ETP on its claim for a post-closing adjustment. (Award, *AMA I*, 08-cv-2128, Docket No. 49-4).

~~107.~~138.     The cash and assets Holmes transferred to himself from AMA's accounts were the only cash and assets sufficient to pay AMA's obligations to Emerson and ETP.

~~108.~~139.     After the Court in *AMA I* issued its June 16, 2009 Order denying AMA's petition to stay arbitration, the frequency and volume of Wilcom payments to AMA followed by quick transfers to Holmes increased.

~~109.~~140.     After Emerson won summary judgment as to liability on March 20, 2012 in its action as plaintiff against AMA for transition services payments (08-cv-1489, E.D.N.Y.), the transfers made to Holmes all but ceased and Holmes caused AMA to operate as an empty shell, while at the same time, establishing Churchill to take over Holmes' business affairs that he had previously run through AMA.

~~110.~~141.     Although Holmes prepared and signed a document dated March 25, 2009 entitled "Demand Note and Security Agreement" purporting to grant him a security interest in AMA's cash and assets, that document was also a fraudulent conveyance, and any cash Holmes allegedly provided AMA were capital contributions and not legitimate "loans" covered by any legitimate security interest.

22

111.142.      To the extent conveyances to Holmes were recorded as "interest" payments to Holmes, they lacked fair consideration because they were allegedly payments to a corporate insider on purported antecedent capital contributions.

112.143.      AMA's transfers to Holmes during the pendency of the litigations with Emerson and ETP were made without fair consideration, and hence, fraudulent as to Emerson because AMA failed to make any payment on the Judgments.

113.144.      As a result of AMA's fraudulent conveyances, Emerson has sustained damages in the amount of the unpaid Judgments and applicable interest.

114.145.      Emerson requests that all conveyances without fair consideration made by AMA to Holmes, or entities that he controls, during the pendency of the litigation that resulted in the Judgments, including those that are revealed in discovery, be avoided, and that such funds be provided to Emerson for payment on the Judgments.

**THIRD CAUSE OF ACTION**
(Fraudulent Conveyances – Debtor & Creditor Law § 276)

115.146.      Emerson repeats and realleges the allegations set forth above.

116.147.      Emerson is the judgment creditor of AMA on the Judgment docketed against AMA on August 13, 2015 at the end of the lengthy litigation which was commenced on April 10, 2008 in which AMA was a defendant on claims seeking monetary damages

117.148.      Emerson is also the judgment creditor of AMA and the assignee of the Judgment docketed against AMA and in favor of ETP on January 9, 2014 that was entered at the end of lengthy arbitration proceedings which began on April 11, 2008 in which AMA was a respondent on claims seeking monetary damages.

118.149.      No appeal was taken from the Judgments, nor was any motion made to vacate or modify them, and the Judgments are final enforceable for 20 years pursuant to CPLR 211(b) and Fed.R.Civ.P. 69 (a)(1).

119.150.      AMA failed to pay any amount on the Judgments which remain wholly unsatisfied.

120.151.      During the time that AMA was a defendant and respondent in the litigations and arbitration proceedings that resulted in the Judgments, Holmes directed AMA to convey at least $2,182,000 to his personal accounts, the total amount to be determined in discovery.

121.152.      These conveyances, however, were made with the intent to hinder, delay, and/or defraud Emerson and ETP so that Emerson and ETP would be unable to collect on the Judgments owed to it by AMA.

122.153.      Defendants' intent to hinder, delay, or defraud Emerson and ETP in their ability to collect on the Judgments is demonstrated by numerous badges of fraud.

123.154.      Holmes is the sole owner, operator, and insider of AMA.

124.155.      Defendants had knowledge of Emerson's and ETP's claims for monetary relief against AMA in litigations and arbitration proceedings wherein AMA was a defendant, and where AMA's risk of liability to Emerson and ETP was apparent:

- Defendants knew that on January 14, 2007, ETP delivered its Closing Statement to AMA seeking payment of $1,082,922 from AMA, which led to AMA serving its Notice of Dispute of ETP's Closing Statement on February 26, 2007;

- Defendants created a so-called "reimbursement agreement" with CSI as early as March 5, 2007, for CSI to "pay the expenses of AMA in connection with the . . . Emerson Litigation," in anticipation of formal litigation against Emerson;

- Defendants knew that, from April 9, 2007 through April 1, 2008, the parties engaged in negotiations in an effort to resolve their disputes, but were unsuccessful in reaching a resolution;

- Defendants knew that it had been sued by Emerson on April 11, 2008 in *Emerson v. AMA*, 08-cv-1489 (E.D.N.Y.), for breach of contract and failure to pay for goods and services sold to AMA in connection with transition services Emerson agreed to provide to AMA in the year after it purchased the ETP businesses;

