1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK

2

3  - - - - - - - - - - - - - -  X

4  EMERSON ELECTRIC CO.,     :
                                16-CV-1390(PKC)

5         Plaintiff      :

6

           -against-      :

7                             United States Courthouse
                             Brooklyn, New York

8  CHARLES S. HOLMES and     :
  ASSET MANAGEMENT ASSOCIATES

9  OF NEW YORK, INC.       :
                             May 18, 2021

10       Defendant.     :  2:00 p.m.

11  - - - - - - - - - - - - -  X

12

13          TRANSCRIPT OF PRETRIAL CONFERENCE VIA VIDEO
          BEFORE THE HONORABLE PAMELA K. CHEN
            UNITED STATES DISTRICT JUDGE

14

  APPEARANCES:

15

16  For the Plaintiff:        SIMON LESSER PC
                          355 Lexington Avenue, 10th Fl.

17                      New York, NY 10017
                      BY: LEONARD F. LESSER, ESQ.

18

19  For the Defendants:       MINTZ & GOLD LLP
                         600 Third Ave., 25th Fl.

20                      New York, NY 10016
                      BY: BARRY M. KAZAN, ESQ.

21                          CARLI M. ABERLE, ESQ.

22

  Court Reporter:          Andronikh M. Barna

23                      225 Cadman Plaza East
                      Brooklyn, New York

24                      (718) 613-2178

25  Proceedings recorded by mechanical stenography, transcript
  produced by computer-aided transcription.

2

1          THE CLERK:  Civil cause for a pretrial conference.

2    Docket 16-CV-1390.

3          Before asking the parties to state their

4    appearances, I would like to note the following.  Persons

5    granted remote access to proceedings are reminded of the

6    general prohibition against photographing, recording and

7    rebroadcasting of court proceedings.  Violation of these

8    prohibitions may result in sanctions, including removal of

9    court-issued media credentials, restricted entry to future

10   hearings, denial of entry to future hearings or any other

11   sanctions deemed necessary by the Court.

12         Will the parties please state their appearances for

13   the record, starting with plaintiff.

14         MR. LESSER:  Good afternoon, Your Honor.

15         Leonard Lesser of Simon Lesser, P.C. for the

16   plaintiff, Emerson Electric Company.

17         THE COURT:  Good afternoon.

18         MR. KAZAN:  Good afternoon, Your Honor.

19         Barry Kazan of Mintz & Gold for Defendant Charlie

20   Holmes.  With me is Carli Aberle.

21         We've been advised to file a notice of appearance

22   for Ms. Aberle, which we will take care of, but she would not

23   have been able to do it before last week, as she just was

24   admitted to the Eastern District of New York.

25         THE COURT:  Congratulations.

3

1          All right.  Good afternoon to both of you.

2          So we are here for an initial pretrial conference in

3 anticipation of trial in this matter.  What we are going to do

4 is go over the joint pretrial order that has been proposed by

5 the parties to address issues that can possibly be resolved

6 today or at least should be discussed initially.  I also am

7 going to explain more about the additional briefing that I

8 think needs to be done before trial itself.  But we will set a

9 date for trial.  Obviously, it is going to be very far out,

10 given our current situation, and then we will set dates

11 related to pretrial briefing that has to be done before we

12 start trial.

13          So hopefully you have in front of you the joint

14 pretrial order.  I want to start out by clarifying a couple of

15 the defenses that Mr. Kazan -- is it Kazan?  I'm sorry.

16 Mr. Kazan, that you have put in the joint pretrial order.

17          One of the things you argue is that the plaintiff's

18 Section 276 claim is barred by the six-year statute of

19 limitations.  I guess I am wondering why this was not the

20 subject of -- or should not be the subject of a motion as

21 opposed to something that is tried to the jury.  Explain to me

22 more what it is you think this defense is and what facts it

23 relies upon, if any.

24          MR. KAZAN:  The defense is that the specific

25 conveyances that would have been attacked would have been

4

1   dealing with conveyances that occurred more than six years

2   prior to the commencement of this action and there has been

3   some -- I would say a little bit of confusion on our part as

4   to a couple of the conveyances that were brought up at various

5   points.  But there's also, I believe, a discovery rule that

6   does potentially impact the statute of limitations defense,

7   which I believe Mr. Lesser -- and he can certainly speak for

8   Emerson -- has suggested that would fall under the two-year

9   discovery rule.  So I believe we made the decision not to move

10  for summary judgment on that basis because the question would

11  be, one, the timing of the specific conveyances that are being

12  opposed, one of which -- or several of which may have occurred

13  prior to six years.  And then, two, certainly on the issue of

14  the discovery rule, I am not sure that's an issue that would

15  have been able to be resolved on summary judgment because I

16  believe we would have had a different version of the facts.

17          THE COURT:  Well, the transactions, Mr. Lesser, that

18  are the subject of -- or I guess conveyances that are the

19  subject of this lawsuit, what is the time frame involved,

20  according to your theory of the case?

21          MR. LESSER:  The transfers that are the subject of

22  the fraudulent conveyance claims all occurred during the

23  underlying litigation, generally 2008 through 2010, but like

24  Mr. Kazan just said, there is the discovery rule.  We didn't

25  get disclosure of these transfers until after the AMA

1  bankruptcy proceeding was dismissed and Mr. Holmes responded

2  to the post judgment discovery.  Remember that after the first

3  judgment was docketed, I served post judgment discovery

4  requests and information subpoenas, restraining orders, you

5  know, all the typical post judgment discovery devices to find

6  the assets.  And shortly thereafter, shortly after those were

7  served, AMA filed for involuntary bankruptcy in the Eastern

8  District -- in New Jersey and then it went through the

9  procedural motions to bring it to the Eastern District of

10  New York before Chief Bankruptcy Judge Carla Craig, who

11  ultimately dismissed the bankruptcy proceeding.  And we

12  didn't -- and then once the stay was lifted, then Mr. Kazan,

13  on behalf of Mr. Holmes, started responding to the post

14  judgment discovery all well within two years of the filing of

15  the complaint.  So I don't think there really is any issue on

16  that.  We didn't have access to the AMA bank records in

17  connection with the underlying litigation, so we didn't see

18  the money trail and all the conveyances until after we got

19  that disclosure, which was within the two years of the filing

20  of the complaint.