- Defendants knew that on April 11, 2008, ETP referred its claims for payment from AMA of a purchase price reduction of $1,082,922 to mandatory arbitration;

- Defendants knew that on June 16, 2009, this Court granted ETP's cross-motion to compel arbitration in *AMA I*, and that on February 10, 2010, this Court denied AMA's Motion for Reconsideration of the Court's June 16, 2009 Order. *See AMA I*, No. 08-cv-2128, 2010 U.S. Dist. LEXIS 143855 (E.D.N.Y. Feb. 10, 2010);

- Defendants knew after the Decision and Order of this Court dated January 25, 2011 in *AMA II* that it could not avoid arbitration of its claims arising from the post-closing dispute. *See AMA II*, No. 08-cv-2506, 2011 U.S. Dist. LEXIS 9434 (E.D.N.Y. Jan. 25, 2011);

- Defendants knew that on March 20, 2012, the Court issued its Decision and Order awarding Emerson summary judgment as to liability against AMA on Emerson's breach of contract claim against AMA in addition to the reasonable attorneys' fees Emerson incurred in that lawsuit. *See Emerson v. AMA*, No. 08-cv-1489, 2012 U.S. Dist. LEXIS 39442 (E.D.N.Y. Mar. 20, 2012);

- Defendants knew that on November 7, 2013, the Arbitrator issued his Award rejecting AMA's claims and finding in favor of ETP on its claim for a post-closing adjustment. (Award, *AMA I*, 08-cv-2128, Docket No. 49-4).

~~125.~~156.     After the Court in *AMA I* issued its June 16, 2009 Order denying AMA's petition to stay arbitration, the frequency and volume of Wilcom payments to AMA followed by quick transfers to Holmes increased.

~~126.~~157.     After Emerson won summary judgment as to liability on March 20, 2012 in its action as plaintiff against AMA for transition services payments (08-cv-1489, E.D.N.Y.), the transfers made to Holmes all but ceased and Holmes caused AMA to operate as an empty shell, while at the same time, establishing Churchill to take over Holmes' business affairs that he had previously run through AMA.

~~127.~~158.     Although Holmes prepared and signed a document dated March 25, 2009 entitled "Demand Note and Security Agreement" purporting to grant him a security interest in

AMA's cash and assets, that document was also a fraudulent conveyance, and any cash Holmes allegedly provided AMA were capital contributions and not legitimate "loans" covered by any legitimate security interest.

128.159.     AMA's transfers to Holmes during the pendency of the litigations with Emerson and ETP were made without fair consideration.

129.160.     AMA had no independent source of income between 2008 and 2015, other than the receipts it recorded as revenue from Wilcom which Holmes transferred to himself after they were received into AMA's accounts from Wilcom.

130.161.     Each such transfer by AMA to Holmes rendered AMA insolvent.

131.162.     To the extent these conveyances were recorded as "interest" payments to Holmes, they lacked fair consideration because they were allegedly payments to a corporate insider on purported antecedent capital contributions.

132.163.     The cash Holmes directed AMA to transfer to his personal accounts were the only assets sufficient to pay AMA's obligations to Emerson and ETP.

133.164.     As AMA's sole owner and insider, Holmes maintained sole, complete and total control of AMA and its property, including all the cash and assets Holmes transferred from AMA's accounts to his own personal accounts.

134.165.     As a result of AMA's fraudulent conveyances, Emerson has sustained damages in the amount of the unpaid Judgments and applicable interest.

135.166.     Emerson requests that all conveyances made by AMA to Holmes, or entities that he controls, during the pendency of the litigation that resulted in the Judgments, including those that are revealed in discovery, be avoided, and that such funds be provided to Emerson for payment on the Judgments.

WHEREFORE, plaintiff Emerson Electric Co. demands judgment against defendants Charles S. Holmes and Asset Management Associates of New York, Inc., jointly and severally:

(a)      Awarding Judgment as against Holmes in the amount of the unpaid Judgments, which collectively amount to $3,931,327.70 plus 9% post-judgment interest from the dates of entry of the unpaid Judgments;

(b)      Cancelling and avoiding all fraudulent transfers made by AMA to Holmes and the accounts he controls;

(c)      Awarding the cost and attorneys fees incurred by Emerson in this Action, pursuant to, *inter alia*, Debtor & Creditor Law § 276-a;

(d)      Awarding punitive damages to the extent that the evidence adduced at trial establishes gross and wanton misconduct; and

(e)      Awarding such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff hereby demands a trial by jury of any issue triable of right by a jury.

Dated:  New York, New York
        ~~March 21, 2016~~November 1, 2019

                                        SIMON▪LESSER PC

                                        By: _____
                                          Leonard F. Lesser, Esq.
                                        355 Lexington Avenue, 10th Floor
                                        New York, New York 10017
                                        212.599.5455
                                        *Attorneys for Plaintiff Emerson Electric Co.*