21            THE COURT:  Okay.  So it does seem to me that at

22  trial there is going to be some evidence produced regarding

23  the actual discovery of these allegedly fraudulent

24  conveyances.  That is going to be necessary for the plaintiff

25  in order to defeat this statute of limitations defense.

1               Is that fair to say, Mr. Lesser?

2          MR. LESSER:  I would say I really don't think

3     there's a legitimate dispute as to when we first got discovery

4     of the fraudulent conveyances and the transfers.  I'm happy to

5     work through that with Mr. Kazan.  I really don't see how

6     there really could be any legitimate dispute as to when those

7     materials were first produced which postdated the bankruptcy

8     proceeding being dismissed, so I'm hoping maybe he and I can

9     work that out.  Otherwise, I mean, it's his burden of proof on

10    the affirmative defense of statute of limitations and I'll

11    just present, you know, an opposition, his letters to me with

12    the disclosures and when I can come pick up the boxes of

13    documents.  I mean, I don't really think this should be

14    something that's in dispute.  I'm hoping that we can work it

15    out.

16         THE COURT:  Mr. Kazan, what do you say to that?  Are

17    there facts that really need to be found by a jury?

18         MR. KAZAN:  At this moment, Your Honor, I think

19    there are.  I don't think it's simply the question of when the

20    actual documents were produced to Mr. Lesser.  For example,

21    one of the conveyances that are raised here is the transfer

22    from Mr. Holmes -- Asset Management Associates acquired CS --

23    the company CSI.  One of the transactions that's noted in your

24    opinion as been raised in Mr. Lesser's expert report is that

25    transfer from Asset Management Associates to Mr. Holmes as a

1 transfer. So in addition, there are issues that I think we

2 intend to raise with respect to the filing of the bankruptcy,

3 both in terms of the timing of the bankruptcy as well as

4 Emerson's decisions within the bankruptcy that go to the

5 equitable estoppel defenses such that it's likely that these

6 issues will still, you know, arise.

7 But certainly Mr. Lesser and I -- and hopefully

8 he'll agree with this statement -- we've been fairly

9 cooperative in terms of timing, deadlines, and trying to work

10 issues out. And we have discussed the fact that we do want to

11 try to narrow some of this down, you know, in terms of the

12 documents and potential testimony and, you know, objections.

13 And so, you know, understanding that we may, due to the

14 Court's schedule, have the time to do some of that, I would

15 intend to, you know, engage in that exercise. So I won't

16 foreclose it, but I do think it's a little broader than what

17 Mr. Lesser has said.

18 MR. KAZAN: I'm happy, Your Honor, to just briefly

19 respond.

20 The only thing I would say is, in connection with

21 the transfer of CSI to Mr. Holmes which took place after the

22 closing, two points on that.

23 One, we didn't get documentation regarding that

24 transfer until discovery in this case in 2017.

25 And two, that transfer is not the subject in and of

1    itself of a fraudulent conveyance claim.  The transfer will be

2    evidence submitted in connection with the alter-ego liability

3    component of the claim, but it is not part of the discrete

4    fraudulent conveyance claims that we're pursuing.  So I really

5    don't see how that raise -- you know, impacts the alleged

6    statute of limitations defense on the fraudulent conveyance

7    claims.

8            And with respect to the bankruptcy and actions in

9    the bankruptcy, I mean, I don't see how that impacts statute

10   of limitations.  There was a bankruptcy that was filed and

11   ultimately it was dismissed on Emerson's motion.  Emerson

12   acted as aggressively as possible to get the bankruptcy

13   dismissed so that the stay could be lifted so that we could

14   get the discovery that then led to the information regarding

15   the fraudulent transfers that we did ultimately include in the

16   complaint that was filed in 2016.

17           So those are my brief responses.  I am hoping that

18   Mr. Kazan and I can confer about that.  I think that there

19   really shouldn't be an issue with respect to those discrete

20   matters.

21           THE COURT:  All right.  Well, I mean, I will leave

22   it to the parties to discuss this further to see if you can

23   come to some resolution, though it sounds like the plaintiff's

24   idea of a resolution is that this defense goes away because

25   there is no factual predicate for it, whereas it does not

9

1   sound like Mr. Kazan agrees with that.  So I am not sure you

2   will be able to negotiate the affirmative defense away.

3           I think though the question becomes whether or not

4   there is any potential evidence that the defense could bring

5   to bear on or support this affirmative defense, as it will

6   have to do at trial, and then it may be a matter of a motion

7   in limine I guess by the plaintiff to preclude any argument

8   with respect to an affirmative defense based on the statute of

9   limitations if you think there is no evidence that would

10  support that.

11          MR. LESSER:  And that's exactly what I would like to

12  do.  Maybe at the very least, the confer -- meet and confer

13  that I do with Mr. Kazan can isolate at least some of the

14  factual allegations that support this defense because it's

15  going to be the defense's burden of proof on that.  And maybe

16  just like you said, Your Honor, I'd present a motion in limine

17  so we can limit the jury's time on that matter and you could

18  make a ruling as a matter of law on anything that's

19  appropriate with respect to the defense.

20          THE COURT:  Right.  I think if you folks cannot work

21  it out and if the defense still wants to pursue this statute

22  of limitations argument and the plaintiff thinks there is no

23  basis for doing so, that will have to be resolved via motion

24  in limine, or at least subject to one if it does not get

25  resolved that way.

1          The second issue I wanted to raise with the defense

2     is this allusion to equitable reasons under the *Brunswick*

3     defense as a means of defeating the 276 claim.  I just want to

4     understand, what exactly does that refer to?  And again, what

5     would it mean for the evidentiary presentation by the defense

6     or I guess on cross of the plaintiff's case?

7               MR. KAZAN:  Thank you, Your Honor.

8          The issue with the equitable defense -- and, you

9     know, it has been referred to as the *Brunswick* doctrine by us,

10    you know, relying on that case, but it really just boils down

11    to an equitable estoppel argument that there are certain

12    indicia by Emerson's conduct that should preclude it from

13    seeking to recover from Mr. Holmes.  And so those issues are

14    such that Mr. Holmes has testified, and Mr. Switzer, who is a

15    representative of Emerson, have testified as to what the

16    parties' intentions were at the time of the AMA contract and

17    whether Mr. Holmes's individual liability was ever

18    contemplated under that agreement under facts such as these,

19    given the fact that AMA -- and sort of goes back to the same

20    issue.  AMA -- our position was that AMA could not hold CSI as

21    an S-corp holding another corporation because of certain tax

22    rules that would have endangered the S-corp status, that

23    Mr. Holmes had made Emerson aware of that and that, as a

24    result, the company ultimately was freestanding as CSI and

25    Emerson and CSI engaged in a course of conduct over years

1   where Emerson knew that they were dealing with CSI.

2          And so there's a lot to -- you know, there may be a

3   lot to unpack there, you know, and obviously we'll attempt to

4   streamline the presentation for the jury so that they can

5   understand it, but effectively it's this idea that the defense

6   should preclude Emerson from recovering, especially in an area

7   where you're arguing an intent to defraud, when Mr. Holmes's

8   testimony is going to be that everyone understood what this

9   deal was and everyone understood what the exposure was going

10  to be, in addition to a couple of contractual provisions that

11  in our view potentially limit recoveries, which we don't know

12  what the jury may ultimately find, you know, which is why we

13  did not move for summary judgment on that, as well as the

14  nature of third-party liabilities within the contract.

15         THE COURT:  Did you want to say anything about that,

16  Mr. Lesser?

17         MR. LESSER:  Oh, certainly.

18         So this equitable defense -- and I believe your

19  decision issued last August, Your Honor, made clear that

20  whether it's pleaded as the equitable estoppel or the

21  equitable reasons, the *Brunswick* reasons, it's still the

22  essence, this equitable estoppel defense which is predicated

23  on the *Brunswick* decision and the allegation that they're --

24  you know, this entity, AMA, is allegedly like the entity,

25  subject entity in *Brunswick* was some sort of shell, not a real

12

1    company and, you know, we knew that going in, that kind of

2    thing.  I mean, we'll address those obviously as it pertains

3    to the equitable claim for alter-ego liability.

4           As to the legal claim of fraudulent conveyance, the

5    defense has no application as a matter of law.  It's an

6    equitable defense to alter-ego liability.  It is not a defense

7    to a fraudulent conveyance claim because the fraudulent

8    conveyance claims obviously flow not from whatever the

9    parties' statements and course of dealing was in the

10   underlying transaction; the fraudulent conveyance claims flow

11   from the transfers of money from the judgment debtor to

12   Mr. Holmes.  And there's no case that applies a

13   *Brunswick*-style equitable estoppel defense to alter-ego

14   liability to add a fraudulent conveyance claim.  And that's

15   the point.  While the equitable claim of alter-ego liability

16   relies in part on the fraudulent transfers as a function of

17   the wrongs component of alter-ego liability, the standalone

18   claims of constructive and intentional fraudulent conveyances

19   is not subject to this *Brunswick* defense and that's pretty

20   clear.

21          And if we need to, you know, further brief that in

22   the motion in limine, we will do that, Your Honor.

23          THE COURT:  So it seems that you acknowledge that

24   there may be some applicability of this *Brunswick* defense to

25   the equitable claim of piercing the -- or rather of the alter

13

1   ego aspect of your claims against Mr. Holmes, but you are

2   saying it has no applicability to the Section 276 liability

3   that you are claiming here; in other words, the fraudulent

4   conveyance liability?  Is that --

5               MR. LESSER:  That's correct.

6               THE COURT:  Okay.

7               MR. LESSER:  That's correct.

8               And, I mean, we briefed the issue as to why I don't

9   think the equitable estoppel applies to the alter-ego

10  liability.  Your Honor said they're issues of fact, that's

11  fine.  But that's separate and discrete from the fraudulent

12  conveyance claims, one of them being the 276 intentional

13  fraudulent conveyance claim.

14              THE COURT:  So, Mr. Kazan, how are you intending to

15  argue this?  Were you intending to argue the *Brunswick* defense

16  only in connection with the alter-ego liability claim or are

17  you going to argue it as to the Section 276 claim in general?

18              MR. KAZAN:  We intended to argue both, Your Honor.

19  I know the issue is briefed.  I don't think Your Honor -- I do

20  think it was addressed under 273-a.

21              THE COURT:  Right.

22              MR. KAZAN:  But I don't think it was addressed under

23  276.  Obviously, you know, when you're talking about intent to

24  defraud and you're arguing that the other side didn't rely on

25  these situations, it appears that it would be relevant for

1   that decision whether it's characterized as a true affirmative

2   defense or whether it's characterized as evidence of a lack of

3   intent that meets 276.  Because 276 is an intentional statute.

4   273, you know, effectively is a strict liability statute in

5   this context.  The context being that shareholder loans,

6   repayments under the version of the -- I want to call it the

7   uniform transaction under 273-a that existed at the time

8   essentially said, you know, an insider cannot get the benefit

9   of a transferee in good faith.  The issue with 276 is, because

10  it's an intent to defraud, we believe we can apply it.  And we

11  did cite cases in the underlying briefing, you know, where,

12  for example, even Magistrate Locke was dealing with a case

13  dealing with equitable defense as to legal claims.  And so I

14  know that's Ms. Emerson's position in this case, but I don't

15  know that it's settled such that it's not -- that it couldn't

16  be presented to the jury in some fashion.

17          THE COURT:  Well, I am looking at that portion of

18  the decision where I addressed this *Brunswick* defense and

19  unless I was mistaken at the time I issued the decision, I

20  characterize Holmes's affirmative defense as the plaintiff

21  should be equitably estopped from piercing AMA's corporate

22  veil because when plaintiff contracted with defendants, it

23  knew that AMA was effectively a dummy corporation that Holmes

24  had created solely as a vehicle to carry out the deal and to

25  shield Holmes from personal liability.  So unless I

1   mischaracterized the defense's argument, it seemed to me that

2   you argued, at least in the context of the summary judgment

3   motion, this *Brunswick* defense exclusively or at least focused

4   it very narrowly on the alter ego or piercing the corporate

5   veil issue because it relates -- it seems to me the case

6   itself relates to this notion of piercing the corporate veil

7   and then the defendant's personal liability.

8          So I think what is going to have to happen here is

9   that the plaintiff is going to have to file a motion in limine

10  if, Mr. Lesser, you want to preclude the defense from arguing

11  more generally that the Section 276 claim or any liability

12  under Section 276 can be defeated by this *Brunswick* defense,

13  an equitable defense.

14         Now, maybe there is no daylight between those two

15  issues -- I just do not remember all that well -- and whether

16  or not Mr. Holmes's personal liability is really the -- you

17  know, would answer the question of Section 276 liability or

18  some, you know, fraudulent conveyance under 276.

19         But, Mr. Lesser, if you think that for some reason

20  the defense should not be allowed to argue this beyond being a

21  defense to the alter-ego argument or liability of Mr. Holmes,

22  you should put that in a motion in limine so that we could

23  resolve that before trial and, you know, decide what -- so I

24  can decide whether or not that argument can even be made to

25  the jury.

1        MR. LESSER:  Yeah, I think that's fine and I'm happy

2    to do that.

3        I would just briefly respond that the whole notion

4    of the equitable estoppel defense to alter-ego liability

5    articulated in *Brunswick* was exactly how you framed it in your

6    decision, Judge, which is an equitable theory based upon the

7    alleged disclosure and knowledge of a purported dummy

8    corporation being used as a vehicle for an acquisition as

9    opposed to it being something more than that.  We addressed

10   that issue.  That's fine, I can readdress it.

11       But with respect to the fraudulent -- intention of

12   fraudulent conveyance claim, what I don't think Mr. Kazan

13   correctly characterized was that with respect to a 276 claim,

14   it's not like you present evidence that there was an

15   intentional fraud committed as a result of the fraudulent

16   transfers, you present evidence to the badges of fraud, right?

17            THE COURT:  Right.

18            MR. LESSER:  And if you have multiple badges of

19   fraud and those badges of fraud are the close relationship

20   between the parties to the con- -- acting in the normal course

21   of a transaction and the inadequacy of consideration, things

22   like that.  If there are multiple badges, then there is clear

23   and convincing evidence of actual intent.  So I don't even see

24   how the concepts that the *Brunswick* court is addressing

25   vis-a-vis allegations that the corporate acquirer was a dummy,

1  how that would even apply to post acquisition fraudulent

2  transfers and the allegations that they were intentional based

3  upon the badges of fraud for those post acquisition transfers.

4       And that's the point.  And I'm happy to address that

5  in a motion in limine to the extent that the Court feels that

6  it should be addressed, which I do.  I think that it should be

7  pulled away from a jury so that you can look at that legal

8  issue and see how that defense should be applied to the extent

9  that the defense presents its burden -- you know, meets his

10 burden of proof to establish it.

11      THE COURT:  Well, and one thing to consider with

12 respect to these affirmative defenses, and I do not know the

13 answer to this, is that oftentimes what will happen is the

14 jury has to make certain findings of fact that are set forth

15 in a special verdict sheet and then I would make a legal

16 determination based on those findings of fact about the

17 applicability of a defense.  That obviously arises in

18 different context.  I do not know if that is the proper way of

19 handling these two affirmative defenses, the statute of

20 limitations as well as the equitable defense as to alter ego,

21 but that is something that the parties will have to sort of

22 apprise me of or argue about if there is disagreement.

23      But I do want to say --

24      MR. LESSER:  Thank you.

25      THE COURT:  Hang on.

1        I do want to say, Mr. Kazan, that at least right now

2   all I found in the summary judgment decision was that there

3   were issues of fact about what alter-ego theory that the

4   plaintiff is pursuing, but I do not think I resolved it and I

5   do not think it was added to the fact that it could be a

6   defense to the 276 claim.  And I think in part, for the

7   reasons that Mr. Lesser says, that it is -- I do not think the

8   original defense was intended to do that and I am not sure

9   that it is a match between the facts that would give rise to

10  the defense and those that would defeat a 276 claim.

11       But like I said, I think the plaintiff should maybe

12  articulate that in a motion in limine.

13       Mr. Lesser, you do not have to reargue the point

14  about the applicability as to the alter ego.  Obviously, that

15  issue possibly can be argued to the jury.  Although, if you

16  think the more proper way to deal with it is for me to make

17  that determination posttrial, facts found by the jury, then

18  you can make that argument as well.

19       MR. LESSER:  And I was just going to suggest that

20  very thing, Your Honor, especially given the fact the

21  alter-ego claim is an equitable -- it's a claim that has to be

22  crafted and that it is the proper way in which it will claim

23  the sheet which will have factual determinations for the trier

24  of facts that then you as the court of equity will then rule

25  upon in a decision based upon the facts found by the fact

1  finder.

2      THE COURT:  Right.  I think that makes sense.  That

3  may not be true of the statute of limitations issue, but --

4      MR. LESSER:  Correct.

5      THE COURT:  But that would be subject to a different

6  briefing --

7      MR. LESSER:  Yes.

8      THE COURT:  -- at any rate because of the reasons

9  that you said earlier, Mr. Lesser, that there are no facts

10  that you think the jury can find or would find that would

11  support an affirmative defense.

12      Okay.  Turning to page 10 of the joint pretrial

13  order, both sides are requesting a jury trial.  I alluded to

14  this earlier that as --

15      (Audio dropped; Reporter asks the Court to repeat.)

16      THE COURT:  So as I alluded to earlier, this case

17  will not be tried any time soon and, as you can appreciate,

18  jury trials have been backed up as a result of the pandemic

19  and we only recently started doing criminal jury trials a

20  couple of weeks ago in April.  So you will not see a trial

21  until 2022 if you want a jury trial and I think even summer of

22  2022 might be ambitious.  Because even though we might be able

23  to do more than the number of trials we are doing now, which

24  is two at a time, we cannot be expected to constantly be

25  picking juries and so things will not fully open up again for

1   a while.

2          So I guess I ask the parties to consider whether or

3   not a bench trial -- if you will consider a bench trial,

4   especially because the issues had been narrowed so much by the

5   summary judgment decision and by the default of AMA.  So you

6   do not need to answer now, but I would give it some thought,

7   depending on your interest in getting this case resolved

8   sooner rather than sometime next year and probably late next

9   year.

10         MR. LESSER:  Your Honor, if I may?

11         What would be your best guesstimate today, if we did

12  a bench trial, when you think it could be slotted in or at

13  least to commence?

14         THE COURT:  I have no idea.

15         I can tell you this, that right now at the rate of

16  two trials every two weeks, which is the jury selection

17  period, we have criminal trials scheduled from now until the

18  end of 2021, and so that means no civil trials will be

19  happening.  Now, it is possible that we will have the

20  potential to pick some civil juries between now and the end of

21  the year.  But again, because we cannot run a nonstop jury

22  selection process, it is just not possible even under the best

23  of times; I do not think we are going to be doing many civil

24  jury trials this year, if any.  So then you are talking about

25  the backlog of civil trials, of which there are many, many.

 1    And so I would think maybe late next year would be a safe

 2    estimate.  Sometime fall or later in 2022 would be the

 3    earliest I would expect we would be able to try this case.

 4    Now, the age of the case contributes -- might bump us up a

 5    little bit, but probably not much.

 6              MR. LESSER:  I may not have been clear.

 7              My question to you was if we decided to do a bench

 8    trial, what would be your best guesstimate today as to when

 9    you think it could be slotted?

10              THE COURT:  My apologies.  That was a very long,

11    unnecessary explanation.

12              We could probably slot it any time before the fall.

13    My deputy is on the call.  We could do it in the summer.  It

14    is only going to be a week, roughly.  And faster if we are not

15    picking a jury; we could get it done, I bet, in five days.  So

16    any time in the summer.

17              MR. LESSER:  Okay.  That will be something that I

18    would like to confer with my client and obviously with

19    Mr. Kazan and we'll definitely consider that.  That's a big

20    swing in terms of timing and there is a lot of prejudgment

21    interest that's attached, so maybe it does make sense to do

22    that.  So we'll confer on that issue.

23              THE COURT:  Yes.  Okay.  I mean, we could do it as

24    early as June.  July, less likely, but August as well are

25    open.  Right now I think August is wide open.

22

1          MR. LESSER:  Okay.

2          THE COURT:  But we could do June 5th, I was just

3   told, if you guys want to start that early.  It is up to you.

4          MR. LESSER:  Thank you.  We will confer on that for

5   sure.

6          THE COURT:  But there is some motion briefing,

7   obviously, that would have to happen first and so I would

8   suggest August, to be more realistic, so you could get all

9   your briefing done and line up all your witnesses and get

10  ready, you know, appropriately.

11         Okay.  So moving on then.  Let's talk about the

12  witnesses that each of you have identified.  Neither side

13  explained what these witnesses would testify about, which are

14  required typically.  However, I imagine that if neither side

15  was handicapped by that, because it seems to me you both know,

16  I gather, who these different witnesses are and what they may

17  be testifying about.  But I do wonder if either side has an

18  objection to any of these witnesses testifying.  And I note

19  that the defense does suggest a challenge to the plaintiff's

20  expert, I believe, which is something that would have to be

21  briefed before trial to be sure, and it is not going to happen

22  in the middle of trial.

23         So any of objections to either side's witnesses?

24         MR. LESSER:  None for the plaintiff.  I mean,

25  obviously to the extent that there is going to be a challenge

1   to the plaintiff's expert, it will be concomitant to whatever

2   that challenge is, but my witness list is relatively discrete

3   to adverse witnesses and the plaintiff's expert, as well as

4   the 30(b)(6) designee.

5          THE COURT:  Okay.  How about you, Mr. Kazan?  Do you

6   have any objection to the plaintiff's witnesses?

7          MR. KAZAN:  No, Your Honor.  I think what happened

8   was the -- I think it's under the motions in limine that

9   Mr. Lesser and I both sort of parroted each other's language

10  as a sort of a precautionary issue, but I believe we're both

11  familiar with all of these individuals who may testify at

12  trial.  I don't foresee a Daubert type exclusion in

13  challenging Mr. Lazzara.

14         THE COURT:  Okay.  Now let me ask you, Mr. Lesser,

15  because in your -- well, as Mr. Kazan just said, both of you

16  have parallel language, apparently you parroted each other,

17  suggesting you might challenge the other side's expert, but

18  you are saying you are not going to do that, right?

19         MR. LESSER:  Yes.  Like Mr. Kazan, I don't expect a

20  Daubert style challenge to Mr. Ashe based upon, you know, his

21  credential.

22         THE COURT:  Okay.  All right.  So rather you are

23  just going to challenge the bases of his opinion as argument

24  to the jury or whoever the fact finder is?

25         MR. LESSER:  Or the foundation, the evidentiary

1    foundation to the opinions that he proffers.

2            THE COURT:  Okay.  All right.  Now let's turn then

3    to the deposition testimony.

4            The plaintiff has identified quite a bit of

5    deposition testimony it may seek to offer at trial.  And the

6    normal -- the way I have these designations dealt with,

7    because I want to do it before trial, especially if we are

8    having a jury trial because I want to avoid any battles in the

9    midst of trial, is to have -- whichever side wants to use the

10   testimony in the first instance, basically produce a copy of

11   the deposition transcript and color code those portions that

12   the plaintiff wants to use; and then the defense, or the

13   opposing party, if it is the defense wants to use it, color

14   code it in another shade, like a highlighter, as

15   cross-designations.  So obviously, as often happens, is the

16   plaintiff will designate certain lines and then the defense

17   will take the view that other lines or portions should be

18   introduced for completeness or to avoid any confusion or

19   misleading testimony being admitted.  So whoever the moving

20   party is has to produce a copy of the deposition transcript

21   with a highlighted -- with the designations it wants

22   highlighted in one color and then the defense will highlight

23   in another color what it proposes to introduce, if the

24   plaintiff gets to introduce their portions, and then any

25   objections should also be noted.  Now, the mechanics of that I

1  leave to you, but you could probably number them somehow and

2  then recite what the objections of the arguments are on a

3  separate document, because I do not think it will necessarily

4  lend itself to doing so in the document.  But at the end of

5  the day, what I want is the deposition transcripts color coded

6  with each side's designations and then some recitation of what

7  the objections are to the other side's designations, so some

8  brief articulation of it so that they can be addressed in a

9  pretrial conference.

10         And I think this goes to some of the -- I think this

11  goes to Holmes's section of the joint pretrial order about

12  deposition designations.  Because there is no specific

13  designations in your section, Mr. Kazan, but it sounds like

14  you may want to cross-designate portions and I want you to do

15  that in the actual document that I mentioned and I want it to

16  be done before trial so I could resolve any disputes before we

17  actually start trial.  Okay?

18         Any objection about that process?

19         Okay.

20         MR. LESSER:  The only thing I would raise is that

21  with respect -- presumably with respect to the plaintiff's

22  burden of proof on its case in chief, that's relatively

23  straightforward; I color/highlight the case-in-chief stuff

24  that I want in and Mr. Kazan will add or raise his objections.

25  With respect to affirmative defenses where the burden is

1   shifted, how would you propose addressing that?  Would it be

2   the same thing where I just color code and he color codes and

3   we kind of work that through?

4         THE COURT:  Yes.

5         MR. LESSER:  Okay.

6         THE COURT:  But I assume that Mr. Kazan would start

7   that process if, in fact, he is going to be eliciting certain

8   evidence in the deposition testimony that he wants to

9   introduce.

10         MR. LESSER:  Right.

11         THE COURT:  So, Mr. Kazan, if there is certain

12   evidence that you want to elicit via deposition testimony or

13   present via deposition testimony in support of your

14   affirmative defenses, you should start that process, the

15   designation process, with whatever transcripts you want to use

16   and then Mr. Lesser can cross-designate.  Okay?  So whoever

17   has the burden, start -- whoever wants to affirmatively use

18   the evidence should start the deposition designation process.

19         But I just want to disabuse you guys of the notion

20   that you can wait until the final pretrial conference to do

21   that.  We are going to get that done and resolved by the time

22   of the final pretrial conference, which is going to be just a

23   half a week before trial starts.

24         MR. LESSER:  Understood.

25         MR. KAZAN:  Understood, Your Honor.

1          May I ask a question on this point?  Because the

2     designations that are there are certainly of every witness who

3     plans to be available in that trial.  And so the question

4     would be, if we are doing designations, assuming it is not a

5     bench trial, is the custom in your court to read the

6     designations to the jury, provide them -- or just provide it

7     to them in writing?

8          THE COURT:  You know, I let the parties decide how

9     they want to present it.

10          So, I have had both done.  Predominantly, it seems

11     like parties have it read.  So someone sits in the witness

12     box, reads back the answers to a lawyer who reads the

13     questions by the lawyer.  So you can choose whatever format

14     you like.  Sometimes I think parties like to make sure the

15     jury hears it.  You know what I mean?  Because you never know

16     if they read it if you just submit it to them in writing.  So

17     that is why I think most parties -- and I understand this.  I

18     have done the same.  I would probably have it read in as if

19     the person were testifying.  Okay.

20          MR. KAZAN:  Thank you, Your Honor.

21          THE COURT:  And obviously the same rules will apply.

22     You know, you cannot have your mock witness inflect in a

23     certain way.  And I have done extensive readings like that in

24     trials.  So you just have to maintain a relatively even tone,

25     whoever the witness is, so as not to affect the impact of the

1   testimony unfairly.  All right?

2         But if you want to submit it in writing and you are

3   satisfied to do it that way just because you want to refer to

4   it during closing argument and you just want it to be there,

5   that is fine, too.  So I am not going to prescribe how you do

6   that.  That is up to you.

7         MR. KAZAN:  Thank you, Your Honor.

8         THE COURT:  Okay.  All right.  Now turning to the

9   exhibits, which start on page 18.

10        First of all, plaintiff's exhibits, the defense has

11  at least listed a lot of objections to a number of plaintiff's

12  exhibits, certainly in the first 17 or so.  And then the same

13  is true with respect to Defendant Holmes's exhibits, plaintiff

14  has raised some objections as well.  What I would like you

15  folks to do is to put those objections that will require some,

16  you know, briefing into a motion in limine.  So I am not going

17  to deal with these, especially if we are in a jury trial, on

18  the fly or as the exhibit is being offered.

19        So I note some of these are really prejudice and

20  relevance objections, but I want you to explain or summarize

21  this, even by category, what your objections are to certain

22  exhibits being proffered by the other side.  It would probably

23  behoove you to talk to each other to make sure that the

24  exhibit that you are objecting to is actually going to be

25  offered as opposed to it was marked, you know, out of caution.

1    And then as part of your motions in limine, I would like you

2    to brief your argument about why an exhibit should be

3    precluded entirely or if you want a cautionary instruction to

4    be given, whatever it is that you want to argue.  If you do

5    not, I will probably be less likely to grant some preclusion

6    because I do not want to deal with it in the middle of a trial

7    without having the time to think about it.

8            Now, obviously objections to, you know, questions

9    asked to witnesses or how a document is characterized, you can

10   make those, of course, during the trial itself.  But it seems

11   to me many of these, for example, decisions from other cases

12   or declarations offered in other cases should be amenable to a

13   written motion in terms of preclusion, so I would like you to

14   do that in advance of trial.

15           MR. LESSER:  Understood.

16           THE COURT:  Okay?

17           So that applies to both sides.

18           And you can put them together if you would like

19   because it seems to me some of these are similar kinds of

20   exhibits, especially the decisions from what appear to be

21   other cases.  You can argue sort of as to exhibits, for

22   example, 13 through 16 that the plaintiff seeks to offer the

23   following argument to preclude them.

24           All right.  And then we get to the motions in limine

25   section.  Neither side identified any, but obviously I have

1   given you a number of --

2           MR. KAZAN:  Your Honor?

3           THE COURT:  Yes.

4           MR. KAZAN:  I'm so sorry to interrupt.

5           THE COURT:  It's okay.

6           MR. KAZAN:  We did identify one that we had not

7   discussed with -- well, it was in our -- it's in the pretrial

8   order, we have not fully discussed it, which is, there are

9   numerous references in various pleadings to the fact as to who

10  Mr. Holmes sold his house to that Mr. Lesser raised.  And so

11  that is one issue that, you know, we flagged as not being

12  appropriate for a preclusion order in advance.  I don't know

13  if Mr. Lesser intended to actually raise it at trial, but it

14  is something that's contained in several of the documents that

15  he has listed as exhibits.

16          THE COURT:  Mr. Lesser, do you intend to elicit this

17  information or present some evidence on whom Mr. Holmes sold

18  his prior residence to?

19          MR. LESSER:  The answer to that was no, it's not

20  actually in any of the exhibits.  To the extent that, you

21  know, that there was some news report articles, we're not

22  going to offer those per se.  To the extent that we offer

23  evidence of Mr. Holmes' bank statements and things like that,

24  I don't think they reflect the sale.  My understanding, at

25  least from the recording, was that he set up some sort of LLC

1   for the purchase, but we didn't really get into that.  So I

2   wasn't offering those articles into evidence, but I'll confer

3   with Mr. Kazan as to what his concerns are and try to work

4   that through by stipulation.

5              THE COURT:  Okay.  If you can do that, great.

6              If not, obviously move, Mr. Kazan, for whatever

7   motion in limine you think -- whatever limiting instruction

8   you want on that or preclusion if Mr. Lesser indicates that he

9   wants to talk about that subject.

10             Now, I have mentioned already that a number of areas

11  have to be covered in motions in limine, so I am not going to

12  reiterate those.

13             Is there anything else that you can think of now,

14  given my general guidelines on how I like to proceed mainly

15  to, you know, resolve as many issues as we can before we start

16  trial, that you think should go into a motion in limine?

17             MR. LESSER:  None for the plaintiff.

18             I would just say that I'd like to -- you know, we'll

19  still confer, continue to confer.  Maybe we can even get some

20  more stipulations of fact to streamline further what's going

21  to be presented to the jury and the specific questions we're

22  going to have them deal with in the proposed special verdict

23  sheet.  And I'll start that process so that we can try to

24  streamline this as much as possible.

25             THE COURT:  Okay.  So I guess here is a question.

1   And I know this requires you to maybe try to figure out what

2   is in each other's minds, but if you think there is some

3   chance that this could be -- that both sides will agree to a

4   bench trial, we could try to set a schedule for all the

5   briefing of the motions.

6           If you think it is more likely that we are going to

7   have a jury trial, I am trying to figure out how best to

8   handle this.  Because I can give you a trial date in 2022, I

9   just do not know -- and we can work backwards in terms of the

10  briefing schedule.  I just do not know how realistic even that

11  exercise is.  I would probably set it for the summer of 2022,

12  in an optimistic sort of vein.

13          But do you have any thoughts I guess on basically

14  whether you think you will agree on a bench trial or not?

15          MR. KAZAN:  Your Honor, for the plaintiff -- sorry.

16  For the defendant, Mr. Holmes, I would suggest that it's

17  unlikely.  I do believe he is going to want to have a jury

18  hear his case.

19          THE COURT:  All right.  That perhaps then answers

20  the question.  Why don't we set a date for summer of 2022.

21  And who knows, I mean, it is impossible to predict how the

22  circumstances surrounding us will change and what that means

23  for the court and its processes, so let's just put it down for

24  sometime maybe June or July in 2022, about a year from now.

25          Does anyone have any notion that they will be

1   unavailable in either of those months next year?

2        MR. LESSER:  Yes, the only blackout that I'm going

3   to have is going to be towards -- it's going to be surrounding

4   when my kids are done with school because we were supposed to

5   take a trip for their bar- and bat mitzvah last year, but then

6   COVID.  And so we were going to go this year, but now with the

7   fighting that's happening, that's not happening.  So I would

8   be hesitant to do it in the beginning part of June.  I would

9   suggest July only if we're looking at the summer, this way I

10  don't have to come to you and say, Your Honor, I need to

11  adjust it further.  So I would say mid-July if we're going to

12  be looking at the summer of 2022.  Obviously, if we can move

13  it up, that would be great.

14        THE COURT:  Okay.

15        MR. KAZAN:  And, Your Honor, similarly, my two

16  children will now be graduating at the same time from college

17  hopefully in June of next year, so.

18        THE COURT:  Congratulations.

19        MR. KAZAN:  Well, one will be celebrating their

20  graduation and the other will have their graduation.

21        THE COURT:  Okay.  Yes, I know, the whole world is

22  topsy-turvey.

23        So how about July 11th as at least our scheduled

24  trial date, and that way at least we can generate some

25  briefing dates based on that.

1           July 11, 2022 to pick the jury and start the trial.

2           In terms of motions in limine, since there are quite

3   a few, why don't we have those briefed six weeks before trial.

4           So, Fida, what date is that?

5           THE CLERK:  June 30th.

6           THE COURT:  June 30th?

7           THE CLERK:  May 30th.

8           THE COURT:  May 30th.  May 30th, that makes sense.

9           Do you know if that is Memorial Day?

10          MR. KAZAN:  That is Memorial Day.

11          THE COURT:  Ah.  So let's make it before then

12   because it is still a lot of time.  So why don't we make it

13   the week before then, May 23rd.  So that will be the date.

14          Is that all right?

15          MR. KAZAN:  Actually, I may have spoken too quickly.

16   I saw that it was the last Monday in May and I assumed that

17   was Memorial Day, but I think that's right.

18          Ms. Aberle is nodding her head.

19          MR. LESSER:  Yeah, May 30, 2022 is Memorial Day.

20          THE COURT:  Okay.  So let's make it May 23.  And why

21   don't we make that kind of an omnibus due date so you only

22   have one deadline.  So that is for the motions in limine as

23   well as the deposition designations.

24          And then each side will have two weeks to respond to

25   the motions in limine, which would put us in June, I think

1    June 6th or 7th.

2             Is that right, Fida, from May 23rd?

3             THE CLERK:  Yes, June 6th.

4             THE COURT:  Okay.  So June 6th it will be due.

5             And then one week if you want to reply, but you do

6    not have to.  And that will be June 13th.

7             And then why don't we make the 13th the date upon

8    which the proposed jury charges should be submitted.

9             And we will put out on the -- well, actually, let me

10   say this.  You do not have to provide any sort of standard

11   instructions like burden of proof or credibility or the whole

12   process by which the jury has to deliberate, et cetera.  Just

13   focus on the claims, obviously the 273-a and the 276 claims,

14   and what those elements are and what the jury needs to find in

15   terms of the elements and then of course the alter ego and

16   then anything else you think that relates to the claims in

17   this case.

18            And the way I would like you to do that, too, is to

19   produce a joint submission.  So to the extent that you agree

20   on any instructions, just have that set forth.  And then if

21   you disagree, indicate defense's position, plaintiff's

22   position, sort of stacked, so that way we have one document

23   that we can use, that my law clerk can use to produce the

24   final instructions.

25            And then we will ask you to send that to us in Word

1   format also to our Chen chambers e-mail so that obviously we

2   could work off of that document in generating or at least cut

3   and paste as appropriate from it.

4            Let's see.  Proposed voir dire, you can submit those

5   two weeks before trial.

6            So what would that be, Fida?

7            And all these dates will be generated again in the

8   minute order.

9            MR. LESSER:  Your Honor, if I may?

10           I was just looking at the calendar and I just --

11   what I don't want to do is, I don't want to be in a situation

12   where I have to come to you and ask for an adjustment.  And

13   just looking at July 11th and when this trip which isn't yet

14   planned but is supposed to be planned, I don't want to be in

15   a -- get in trouble with -- in that.

16           THE COURT:  That is fine.

17           MR. LESSER:  If we can just make it July 18th,

18   Judge, then I know I'm clear because I know it's not going to

19   extend that far.

20           THE COURT:  Okay.  So we will make the trial date

21   July 18th.

22           MR. LESSER:  Thank you.

23           THE COURT:  Assuming, Fida, we do not have nothing

24   else on that date, for 2020.

25           MR. LESSER:  And we can keep all of the other dates

1    because I would like to get it all done before that trip.  So

2    we don't need to, you know, push back those deadlines.  You

3    know, we can keep the dates that you suggested for the

4    pretrial submissions.

5              THE COURT:  Mr. Kazan, are you fine with that?

6              MR. KAZAN:  I am, Your Honor.

7              THE COURT:  Okay.  So all the dates that we have

8    just discussed will stay the same.  The trial date will move

9    to July 18th.  And then two weeks before that, which should be

10   July 4th --

11             THE CLERK:  June 27th.

12             THE COURT:  Thank you.

13             We will make it June 27th.  That will be the date on

14   which you submit your proposed voir dire and also a list of

15   names and terms that could be referenced during the trial so

16   that we could provide it to the court reporters.  So basically

17   you are looking for unique spellings or unusual spellings.

18             And also just remember in your proposed voir dire to

19   include the names of everyone who might be referenced during

20   the trial, or places if that is relevant at all, so that we

21   can make sure that we have jurors -- that you pick jurors who,

22   you know, do not have unique familiarity with either people or

23   places that are relevant to the trial.

24             Fida, I think I have covered everything, right?

25             The one other thing --

1          THE CLERK:  I think --

2          THE COURT:  Oh, sorry.

3          The one other thing I will say is that we will post

4  my standard, what I call, peremptory challenge questions.

5  Things like:  Are you married or do you have a partner?  What

6  do you do for a living?  Where do you live?  You know, county

7  and borough.  That sort of stuff we will put online so you do

8  not need to -- when I say online, we will docket it so that

9  you will see what my standard questions are, including some

10  cause questions that are standard.  So you do not have to

11  re-suggest those.  You should probably focus on questions that

12  are unique to this case.

13          Okay.  Fida, you were going to say something?

14          THE CLERK:  Just that I think that covers

15  everything.

16          THE COURT:  Oh, okay.

17          So I think we are good.

18          Anything else from you, Mr. Lesser?

19          MR. LESSER:  No, Your Honor.  Thank you.

20          THE COURT:  Okay.  And you, Mr. Kazan?

21          MR. KAZAN:  Do we have a where the trial will be

22  relative to Central Islip or Brooklyn?

23          THE COURT:  Oh.  Are you guys in Central Islip?  I

24  know the case was originally filed there and, unfortunately

25  for you, either it got transferred to me or got assigned to me

1  from the beginning because we are sharing the workload of the

2  Central Islip courthouse.

3  Let me look at your addresses.

4  Well, Mr. Lesser is on Lexington Avenue.

5  You are both in --

6  MR. LESSER:  Yeah.  The counsel are all in the City.

7  The only reason that it was -- and the underlying cases were

8  in Islip because that's AMA -- AMA's location was out in

9  Long Island.

10  MR. KAZAN:  Yeah.  Half the witnesses are on the

11  Island and half the witnesses are not on the Island, so.

12  THE COURT:  It is going to be in Brooklyn.  So

13  hopefully they do not mind, but I think the majority of us can

14  get to Brooklyn relatively easily.

15  The last thing I should mention to you; if the case

16  is going to settle, you should settle it before the Thursday

17  before the trial or else you are going to have to pay the jury

18  fee, which for civil cases I think runs about -- what was it,

19  Fida, 1800 or something like that?

20

21  THE CLERK:  I believe it's $50 per juror.  So it's

22  60 jurors times $50 divided by two.

23  THE COURT:  Okay.  Which is about $1500 a party.

24  So keep that in mind.  If you are going to settle

25  it, settle it before the Thursday before trial starts.

1          MR. KAZAN:  Thank you, Judge.

2          MR. LESSER:  Thank you, Judge.

3          THE COURT:  You obviously have at least a year to

4    figure that out.

5          All right.  If you folks decide -- if you change

6    your mind about jury trial, you will let me know.

7          If, for example, Mr. Kazan, you talk to Mr. Holmes

8    and he decides he wants to get the case done this summer, we

9    are available for that.  Okay?

10         MR. KAZAN:  Understood, Your Honor.

11         THE COURT:  All right.  So thank you, everyone.

12   That concludes this proceeding.

13         Stay safe and have a good summer.  We will hear from

14   you I guess in about a year or so from now.

15         MR. LESSER:  Thank you so much, Your Honor.  And you

16   too and to your court staff, stay safe and best regards.

17         THE COURT:  Thanks, everybody.

18         MR. KAZAN:  Thank you, Your Honor.

19         (Matter concluded.)

20                  *     *     *     *     *

21   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
22

23     /s/ Andronikh M. Barna              August 17, 2022
     _____   _____
24       ANDRONIKH M. BARNA                 DATE

25