UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
EMERSON ELECTRIC CO.,

                          Plaintiff,

            - against -

ASSET MANAGEMENT ASSOCIATES OF
NEW YORK, INC.; and DIANA GUZIK
HOLMES, *as legal successor of Charles S.
Holmes*,

                          Defendants.
-------------------------------------------------------x

**FINDINGS OF FACT &
CONCLUSIONS OF LAW**
16-CV-1390 (PKC) (SIL)

PAMELA K. CHEN, United States District Judge:

In this action, Plaintiff Emerson Electric Co. ("Emerson" or "Plaintiff") seeks post-judgment relief from Defendants Charles S. Holmes ("Holmes") and Asset Management Associates of New York, Inc. ("AMA"), pursuant to Federal Rule of Civil Procedure 69 and New York Civil Practice Law & Rules ("CPLR") § 5525(b), based on two judgments (the "Judgments") issued in Emerson's favor by this Court.  *See Emerson Electric Co. v. Asset Mgmt. Assocs. of New York, Inc.*, No. 08-CV-1489 (DRH) (AYS) (E.D.N.Y.) ("No. 08-CV-1489")[1] and *Asset Mgmt. Assocs. of New York, Inc. v. Emerson Electric Co.*, No. 08-CV-2128 (TCP) (AKT) (E.D.N.Y.) ("No. 08-CV-2128").  In a decision issued on August 11, 2020, the Court, in sum and substance: (1) denied summary judgment on the liability portion of Plaintiff's constructive fraudulent conveyance claim as to Defendant Holmes under New York State Debtor and Creditor Law ("DCL") § 273-a, finding that the issue turned on whether Plaintiff can pierce Defendant AMA's

---

[1] This action was originally assigned to the Honorable Thomas C. Platt and later to the Honorable Denis R. Hurley.  (*See* No. 08-CV-1489, 7/8/2014 Docket Order.)

1

corporate veil and hold Holmes liable as AMA's alter ego; (2) denied summary judgment on Plaintiff's fraudulent conveyance claim under DCL § 276; and (3) granted default judgment against Defendant AMA, but only to the extent that Plaintiff was seeking to void the fraudulent conveyances made by AMA to Holmes; and (4) dismissed Defendant Holmes's "unclean hands" defense, but not his "equitable estoppel" defense. *See Emerson Electric Co. v. Holmes*, No. 16-CV-1390 (PKC) (SIL), 2020 WL 4592808, at *17 (E.D.N.Y. Aug. 11, 2020).

On October 11 and 12, 2022, the Court presided over a bench trial in this matter. On October 24, 2022, the parties filed their respective proposed Findings of Fact and Conclusions of Law. On March 28, 2023, Defendant Holmes unfortunately passed away.[2] (Dkts. 114; 115-2.) Plaintiff moved to substitute Diane G. Holmes, Defendant Charles Holmes's wife and executor of his estate, as a proper party to this action on May 12, 2023 and again on June 16, 2023. (Dkts. 115, 116.) On June 16, 2023, the Court ordered Diana G. Holmes to be substituted as a "legal successor of Charles S. Holmes." (6/16/2023 Docket Order.) Approximately one month later, on July 13, 2023, Diana G. Holmes's counsel entered an appearance on the record. (7/13/2023 Notice of Appearance.)

For the reasons below, the Court finds that Plaintiff has proven all its claims by a preponderance of the evidence. Plaintiff has established under DCL § 273-a that the amount of money fraudulently conveyed from AMA to Holmes was $2,194,744. Moreover, the Court finds

---

[2] The Court offers its condolences to Defendant Holmes's family. The Court had intended to issue these Findings of Fact & Conclusions of Law within a month of the bench trial, but due to the press of other matters, was unable to do so. (Tr. 457:19–458:5 (Court explaining that "it's never good for [the Court] to delay or wait . . . for a month or more" "to make [] findings and resolve a bench trial" because it's better to enter judgment "as soon as possible while everything is still fresh in [the Court's] mind."); Tr. 230:14–17 ("THE COURT: Yes. I plan to move very quickly on this matter. Just because of my own schedule, quite honestly[—]if [issuing this judgment] gets stuck [behind subsequent trials], it will be a very long time before you get a decision.").)

that Plaintiff has proven its DCL § 276 claim and thus is entitled to attorney's fees in this matter. Plaintiff shall therefore submit its fee application with all necessary supporting documentation within 30 days of this Order.  Lastly, Plaintiff has successfully pierced AMA's corporate veil and is therefore entitled to recover the underlying Judgments and post-judgment interest directly from Defendant Holmes.  Due to the Court's delay in rendering this judgment, the Court issues these Findings of Fact & Conclusions of Law *nunc pro tunc*, to be entered as of October 31, 2022.

## FINDINGS OF FACT

The Court has thoroughly reviewed both parties' Proposed Findings of Fact and Conclusions of Law, which were submitted to the Court after trial concluded.  (*See* Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Pl. PFFCL"), Dkt. 113; Defendants' Proposed Findings of Fact and Conclusions of Law ("Defs. PFFCL"), Dkt. 112.)  The Court adopts the following undisputed[3] portions of Plaintiff's Proposed Findings of Fact and Conclusions of Law, including all record citations, as the Court's Findings of Fact: (1) Section II.A (*see* Pl. PFFCL, Dkt. 113, at 2–3 (providing the parties' "stipulated factual background")); (2) Section II.C (*see id*. at 5–13 (providing the parties' agreed-upon, "undisputed facts")).[4]  Further, the Court adopts Section III of Pl. PFFCL (see *id*., at 13–26), including all record citations, as the Court's Findings of Fact.[5]  The Court assumes the parties' familiarity with the adopted facts and will not recite them here.

---

[3] Sections II.A and II.C of Pl. PFFCL are comprised entirely of facts taken directly from the parties' joint Trial Stipulations of Fact, which were provided to the Court on the first day of trial and marked as Court Exhibit #1.  (*See* Tr. Stipulations of Fact, Dkt. 109.)

[4] The Court notes that paragraph 47 of Section II.C of Pl. PFFCL cites erroneously to Dkt. 109, ¶ 41.  (Pl. PFFCL, Dkt. 113, ¶ 47 (citing Tr. Stipulations of Fact, Dkt. 109, ¶ 41).)  The correct citation for paragraph 47 is Dkt. 109, ¶ 47.

[5] The Court notes that paragraph 70 of Section III of Pl. PFFCL erroneously cites to Tr. 58:19–25.  (Pl. PFFCL, Dkt. 113, ¶ 70 (citing Tr. 58:19–25).)  The correct citation for paragraph

In addition to the adopted sections from Plaintiff's Proposed Findings of Fact, the Court makes the following factual findings based on the record and the balance of evidence submitted at trial. First, Holmes did not make any loans to AMA prior to 2009. In other words, the Court finds that Defendants fabricated the assertion that AMA had a purported shareholder loan balance of $14,472,005 as of the end of 2008. (Defs. PFFCL, Dkt. 112, ¶ 70.) Further, the Court finds that Holmes's testimony supporting such a claim was uncredible and false. (Defs. PFFCL, Dkt. 112, ¶ 66 (Defendants' conceding that they were not in possession of any loan document "characterizing the loan relationship between Holmes and AMA"); Tr. 80:2–8 (Plaintiff's counsel: "Is it your testimony that there is a loan document that predates the March 25, 2009, demand note and security agreement, but nobody's got a copy of it[?]" Holmes: "As far as I remember, there was a loan agreement." Plaintiff's counsel: "But nobody's got a copy of it[?]" Holmes: "No."); Tr. 180:13– 181:12 (Holmes's and AMA's accountant, Sanford Kirschenbaum ("Kirschenbaum"), testifying that he has never seen "any loan documentation" and did not know any details regarding the terms of the pre-2009 loan); Tr. 169:8–10 (Kirschenbaum testifying he had been Holmes's accountant for "the last 25, 30 years"); Tr. 78:15–17 (Holmes testifying that he "believe[d]" that the pre-2009 loan had a regular interest rate of 6% and penalty interest rate of 9%); Tr. 301:21–302:3 (Plaintiff's expert explaining that AMA's $10,000 increments of interest payments to Holmes "came nowhere near" the interest rate terms Holmes claimed to exist in the lost promissory note).)

## CONCLUSIONS OF LAW

Plaintiff brings this lawsuit, alleging that "[d]uring the many years of litigation in this Court that resulted in the unpaid Judgments, Holmes methodically stripped AMA of its assets . . . for the

---

70 is Tr. 56:19–25. Further, paragraph 95 of Section III erroneously cites to Tr. 85:16–20. (Pl. PFFCL, Dkt. 113, ¶ 95 (citing Tr. 85:16–20).) The correct citation for paragraph 95 is Tr. 85:16– 24.

purpose of avoiding[6] collection on the Judgments." (Am Compl., Dkt. 85, ¶ 5.) Plaintiff asks that the fraudulent conveyances made by AMA to Holmes, during and after the lawsuits that resulted in the underlying Judgments, be voided pursuant to DCL §§ 273-a and 276. (*Id.* ¶¶ 146, 168 (second and third causes of action).) Moreover, Plaintiff seeks to pierce AMA's corporate veil and hold Holmes liable for the unpaid Judgments. (*Id.* at ¶¶ 49–129 (first cause of action).) The Court analyzes each cause of action below and concludes that Plaintiff prevails on all three. However, the Court declines to award pre-judgment interest on Plaintiff's fraudulent conveyance claims because it would be duplicative of the post-judgment interest Plaintiff is already entitled to on the underlying Judgments.

## I.   Plaintiff's DCL § 273-a Claims

### A.   Plaintiff Has Established Which AMA Conveyances to Holmes Should Be Voided Under DCL § 273-a

#### 1.   Legal Standard

DCL § 273-a provides that:

[e]very conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

N.Y. DEBT. & CRED. § 273-a.[7] "To prevail on a claim under DCL § 273-a, a plaintiff must establish

(1) that the conveyance was made without fair consideration; (2) that the conveyor is a defendant

---

[6] Though much of the relevant case law refers to "avoiding" transfers, the Court instead uses the term "voided."

[7] The Court notes that DCL § 273-a was repealed with an effective date of April 4, 2020. *See Diaz v. 297 Schaefer St. Realty Corp.*, 145 N.Y.S.3d 813, 814 (N.Y. App. Div. 2021) (citing 2019 N.Y. Laws, ch. 580 § 2). However, the repeal does not "apply to a transfer made or obligation incurred before such effective date," and thus DCL § 273-a was in effect at all relevant times for

in an action for money damages or that a judgment in such action has been docketed against him; and (3) that the defendant has failed to satisfy the judgment." *Grace v. Bank Leumi Tr. Co. of N.Y.*, 443 F.3d 180, 188 (2d Cir. 2006); *see also Mitchell v. Garrison Protective Servs., Inc.*, 819 F.3d 636, 641 (2d Cir. 2016) (same).

The party challenging the conveyance bears the burden of proving an absence of fair consideration.  *See United States v. McCombs*, 30 F.3d 310, 324 (2d Cir. 1994).   "Fair consideration is comprised of two elements—good faith and the payment of a fair equivalent value for the property interest conveyed." *Allstate Ins. Co. v. Mirvis*, No. 08-CV-4405 (SLT) (PK), 2017 WL 3981157, at *4 (E.D.N.Y. July 31, 2017) (internal quotation marks and citation omitted), *report and recommendation adopted*, 2017 WL 6029128 (E.D.N.Y. Dec. 5, 2017). "[T]he recipient of the debtor's property[ ] must . . . convey property in exchange[,] . . . and . . . such exchange must be a 'fair equivalent' of the property received . . . [and] must be 'in good faith.'" *In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir. 2005) (citation omitted).  DCL § 273-a *does not* require fraudulent intent.  *See Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 419 n.3 (S.D.N.Y. 2014).

    2.    Application

On April 11, 2008, Plaintiff initiated arbitration proceedings against Defendant AMA for breach of contract.  (Tr. Stipulations of Fact, Dkt. 109, ¶ 9.)[8]  As noted above, the Court previously

---

the instant action.  *Great Atl. & Pac. Tea Co., Inc. v. 380 Yorktown Food Corp.*, No. 16-CV-5250 (NSR), 2020 WL 2139699, at *17 n.19 (S.D.N.Y. May 4, 2020).

[8] The Court notes that the parties' stipulated facts erroneously state that the arbitration proceedings commenced on April 10, 2008.  However, Plaintiff's documentary evidence reflects that Plaintiff's counsel, Mr. Lesser, notified Defendants on April 11, 2008, that Emerson would like to appoint an arbitrator to "resolve the parties' post-closing dispute."  (No. 08-CV-2128 (TCP) (AKT), Dkt. 2-4, at ECF 28.)  The Court further notes that "ECF" refers to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

issued partial default judgment against Defendant AMA with respect to Plaintiff's constructive fraudulent conveyance claim under DCL § 273-a and voided the fraudulent conveyances that AMA had made to Defendant Holmes. *See Emerson Electric Co.*, 2020 WL 4592808, at *13 ("[T]he Court finds that AMA is liable under DCL § 273-a to the extent that Plaintiff seeks to void the fraudulent conveyances that AMA made to Holmes."). However, the "monetary amount of the conveyances" remained in dispute. *Id.* at *9. At trial, Plaintiff presented evidence that the Court finds sufficient to establish the nature and amount of these conveyances: (1) $1,747,500 in purported loan interest payments (Tr. Stipulations of Fact, Dkt. 109, ¶ 50); (2) $376,034 in payments of Holmes's personal American Express charges (*id.* ¶ 51); and (3) $71,210 in salary paid from AMA to Holmes after April 11, 2008 (*id.* ¶ 52). Thus, the total monetary amount of the fraudulent conveyances to be voided is $2,194,744.

### a. Purported loan interest payments

Holmes admits that after April 11, 2008, the date that AMA became a defendant in the underlying litigations and arbitration that resulted in the unpaid Judgments, AMA conveyed $1,747,500 in cash conveyances to Holmes, labeled as interest on Holmes's alleged loans to AMA. (*Id.* ¶ 50.) Holmes further admits that no other consideration was provided to AMA for these insider conveyances "other than lowering the total amount of princip[al] and interest owed to" Holmes on his purported previous loans to AMA. (Tr. 78:12–14.) Thus, the Court presumes that these loan interest payments are fraudulent conveyances as a matter of law. *See In re Montclair Homes*, 200 B.R. 84, 97 (Bankr. E.D.N.Y. 1996) ("Transfers to a director, officer or controlling shareholder of an insolvent corporation are deemed to be lacking in good faith and are therefore presumptively fraudulent." (citation omitted)); *First Keystone Consultants, Inc. v. Schlesinger Electrical Contractors, Inc.*, 871 F. Supp. 2d 103, 118 (E.D.N.Y. 2012) (explaining that under

New York state law, insider conveyances made "even as repayments of a preexisting debt, are deemed to lack fair consideration as a matter of law."). Moreover, given the Court's finding that Holmes never made any loans to AMA prior to 2009, the bulk of the loan interest payments were being paid on a non-existent insider loan and thus, in fact, fraudulent conveyances. *See Montclair Homes*, 200 B.R. at 97–98 (voiding repayments of undocumented insider loans given lack of formal loan agreements and evidence that corporation's principal unilaterally decided when the corporation would retain cash as working capital and when it would repay these undocumented insider loans).

### b.   Personal credit card charges

Holmes further admits that "[a]fter April 1[1], 2008, AMA paid $376,034 in personal charges on AMA's business card that were applied against Holmes's loans . . . thereby reducing the amount owed to him." (Tr. Stipulations of Fact, Dkt. 109, ¶ 51.) These personal charges are also fraudulent as a matter of law. *See First Keystone Consultants, Inc.*, 871 F. Supp. 2d at 118.

### c.   Salary

Lastly, Holmes concedes that after April 11, 2008, AMA's sole work, and by extension Holmes's sole work for AMA, was "giving support to the Emerson litigation." (*See* Tr. 70:20–24; *see also* Tr. 70–75.) During 2008 and 2009, "AMA paid Holmes $71,210 in salary" (Tr. Stipulations of Fact, Dkt. 109, ¶ 52; *see also* Pl. Trial Ex. 68; Tr. 265–66), which comprised $29,729 in 2008 (Tr. 267:7–8), and $41,481 in 2009 (Tr. 267:10–11). Under New York law, "[t]he payment of salary is presumed to be for fair consideration" for purposes of, *inter alia*, DCL §§ 273–75. *In re Wonderwork, Inc.*, 611 B.R. 169, 208 (Bankr. S.D.N.Y. 2020). To overcome the presumption, the movant must show evidence of one of the following: (1) bad faith, (2) excessive

or unreasonable payments, or (3) "that the corporation did not receive full value in return." *In re Direct Access Partners, LLC*, 602 B.R. 495, 556–57 (Bankr. S.D.N.Y. 2019) (citation omitted).

Here, Plaintiff has shown that AMA did not receive full value in return for Holmes's services during the period in which he was paid $71,210 in salary and that those payments were excessive. AMA's sole business in 2008 and 2009 was providing consulting services to Wilcom. (*See* Decl. of Frank Lazzara ("Lazzara Decl."), Dkt. 57-36, ECF 29–30 (indicating that AMA's total income in 2008 and 2009 consist of payments from Wilcom).) But Holmes concedes that the "consulting" services AMA was providing to Wilcom during that period was mostly comprised of AMA's work defending itself in its own lawsuits with Plaintiff. (*See* Tr. 74:2–5 (Plaintiff's counsel: "You deemed [AMA's] services in connection with the AMA litigations [with Emerson] to be protecting Wilcom's assets[?]" Holmes: "Yes."); *id.* 71–72 (Holmes explaining that Wilcom's building was pledged as security for AMA's loan which was at risk in the AMA litigations); *id.* 74:6–9 (Plaintiff's counsel: "You directed Wilcom to issue payments to AMA to compensate AMA for yours and Teresa's time in protecting Wilcom's assets[?]" Holmes: "Yes.").) Moreover, Plaintiff has established that the bulk of the income AMA received from Wilcom was reconveyed to Holmes as "interest on Holmes'[s] loans to AMA." (*See* Tr. Stipulations of Fact, Dkt. 109, ¶ 50; *see also* Tr. 251:20–253:5 (Plaintiff's expert explaining that AMA conveyed $300,000 in interest payments to Holmes in the 2008 period[9] and $390,000 in 2009); Lazzara Decl., Dkt. 57-36, ECF 30 (showing that AMA had $400,000 of income in the 2008 period and $500,000 of income in 2009 from Wilcom).) The Court has found that this pre-2009 loan never existed and was fabricated by Holmes.

---

[9] The "2008 period" excludes payments made before April 11, 2008.

Thus, the Court finds that Holmes's responsibilities as an AMA officer during 2008 and 2009, was to generate bills to Wilcom and re-convey the majority of the monies received back to himself as purported interest in a non-existent loan.  These "responsibilities" are not within the realm of a legitimate corporate officer's duties, and certainly do not warrant the $71,210 in salary AMA paid to Holmes for his "services."[10]  *See Wonderwork*, 611 B.R. at 208 ("To [v]oid salary payments, the trustee 'must establish that the salary payments were in bad faith or the payments were excessive in light of the Defendants' employment responsibilities.'" (citing *Pryor v. Tiffen (In re TC Liquidations LLC)*, 463 B.R. 257, 268 (Bankr. E.D.N.Y. 2011))).

In sum, the Court voids $2,194,744 in fraudulent conveyances from AMA to Holmes under DCL § 273-a.

---

[10] Plaintiff also asserts that AMA "essentially discontinued operating [] in 2009" and cites to a New York state court case finding that "salaries paid to a corporation's officer constituted a constructively fraudulent transfer 'when ostensibly, the corporation had ended active operations.'" (Pl. PFFCL, Dkt. 113, at 28–30 (citing *New Gold Equities Corp. v. Valoc Enters., Inc.*, No.: 652528/2013, 2018 N.Y. Misc. LEXIS 6278, at *26 (N.Y. Sup. Ct. Dec. 14, 2018)).).  But Plaintiff's argument is irrelevant here because AMA's salary payments to Holmes occurred in 2008 and 2009, *before* AMA ceased operations.  (S*ee* Tr. Stipulations of Fact, Dkt. 109, ¶ 41 (Holmes explaining that he removed himself from AMA's payroll as of December 2009 because "the business discontinued its operations at that point.").)  Moreover, although Holmes discontinued AMA's operations after December 2009, he testified that he believed the company had "a future" until the end of 2013, "when the Court entered judgment against AMA." (Tr. 82:10–20 (Holmes: "We had every expectation that we were going to win that arbitration proceeding.  Up until that day, I thought AMA had a future.  After that, you know, it just didn't seem to be worth it."); *see also* No. 08-CV-2128, 12/17/2013 Docket Order and 1/9/2014 Judgment (Judge Platt confirming November 25, 2013 arbitration award against AMA).)  Thus, the applicability of *New Gold Equities Corp.* to this case is unclear.  While the Court is skeptical of Holmes's claim, the Court need not resolve that issue, given its finding that Plaintiff has shown that the salary payments to Holmes were made without full value in return.

## B.     Defendants' "Offset" Defense Fails

At trial, Defendants' counsel attempted to flesh out the concept of an "offset" or "set-off" affirmative defense.[11]  (Tr. 463:13–464:23.)  Specifically, Defendants argue that after April 11, 2008, Holmes "loan[ed] [$278,000] to AMA for its operating expenses" that "were for legitimate business purposes," and thus the $278,000 should be subtracted from the total voided fraudulent conveyances amount.  (Defs. PFFCL, Dkt. 112, at 23–24.)  Defendants also claim that the $1,130,626 that CSI Technologies, Inc. ("CSI")[12] paid on behalf of AMA's legal fees, which after amendments to CSI's and AMA's tax returns, are characterized as shareholder loans by Holmes to AMA, should also be subtracted from the voided fraudulent conveyances.[13]  (Defs. PFFCL, Dkt. 112, at 23 n.2.)  The Court finds this defense to be entirely meritless.

### 1.     Legal Standard

"The common law right of setoff, codified by DCL § 151, 'allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A.'"  *DeFlora Lake Dev. Assocs., Inc. v. Hyde Park*, 689 F. App'x

---

[11] Plaintiff asserts that Defendants "never [specifically] pled" the affirmative offset defense (Tr. 463:19–22; *see also* Pl. PFFCL, Dkt. 113, at 33 ("As a threshold matter, Holmes should be deemed to have waived the affirmative defense of putative setoff due to his failure to assert it in his Amended Answer.").)  The Court disagrees.  The Court finds that throughout this case, Defendants' theory was "always . . . that there is some sort of offset or reduction that is due in the amount of the fraudulent conveyance," and thus the Court will address the argument here.  (Tr. 465:10–13.)

[12] CSI Technologies, Inc. became the name of Emerson Network Power Optical Connectivity Solutions, Inc. ("ENPOCS") after AMA purchased ENPOCS from Plaintiff in November 2006 for $6 million.  (Pl. PFFCL, Dkt. 113, ¶ 1–3.)

[13] The Court notes that, damningly, Holmes's own expert admitted on cross-examination that he could not "in good faith" tell the Court that the $1,130,626 in legal fees should "be viewed as a reduction to the amount of [fraudulent] conveyances[.]"  (Pl. PFFCL, Dkt. 113, at 39 (citing Tr. 413:4 – 416:21.).)

11

99, 100 (2d Cir. 2017) (quoting *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18, (1995)).  For the

Court to apply setoff, the debts "must be mutual.  Debts are mutual when they are due to and from

the same persons in the same capacity." *Id.* (quoting *Westinghouse Credit Corp. v. D'Urso*, 278

F.3d 138, 149 (2d Cir. 2002)).

> 2.   Application

Here, Holmes does not claim that he has mutual debts with Emerson, AMA, or CSI.  Thus,

as a matter of law, Holmes's offset defense fails.  Holmes's post-trial brief contains a single

paragraph asserting his offset defense, which inexplicably does not cite any case law regarding

New York's setoff statute, DCL § 151.  (*See* Defs. PFFCL, Dkt. 112, at 23–24.)  Rather, Holmes

asserts he is entitled to an offset by erroneously appealing to the Uniform Fraudulent Conveyance

Act.  He argues:

> "Under [the] New York Uniform Fraudulent Conveyance Act (UFCA)[,] if debtor
> retains proceeds from first exchange [sic], reconveys them for fair consideration,
> or uses them for some other legitimate purposes, including preferential repayment
> of preexisting debts, and if debtor does not make [a] subsequent transfer with actual
> fraudulent intent, since [the] entire transaction in that situation does not adversely
> affect debtor's ability to meet its overall obligations [sic]."[14]  Then those proceeds
> should not be deemed a fraudulent conveyance.

---

[14] Defendants attribute this nonsensical sentence to a direct quote from *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).  (*See* Defs. PFFCL, Dkt. 112, 23–24).  However, *HBE Leasing Corp.* does not contain the quoted language as Defendants have presented it.  Rather, *HBE Leasing Corp.* contains the following discussion:

> It is well established that multilateral transactions may under appropriate
> circumstances be "collapsed" and treated as phases of a single transaction for
> analysis under the UFCA.  This approach finds its most frequent application to
> lenders who have financed leveraged buyouts of companies that subsequently
> become insolvent.  The paradigmatic scheme is similar to that alleged here: one
> transferee gives fair value to the debtor in exchange for the debtor's property, and
> the debtor then gratuitously transfers the proceeds of the first exchange to a second
> transferee.  The first transferee thereby receives the debtor's property, and the
> second transferee receives the consideration, while the debtor retains nothing.
> Under these circumstances, the initial transfer of the debtor's property to the first
> transferee is constructively fraudulent if two conditions are satisfied.  First, in

(Defs. PFFCL, Dkt. 112, at 23–24 (citing *HBE Leasing Corp.*, 48 F.3d at 635).)  This argument misapplies *HBE Leasing Corp.* and, frankly, is difficult for the Court to decipher.  Nevertheless, the Court attempts to address the merits of Defendants' argument under the UFCA out of an abundance of caution.

In *HBE Leasing Corp.*, the Second Circuit explains, *inter alia*, when it is appropriate to "collapse" multilateral transactions and treat them "as phases of a single transaction for analysis under the UFCA."  48 F.3d at 635.  The portion of the *HBE Leasing Corp.* decision that Holmes misquotes—and misapplies—explains the following: if a transferee gives consideration to a debtor in exchange for a conveyance, and that debtor retains the consideration and reconveys it "for fair consideration, or uses [it] for some other legitimate purposes[,]" then "the entire transaction, even if 'collapsed,' cannot be a fraudulent conveyance because it does not adversely affect the debtor's ability to meet its overall obligations."  *Id.*  This holding in *HBE Leasing Corp.* is inapplicable to Holmes's case, because the Court finds (and Holmes himself concedes) that AMA's conveyances to him were without any consideration "other than lowering the total amount of princip[al] and interest [AMA purportedly] owed to [him]."  (Tr. 78:12–14.)  Thus, for this case to be analogous to *HBE Leasing Corp.*, Defendants would need to show that AMA (the debtor) retained and reconveyed the consideration it received from Holmes (the transferee) for a legitimate purpose.

---

accordance with the foregoing paradigm, the consideration received from the first transferee must be reconveyed by the debtor for less than fair consideration or with an actual intent to defraud creditors.  If, instead, the debtor retains the proceeds from the first exchange, reconveys them for fair consideration, or uses them for some other legitimate purpose, including the preferential repayment of pre-existing debts, and if the debtor does not make the subsequent transfer with actual fraudulent intent, then the entire transaction, even if "collapsed," cannot be a fraudulent conveyance, because it does not adversely affect the debtor's ability to meet its overall obligations.

*HBE Leasing Corp.*, 48 F.3d at 635.

But Defendants cannot show that here because AMA did not receive any consideration from Holmes which they could re-convey in this case, since the "consideration" that AMA received from Holmes was a reduction in the principal AMA owed on loans from Holmes.  Moreover, with respect to Holmes's attempt to offset CSI's legal fee expenses, Holmes's own expert conceded on cross-examination that these fees were *not* AMA's expenses because under the Reimbursement Agreement, they were CSI's direct legal obligations.  (Pl. PFFCL, Dkt. 113, at 38–39 (quoting Tr. 413:4–416:21).)

Thus, the Court rejects Defendants' offset defense.

## II.   Plaintiff Has Proven Its DCL § 276 Claim

### A.   Plaintiff Has Established Defendants' Intent to Defraud by Clear and Convincing Evidence

#### 1.   Legal Standard

Under DCL § 276, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  N.Y. DEBT. & CRED. § 276.  Thus, in contrast to DCL § 273-a, "intent to defraud on the part of the transferor" is required for prevailing on a Section 276 claim.  *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 612 (S.D.N.Y. 2018) (citing *Sharp*, 403 F.3d at 56).

Proving "actual intent" through direct evidence is difficult, however, and intent may instead be "inferred from the facts and circumstances surrounding the transfer."  *Id.* (citing *S.E.C. v. Smith*, 646 F. App'x 42, 45 (2d Cir. 2016)).  Such " badges of fraud" include: "(1) the lack or inadequacy of consideration; (2) the family, friendship[,] or close associate relationship between the parties; (3) the retention of possession, benefit[,] or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in

14

question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry." *In re Daffner*, 612 B.R. 630, 647 (Bankr. E.D.N.Y. 2020). "[T]he existence of several badges of fraud can constitute the requisite clear and convincing evidence of actual intent to defraud." *Id*. at 647–48 (citing *In re Xiang Yong Gao*, 560 B.R. 50, 64 (Bankr. E.D.N.Y. 2016)).

2.   Application

Plaintiff has established the existence of several badges of fraud, which constitute clear and convincing evidence of AMA's actual intent to defraud with respect to AMA's conveyances to Holmes. First, these conveyances were made without any consideration "other than lowering the total amount of princip[al] and interest owed to" Holmes on a non-existent loan. (Tr. 78:12–14.) Second, there is no doubt that Holmes was AMA's sole owner (Defs. PFFCL, Dkt. 112, ¶ 44) and directed the conveyances to himself. (Tr. 79:21–24 (Holmes confirming that "[a]ny payments or transfers made to [him] from the AMA accounts was based upon [his] authorization and instruction.").) Third, Holmes retained these conveyances from AMA for his benefit, including as direct payments on his personal credit card. *See In re TC Liquidations LLC*, 463 B.R. at 277 ("Under the third 'badge of fraud' [the movant] must establish that the [transferees] retained or used the [conveyed] funds.").

As to the remaining factors, Holmes concedes that after the onset of the underlying lawsuits, at the end of 2009, he unilaterally "discontinued" AMA's business consulting operations. (Tr. 101:18–102:5.) He did this even though AMA was still generating millions in income in order to defend itself in the lawsuits with Emerson in 2008 and 2009. (Tr. 71–75.) At the same time Holmes decided to discontinue AMA's consulting operations, he set up his new entity, Churchill, to effectively replace AMA. (Tr. 103:4–107:17 (Holmes explaining that Churchill has the same

15

employees as AMA, same clients, and same operating address).)  Thus, the Court finds that the financial condition of AMA was greatly reduced, given that the business was discontinued after the conveyances in question.  Moreover, it is undisputed that after the onset of the Emerson lawsuits, Holmes conveyed all income generated by AMA to himself, mostly as insider loan interest payments.  (Tr. 431:2–8.)  Finally, Holmes's own expert witness averred that Holmes understood the significance of AMA's lawsuits and the potential for judgments against AMA, given Holmes's background as a lawyer and professional investor, and the fact that he had legal counsel.  (Tr. 432:7–24.)  Thus, the Court finds that AMA's conveyances to Holmes were made with actual intent to make AMA judgment-proof and avoid paying the underlying Judgments.

In response, Defendants argue that AMA's conveyances to Holmes, including the interest payments and credit card payments, were not made with the intent to defraud Plaintiff (Tr. 433:3–10), but rather "were structured as part of a tax minimization strategy" for Holmes's benefit (Defs. PFFCL, Dkt. 112, at 26).  However, the Court finds that Holmes's trial testimony regarding his purported tax minimization strategy was fabricated.  During trial, Holmes claimed that he implemented the tax-minimization strategy because "his accountant, Kirschenbaum, [advised him] to make distributions directly into AMA then take the distributions to AMA as interest to himself and then loan back funds to AMA for any other expenses of AMA."  (Tr. 438:13–18.)  But when questioned, Kirschenbaum denied giving this advice to Holmes.  (Tr. 441:2–5.)  Moreover, the Court has found Defendants' claims regarding the existence of a loan from Holmes to AMA prior to 2009 not credible.  *See supra* Findings of Fact.  Thus, the Court rejects Defendants' contention that AMA's conveyances were simply a part of a tax-minimization strategy rather than made with an intent to defraud Plaintiff.

**B.      Plaintiff is Entitled to Attorney's Fees**

1.      Legal Standard

Section 276 allows for the recovery of reasonable attorney's fees:

> In an action or special proceeding brought by a creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors to set aside the conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action or special proceeding the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors shall recover judgement, the justice or surrogate presiding at the trial shall fix the reasonable attorney's fees of the creditor, receiver, trustee in bankruptcy or assignee for the benefit of creditors in such action or special proceeding, and the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors shall have judgment therefor against the debtor and the transferee who are defendants in addition to the other relief granted by the judgment.  The fee so fixed shall be without prejudice to any agreements, express or implied, between the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors and his attorney with respect to the compensation of such attorney.

N.Y. DEBT. & CRED. § 276-a; *see also In re All Am. Petroleum Corp.*, 259 B.R. 6, 20 (Bankr. E.D.N.Y. 2001) ("Pursuant to DCL § 276–a, a party that succeeds in avoiding a transfer on the grounds of actual fraud under § 276 is entitled to recover its attorney's fees.").

2.      Application

Here, the Court has found that AMA's conveyances to Holmes should be voided under both DCL §§ 273-a and 276.  Thus, Plaintiff is entitled to recover its attorney's fees in this litigation.  Accordingly, within 30 days, Plaintiff shall submit a fee application with the necessary supporting documentation.

**C.      Defendants' Statute of Limitations Defense Fails**

Defendants argue that Plaintiff's DCL § 276 claim is barred by the applicable statute of limitations.  The Court disagrees.

1.    <u>Legal Standard</u>

"A claim pursuant to Section 276 must be brought within six years of the fraud or conveyance, or within two years of discovery, whichever period is longer." *Aaron v. Mattikow*, 225 F.R.D. 407, 413 (E.D.N.Y. 2004) (citing *Bloomfield v. Bloomfield*, 721 N.Y.S.2d 15, 16 (N.Y. App. Div. 2001); *see also* N.Y. C.P.L.R. § 213(8) (mandating that for "an action based upon fraud; the time within which the action must be commenced shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it.").

2.    <u>Application</u>

This lawsuit was initiated on March 21, 2016. (*See* Compl., Dkt. 1.) By Defendants' own admission, they did not produce any "records reflecting the AMA conveyances to Holmes" until January 2015. (Defs. PFFCL, Dkt. 112, 41; *see also* Tr. Stipulations of Fact, Dkt. 109, ¶ 62–63.) Thus, Plaintiff's Complaint was filed a year and two months after Plaintiff's discovery of the conveyances, which is squarely within the two-year statute of limitations for a Section 276 claim.[15]

## III.   Plaintiff Has Pierced AMA's Corporate Veil and Proven DCL §§ 273-a and 276 Liability Against Holmes

"Under New York law, a party seeking to pierce the corporate veil must show that (1) the alleged alter ego exercised complete domination over the corporation with respect to the transaction at issue; and (2) such domination was used to commit a fraud or wrong that injured the

---

[15] In opposition, Defendants argue that Plaintiff was on notice regarding the fraudulent conveyances as early as February 25, 2014, when Holmes's counsel notified Plaintiff that AMA had filed for bankruptcy. (Defs. PFFCL, Dkt. 112, at 41; Tr. Stipulations of Fact, Dkt. 109, ¶ 60.) But Defendants go on to concede that in the same email notifying Plaintiff of AMA's bankruptcy, Holmes's counsel expressly refused to provide any information regarding the location of AMA's assets or whether they had been conveyed away. (Tr. Stipulations of Fact, Dkt. 109, ¶ 60.) Thus, although Plaintiff was aware that AMA was in bankruptcy as of February 25, 2014, they had no reason to believe that AMA's bankruptcy was the result of fraud.

party seeking to pierce the corporate veil." *First Keystone Consultants*, 871 F. Supp. 2d at 124

(citing *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir.

2001)). "New York courts have made clear that the veil-piercing standard is demanding. The

Court of Appeals has repeatedly emphasized that those seeking to pierce the corporate veil bear a

heavy burden." *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 402

(S.D.N.Y. 2015) (internal quotation marks and alterations omitted). Despite this heavy burden,

the Court finds that Plaintiff has pierced AMA's corporate veil and met the burden of establishing

that Holmes had "complete domination" over AMA and its conveyances, and that Holmes used

this control to commit a "fraud or wrong" to injure Plaintiff.

## A. Holmes Exercised Complete Domination Over AMA and AMA's Conveyances

### 1. Legal Standard

The Second Circuit has found that the following ten factors, commonly referred to as the

*Passalacqua* factors, "tend to show" that an alter ego exercised complete domination over the

corporation:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm['s] length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991); *Sentry*

*Ins. v. Brand Mgmt. Inc.*, 120 F. Supp. 3d 277, 286 (E.D.N.Y. 2015) (same). "[I]t is not required

that every single factor weigh in favor of piercing the corporate veil—a district court need only

find that, as a matter of law, the balance of *Passalacqua* factors weighs in favor of either party[.]"

*Sentry Ins.*, 120 F. Supp. 3d at 288 (internal quotation marks omitted) (quoting *Feitshans v. Kahn*,

No. 06-CV-2125 (SAS), 2007 WL 2438411, at *7 (S.D.N.Y. Aug. 24, 2007)), *aff'd sub nom.*,

*Sentry Ins. a Mutual Co. v. Weber*, 720 F. App'x 639 (2d Cir. 2017).

        2.   Application

Here, the undisputed evidence shows that Holmes dominated AMA.  Defendants raise few

valid defenses and focus mostly on arguing that AMA was not "undercapitalized"—but rather

"thinly capitalized[,]" which was consistent with "AMA's operating expenses."  (Defs. PFFCL,

Dkt. 112, at 31–32.)  As an initial note, Defendants' attempted wordplay falls woefully short of a

valid legal argument.  (*See id.* at 29 ("[Plaintiff] argues that AMA was undercapitalized.  Holmes,

however, has provided contrary evidence [to show] . . . that AMA was *thinly* capitalized.")

(emphasis added).)  More damningly, AMA was not just a "thinly capitalized" business—AMA

was entirely insolvent due to its liabilities to Holmes.  (*See* Defs. PFFCL, Dkt. 112, ¶ 70

(explaining that AMA owed Holmes $14,472,005 by the end of 2008); Pl. PFFCL, Dkt. 113, ¶ 53

(explaining that Holmes loaned $654,300 to AMA after April 10, 2008.)  And AMA's outstanding

debts to Holmes were inexplicably and disproportionately large given AMA's self-professed low

operating expenses.  (Tr. 374:2–8 (Defendants' expert witness explaining that AMA "does not

need working capital" because it is an investment holding company); Defs. PFFCL, Dkt. 112, ¶ 60

("Historically, AMA's annual operating expenses amounted to between $125,000 and $250,000).)

In addition to AMA being undercapitalized to the point of insolvency, Holmes used AMA's

business credit card to pay for personal expenses (Pl. PFFCL, Dkt. 113, ¶ 51), and AMA's address,

telephone, and fax machine were the same as Holmes's personal ones.  (Tr. 424:8–25; Tr. 425:4–

9.)  Moreover, AMA's financing proposal to buy CSI stated that AMA had purchased Wilcom (Tr.

20

41:4–21), even though Holmes had purchased Wilcom in his individual capacity (Defs. PFFCL, Dkt. 112, ¶ 23).  When questioned about this, Holmes explained that the statement was still accurate because saying "AMA purchased [Wilcom]" is like saying "Charles Holmes, sole shareholder purchased it.  It doesn't mean anything to them.  That's why I said it.  Trust me, everybody that saw this knew that AMA was Charles Holmes."  (Pl. PFFCL, Dkt. 113, ¶ 23.) Thus, in Holmes's mind, his personal assets, debts, and acquisitions were one and the same as AMA's.  Additionally, Holmes used the building from another wholly-owned corporation, Wilcom, as part of the security to secure AMA's financing from Wells Fargo to purchase CSI.  (*Id.* ¶ 29.)

Still other *Passalacqua* factors demonstrate Holmes's complete domination over AMA. Holmes was the sole owner, shareholder, and director of AMA (Tr. Stipulations of Fact, Dkt. 109, ¶¶ 23, 25) and had sole decision-making authority at AMA (*see* Tr. 59:17–22, 79:18–24 (Holmes explaining that AMA's only two other employees—one of which who is his wife—had no control over business or financial decisions).  Holmes was also effectively the sole officer of AMA.[16] AMA's only business during the years at issue was providing consulting services to other businesses solely owned by Holmes.  There were no engagement letters or documentation of any kind to suggest that any dealings between Holmes's entities were conducted at an arm's length. (Tr. 68:25–69:7 (Holmes explaining that there were no written agreements or engagement letters

---

[16] Defendants claim that "Dennis McCarthy acted as an officer of AMA."  (Defs. PFFCL, Dkt. 112, at 30 (citing Tr. 81:11–12.)  However, in the portion of the transcript Defendants cite to, Holmes also concedes that he "appointed [McCarthy] as Vice President of AMA for the purpose of executing" the March 25, 2009 demand promissory note, and aside from the period of time needed to execute the demand note, Holmes was AMA's sole officer.  (Tr. 81:18–21; *see generally* Tr. 80–81.)  Thus, McCarthy clearly was not a legitimate officer of AMA and, in fact, was specially appointed by Holmes to assist him in executing fraudulent conveyances after the commencement of the underlying lawsuit.

that control the business relationship between Wilcom and AMA).)  Holmes confirmed that "all payments and transfers made to [him] from AMA accounts w[ere] based upon [his] authorization and instruction."  (Tr. 79:21–24.)  And moreover, for the purported loan interest payments, he directed them to be paid whenever there was money in "excess" of AMA's monthly expenses and for them to be paid in whatever "round figure" his employee could "come up" with.  (Tr. 79.)

In sum, Plaintiff has overwhelmingly established that almost all of the *Passalacqua* factors exist in this case and that Holmes exercised complete domination over AMA, including personally authorizing and directing the fraudulent conveyances from AMA to himself.

### B.      Holmes Dominated AMA to Commit a Fraud or Wrong Against Plaintiff

#### 1.      Legal Standard

To fulfill the second requirement, Plaintiff must show that Holmes, "through [his] domination of the corporation, 'abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against" Plaintiff.  *Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp.*, 938 F. Supp. 2d 361, 375 (E.D.N.Y. 2013) (quoting *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc.*, 386 F. Supp. 2d 461, 465 (S.D.N.Y. 2005); *see also MAG Portfolio Consult*, 268 F.3d at 64 ("Without a finding that the domination occurred for the purpose of committing a wrong, the second element of a veil-piercing analysis has not been met.").

Specifically, the "fraud or wrong" requirement is satisfied "[i]f a corporation is not able to pay its debts to the plaintiff as a result of the owner's domination[.]" *Nat'l Integrated Grp. Pension Plan*, 938 F. Supp. 2d at 378 (citing *EFCO Corp. v. Nortek, Inc*., 205 F.3d 1322, at *2 (2d Cir. 2000) (summary order); *see also Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, 724 F. Supp. 2d 308, 320 (E.D.N.Y. 2010) (finding "fraud or wrong" established where the "defendant raided the assets of the company for his own purposes, indifferent to whether his steady drain of funds

from its coffers would impair its ability to meet its substantial contractual obligations to Fannie Mae (and other parties)" and that "[t]here is no doubt that [the defendant] appropriated significant monies which would otherwise have been available to satisfy Fannie Mae's current judgment against [the defendant's corporation], thus committing a wrong against Fannie Mae.").

 2.  Application

Here, it is undisputed that Holmes directed all of AMA's cash and assets to be conveyed to him as interest and principal repayments of his purported insider loans.  (Tr. 79:2–6.)  It is also undisputed that Holmes directed these conveyances to be made during the pendency of the underlying litigations, knowing that judgment could be entered against AMA and that draining AMA's funds would render AMA unable to satisfy any future judgments.  (Tr. 432:7–24.)  Thus, the Court finds that Holmes used AMA to commit a wrong against Plaintiff.  *Capital Distrib. Servs., Ltd. v. Ducor Express Airlines, Inc.*, No. 04-CV-5303, 2007 WL 1288046 (NG) (VVP), at *3 (E.D.N.Y. May 1, 2007) ("[T]he diversion of funds to make a corporation judgment-proof constitutes a wrong for the purposes of determining whether the corporate veil should be pierced.") (citation omitted).).

**C.  Holmes's Equity Defense Under *Brunswick* Fails**

Defendants rely heavily on *Brunswick Corp. v. Waxman* to assert that Plaintiff "should be equitably estopped from piercing AMA's corporate veil" because Emerson was "aware of the nature of the relationship between Holmes and AMA" when it entered into the CSI deal.[17]  (Defs.

---

[17] Defendants mistakenly conflate the holding in *Brunswick* and the doctrine of "equitable estoppel" in their defense against piercing the corporate veil.  The *Brunswick* court did not apply the doctrine of equitable estoppel; rather, *Brunswick* emphasized the need for courts to reach an "equitable result" when analyzing veil piercing.  Specifically, *Brunswick* explained that "[w]hat the [veil piercing] formula comes down to, once shorn of verbiage about control, instrumentality, agency and corporate entity, *is that liability is imposed to reach an equitable result." Brunswick Corp.*, 599 F.2d at 36 (citations omitted) (emphasis added).  Thus, to the extent Defendants are raising equitable estoppel as an affirmative defense, *Brunswick* is inapplicable.  Indeed, the phrase

PFFCL, Dkt. 112, at 35–36.; *id. generally* at 36–39 (citing *Brunswick Corp. v. Waxman*, 599 F.2d 34 (2d. Cir. 1979)).)  However, Defendants' argument falls flat because *Brunswick* and its progeny are distinguishable from this case.

       1.   <u>Legal Standard</u>

In *Brunswick*, the Second Circuit found that the ultimate goal of piercing the corporate veil is to ensure that "liability is imposed to reach an equitable result."  *Brunswick Corp.*, 599 F.2d at 36; *see also Aries Ventures Ltd. v. Axa Fins. S.A.*, 729 F. Supp. 289, 296 (S.D.N.Y. 1990) ("The rule that allows courts to disregard the corporate form and pierce the corporate veil is not applied unless it would 'accomplish justice or equity.'" (citing *Brunswick Corp.*, 599 F.2d at 36.)). Specifically, "the Circuit held that it would thwart justice and equity to pierce the corporate veil . . . where the plaintiff knowingly entered into a sales contract with a no-asset corporation, knowing that the defendants—the corporation's owners—wished to avoid personal liability by creating the no-asset, dummy corporation *for the sole purpose of carrying out the transaction*."  *Emerson Electric Co.*, 2020 WL 4592808, at *13 (citing *Brunswick Corp.*, 599 F. Supp. at 36) (emphasis added); *see also Brunswick Corp.* 599 F. Supp. at 36 ("The district judge who tried the case found that Brunswick had knowingly entered into the conditional sales contracts involved in this litigation with a no-asset corporation *which was created for the sole purpose of taking title to the equipment Brunswick sold* . . . . Thus, Brunswick was aware . . . that the dummy corporation was *created for the limited purpose of purchase*[.]" (emphasis added)).  In other words, a dummy corporation's veil should not be pierced if the corporation was created solely for the purpose of

---

"equitable estoppel" is nowhere to be found in the *Brunswick* opinion.  *See generally id*. Nevertheless, in order to thoroughly dispose of all issues in this matter, the Court will address both the *Brunswick* case and the doctrine of equitable estoppel, and explain why Defendants cannot prevail under either defense.

entering into a transaction and "eliminat[ing] personal responsibility" in *that* transaction. *Brunswick Corp.*, 599 F. Supp. at 36.

2.   <u>Application</u>

Here, AMA is *not* a dummy corporation created solely for the purpose of entering into the Emerson transaction. In fact, AMA was created 15 years before AMA purchased CSI from Plaintiff. (*See* Tr. 448:11–15 (Defendants' expert confirming that AMA "was a long-standing investment vehicle and investment holding company that had been established in New York in 1991.").) Moreover, Defendants' own expert report declared that "[t]his is not the type of case involving the piercing of a corporate veil where a new entity is created to avoid a liability." (Pl. PFFCL, Dkt. 113, at 70.) Thus, *Brunswick* is clearly inapplicable.

In opposition, Defendants argue that Plaintiff "was fully aware of the business structure of AMA" when it entered into the transaction, including that AMA: (1) was a "subchapter S corporation that could not own another company because of tax laws"; and (2) had "no major liquid assets[,]" operating "like an opera company where its assets (*i.e.*, the personnel) would leave at the end of each evening." (Defs. PFFCL, Dkt. 112, at 36.) However, Defendants' contentions are either demonstrably false or distinguishable. First, at the time of the transaction, AMA expressly represented to Emerson that AMA "has the power and authority to enter into this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby." (Pl. Trial Ex. 25 § 4.1([a]).) Indeed, AMA's financing proposal represented that AMA had previously purchased Wilcom, implying that AMA could purchase and hold companies. (Tr. 41:18–21.) Thus, at the time of the transaction, AMA represented to Emerson that AMA had the power to purchase and own CSI.

Second, AMA made an affirmative representation in the Acquisition Agreement that "[AMA] has and at all times will have sufficient funds on hand or available pursuant to

25

unconditional commitments to pay the purchase price and any adjustment thereafter." (Tr. 156:18–21.).  Thus, Emerson believed at the time of the transaction that AMA had at least the $6 million in liquid assets needed to close the deal.  (Tr. 156:3–10.)  Even if Emerson did not know how AMA's financing for the deal was acquired, Defendants' reliance on Plaintiff's purported knowledge of AMA's undercapitalization misses the point of *Brunswick*'s equity defense. *Brunswick* holds that a plaintiff cannot pierce a corporation's veil after a deal has gone wrong if that plaintiff executed the deal *knowing* that the corporation was a shell entity created specifically for executing that deal.  *See Cortlandt St. Recovery Corp. v. TPG Capital Mgmt., L.P.*, 176 N.Y.S. 3d 474, 2022 WL 14725934, *17 (N.Y. Sup. Ct., Oct. 25, 2022) (finding that "the *Brunswick* rule does not apply" because "although "defendants point to the provision in the [offering memorandum] stating that Hellas II was a 'holding company without operations,' they do not claim that Hellas II was formed 'for the sole purpose of carrying out the transaction' and specifically to allow defendants to avoid personal liability," and further noting that Hellas II was "formed in 2005"—a year before the transaction at issue).  That AMA, in fact, might have been a shell company solely created for that purpose—a conclusion the evidence does not support— *unbeknownst* to Plaintiff does not implicate the *Brunswick* equity defense or permit Defendants to avail themselves of it.  In any event, here, Defendants have presented no evidence that AMA was a dummy corporation created solely for conducting the transaction with Emerson—and in fact reject that assertion themselves.  Moreover, Emerson entered into a transaction with AMA, in part, because of "AMA's history"—proving that Emerson knew AMA was in operation long before the deal they were about to transact.  (Tr. 150:22–151:2.)

Lastly, the district court in *Brunswick* expressly based its holding on the lack of fraud and/or wrongdoing by the corporation's individual owners, which undermines Defendants'

reliance on the case.  (*See* Pl. PFFCL, Dkt. 113, at 72–73.)  The court explained that the "decisive factor" in the case was that the individual defendants "never attempted to strip their corporations" of assets, specifically noting that "[i]f there had been operating profits which the [individual defendants] had appropriated to themselves, or shuttled to and from their other enterprises . . . a different result would emerge and the [individuals] would be subject to personal liability." *Brunswick Corp. v. Waxman*, 459 F. Supp. 1222, 1233 (E.D.N.Y. 1978), *aff'd*, 599 F.2d 34 (2d Cir. 1979).  Here, the Court has found that Defendant Holmes fraudulently conveyed millions of dollars to himself in order to evade the Judgments against AMA.  And thus the facts of this case are even further distinguishable from those presented in *Brunswick*.

In sum, it is manifestly clear to the Court that the *Brunswick* rule does not apply here and that equity requires piercing the corporate veil.

**D.      Defendants' Equitable Estoppel Defense Fails**

1.    <u>Legal Standard</u>

"Equitable estoppel is an extraordinary remedy, that is to be "invoked sparingly and only under exceptional circumstances."  *Roeder v. J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 616 (S.D.N.Y. 2021) (internal citations and quotation marks omitted).   "Under New York law, equitable estoppel requires a showing of (1) an act constituting a concealment of facts or a false misrepresentation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoers; (4) reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment."  *Intelligent Digit. Sys., LLC v. Beazley Ins. Co., Inc.*, 906 F. Supp. 2d 80, 94–95 (E.D.N.Y. 2012) (brackets omitted) (quoting *Gen. Electric Cap. Corp. v. Eva Armadora, S.A.*, 37 F.3d 41, 45 (2d Cir. 1994).

2.      <u>Application</u>

Although Defendants do not articulate their equitable estoppel argument with any specificity or clarity, the Court assumes that they are claiming that Plaintiff's awareness "of the business structure of AMA at the time of entering into the transaction" constitutes a misleading act that Defendants relied upon to their detriment.  (Defs. PFFCL, Dkt. 112, at 37 ("In sum, Emerson was aware of the business structure of AMA at the time of entering into the transaction. Emerson should therefore be estopped from its attempt to impose liability on Holmes, individually[.]").)  In other words, because Plaintiff purportedly knew that AMA was a shell company created to limit Holmes's liability at the time of the CSI deal, Holmes relied on that representation to believe that he had no personal liability regarding the deal and took actions accordingly to his substantial detriment.  This argument is plainly nonsensical.  If Plaintiff's knowledge of Holmes's lack of liability was the "act constituting concealment or a false misrepresentation," then the "true facts" that Plaintiff had actual or constructive knowledge of (and concealed from or misrepresented to Defendants) is that Holmes *is* liable as AMA's alter ego.  But this would defeat Defendants' argument against piercing the corporate veil.  Thus, Defendants have failed to articulate or establish any of the four elements required for an equitable estoppel defense.

In sum, Plaintiff has successfully pierced AMA's corporate veil and established liability for the underlying Judgments against Defendant Holmes.  Thus, Holmes is liable for Plaintiff's claims against AMA under DCL §§ 273-a and 276 and all judgments in this case and the underlying Judgments will be entered against Defendant Holmes accordingly.

IV.    **Plaintiff Can Only Recover Post-Judgment Interest**

A.    **Legal Standard**

Interest under New York law can be awarded for "three distinct time periods on money obligations":

> The first, governed by [New York Civil Practice Law and Rules ("CPLR")] 5001, is interest on the cause of action from the time it accrues until the time of verdict or decision. The second, governed by CPLR 5002, speaks to the time between the date of the verdict and the entry of the final judgment. The third, governed by CPLR 5003, speaks to interest that accrues upon a judgment from the date of its entry, forward. The rate of interest is the subject of CPLR 5004.

N.Y. C.P.L.R. § 5001:1 (McKinney 2023).

Under CPLR § 5001, pre-judgment "[i]nterest shall be recovered upon a sum awarded . . . because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property" and "shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred." N.Y. C.P.L.R. § 5001(a)–(b); *see also In re Kopicel v. Schnaier*, 42 N.Y.S.3d 789, 600 (N.Y. App. Div. 2016) ("[T]he court should have awarded pre[-]judgment interest on petitioner's claim for fraudulent conveyance under Debtor and Creditor Law § 273."). N.Y. C.P.L.R. § 5003 governs post-judgment interest, and "provides that interest accrues on the judgment from the date judgment is entered" and continues to accrue "until the judgment is satisfied." *Mahoney v. Brockbank*, 35 N.Y.S.3d 459, 460–61 (N.Y. App. Div. 2016) (citing N.Y. C.P.L.R. § 5003 ("[e]very money judgment shall bear interest from the date of its entry[.]")). "Interest shall be at the rate of nine per centum per annum." N.Y. C.P.L.R. § 5004.

The rationale for awarding interest on damages "is intended to make the plaintiff whole." *Mahoney*, 35 N.Y.S.3d at 460. "[P]laintiff has suffered injury for which the defendant has been found legally responsible[,]" and thus interest is "'simply the cost of having the use of another

person's money for a specified period.'" *Id.* (quoting *Love v. New York*, 577 N.Y.S.2d 359, 361 (N.Y. 1991). Importantly, "[s]tatutory interest is not intended to operate as a punishment upon the payer" or provide a windfall to the payee. N.Y. C.P.L.R. § 5001:1 (McKinney 2023); *see also Verizon N.Y., Inc. v. Supervisor of Hempstead*, 140 N.Y.S.3d 45, 47 (N.Y. App. Div. 2020) ("[I]nterest is not a punishment arbitrarily levied upon a culpable party. Instead, an award of interest is simply a means of indemnifying an aggrieved person. It represents the cost of having the use of another person's money for a specified period." (quoting *Mohassel v. Fenwick*, 799 N.Y.S.2d 758, 762 (N.Y. 2005))). Indeed, the Second Circuit has expressly held that courts are "not bound to award pre-judgment interest under CPLR § 5001, where such an award would 'amount to double recovery.'" *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 108 F. Supp. 3d 52, 56 (E.D.N.Y. 2015) (citing *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.*, 697 F.2d 481, 485 (2d Cir. 1983)), *aff'd*, 646 F. App'x 25 (2d Cir. 2016); *see also Greenway Mews Realty, L.L.C. v. Liberty Ins. Underwriters, Inc.*, 185 N.Y.S.3d 58, 60 (N.Y. App. Div. 2023) (confirming the lower court's denial of pre-judgment interest on an unpaid judgment because "[a]warding such interest would result in a double recovery, given that [plaintiffs] were already entitled to post[-]judgment interest on the judgment").

**B.    Application**

Here, Plaintiff is requesting an interest award that would amount to double recovery on a portion of the underlying Judgments. The Court accordingly denies Plaintiff's request for pre-judgment interest because Plaintiff is already receiving post-judgment interest on the underlying Judgments.

1.    The Underlying Judgments Already Have Pre-Judgment and

Post-Judgment Interest Awards

The first underlying Judgment was entered against AMA on January 9, 2014 and included

5% pre-judgment interest and 9% post-judgment interest.  (*See* No. 08-CV-2128, Dkt. 52, at 2

(awarding Plaintiff "[1,446,369.78] . . . plus 5% pre-judgment interest . . . until entry of Judgment

. . . plus 9% post-judgment interest[.]"); No. 08-CV-2128, 1/9/2014 Judgment.)   The second

underlying Judgment was entered against AMA on August 13, 2015 and included 5% pre-

judgment interest and 9% post-judgment interest.[18]  (*See* No. 08-CV-1489, Dkt. 79, at ₱26 ("The

Court finds that . . . Emerson is entitled to damages in the amount of $1,120,678.31, plus 5%

contractual pre-judgment interest . . . through the date of entry of Judgment."); No. 08-CV-1489,

8/13/2015 Judgment.)  Accordingly, Plaintiff has been accruing interest at 9% *per annum* on the

$1,965,081.40 Judgment since January 9, 2014 and on the $1,966,246.35 Judgment since August

3, 2015.

2.    Awarding 9% Pre-Judgment Interest on Plaintiff's DCL § 273-a Claim

Constitutes Double Recovery

Plaintiff now requests an award of pre-judgment interest at a rate of 9% *per annum* on the

$2,194,744 fraudulent conveyances amount, calculated from January 10, 2014.  (Pl. PFFCL, Dkt.

113, at 75.)  However, as explained above, Plaintiff is already earning 9% post-judgment interest

on the entirety of the underlying Judgments (totaling $3,931,327.75) which properly compensates

Plaintiff for any lost use of the funds.  "[A]n award of interest is simply a means of indemnifying

---

[18] Although the August 13, 2015 judgment does not expressly include post-judgment interest, post-judgment interest is mandatorily awarded once a money judgment is entered.  *See* N.Y. C.P.L.R. § 5003 ("Every money judgment shall bear interest from the day of its entry."). Thus, the second Judgment also has been accruing 9% post-judgment interest since it was entered on August 13, 2015.

an aggrieved person.  It represents the cost of having the use of another person's money for a specified period." *Verizon N.Y., Inc.*, 140 N.Y.S.3d at 47 (quoting *Mohassel v. Fenwick*, 799 N.Y.S.2d 758, 762 (N.Y. 2005)).  Thus, the Court denies Plaintiff's request for pre-judgment interest because permitting Plaintiff to receive another 9% pre-judgment award on top of the 9% post-judgment award would constitute double recovery on that portion of the underlying Judgments.

## V.     The Court Enters Judgment Against Defendant Holmes *Nunc Pro Tunc*

### A.     Legal Standard

The Court has the "inherent power to enter an order having retroactive effect." *Iouri v. Ashcroft*, 487 F.3d 76, 87 (2d Cir. 2006) (quoting Black's Law Dictionary 1100 (8th ed. 2004)). "As the Second Circuit has stated, *nunc pro tunc* relief 'is a far-reaching equitable remedy applied in certain exceptional cases, typically aimed at rec[tifying] any injustice [to the parties] suffered by them on account of judicial delay.'" *Constantino v. U.S. Citizenship*, No. 14-CV-8753 (AT) (DCF), 2015 WL 8489976, at *2 (S.D.N.Y. Dec. 9, 2015) (quoting *Iouri*, 487 F.3d at 87). "The paradigm case [for *nunc pro tunc* relief] involves a party who has died after his case has been submitted to the court, but before the court has entered judgment.  Cases in which a party would otherwise be prejudiced by the clerk's delay in entering the judgment stand upon the same footing." *Weil v. Markowitz*, 898 F.2d 198, 201 (D.C. Cir. 1990).

In other words, a judgment or decree delayed solely by the court and not the unreasonable delay of the parties, "may be entered retrospectively, as of a time when it should or might have been entered[.]" *Mitchell v. Overman*, 103 U.S. 62, 64–65 (1880) (affirming state court's entry of judgment for deceased plaintiff as of the time case was submitted because plaintiff was "alive when [case] was argued and submitted" but died "while the case was held under advisement," and "[t]he delay was altogether the act of the court").  Moreover, judicial delay that alters the priority

of liens and judgments qualifies as injustice that warrants *nunc pro tunc* relief.  *See Weil*, 898 F.2d at 200–01.

### B.      Application

As previously discussed, *see supra* note 2, the Court failed to enter a timely judgment in this matter due to competing demands on the Court's time, and Plaintiff has been prejudiced by this judicial delay.   Throughout the two-day bench trial, the Court repeatedly expressed its intention to enter judgment expeditiously.  (*See, e.g.*, Tr. 230:5–11 (the Court directing the parties on October 12, 2022, to expedite their transcript orders because the Court would "like to get the decision done quicker, even [in less] than . . . a month or so," which is how long it "would take if [parties] got the transcript later"); Tr. 230:14–17 ("THE COURT: Yes.  I plan to move very quickly on this matter.  Just because of my own schedule, quite honestly[—]if [issuing this opinion] gets stuck [behind subsequent trials], it will be a very long time before you get a decision."); Tr. 457:16–18 ("[T]he window in [the Court's] schedule to attend to this case and resolve it expeditiously" is small); Tr. 457:19–458:7 (the Court explaining that "it's never good for [the Court] to delay or wait . . for a month or more" "to make [] findings and resolve a bench trial" because it's better to enter judgment "as soon as possible while everything is still fresh in [the Court's] mind.").)  At the Court's request, the parties promptly filed their Proposed Findings on October 24, 2022.  (Dkts. 112–13; Tr. 469:4–7 (THE COURT: ". . . I'm [] going to require both sides to submit their proposed findings of fact and conclusions of law by October 24, which I know presses everybody for time.").)  Despite emphasizing the short "window of opportunity" it had to render judgment in this case before turning to its backlog of trials (Tr 230:14–18), the Court failed to resolve this matter within that time frame, and the Court's subsequent trial schedule prevented it from timely rendering judgment.  Defendant Holmes unfortunately passed away in the interim, on March 28, 2023.  (Dkts. 114; 115-2.)  Thus, due to judicial delay outside of the parties' control,

the Court did not issue an opinion entering judgment prior to Defendant Holmes's death, despite Holmes being alive during the pendency of the trial.  (Dkts. 113, 114.)  *Mitchell*, 103 U.S. at 64–65.

Here, the Court's delay prejudiced Plaintiff because had the Court issued this Memorandum and Order resolving Plaintiff's fraudulent transfer claims before Defendant Holmes's death, the resulting judgments against him would have had priority in the distribution of his estate.  In New York Surrogate's Court, "[j]udgments docketed and decrees entered against the decedent [are paid] according to the priority thereof respectively."  N.Y. SURR. CT. PROC. ACT § 1811(2)(c).  The New York Surrogate Courts have consistently held that judgments docketed and decrees entered, are given priority over subsequent judgments based on the timing of entry.  *See, e.g.*, *In re VNB N.Y., LLC (Hakimian)*, 2017 N.Y. Misc. LEXIS 3153, at *4 (N.Y. Surr. Ct. Aug. 8, 2017) (explaining that "judgments docketed and decrees entered against the decedent during his lifetime" are given priority "with further priority given to the earliest docketed or entered"); *In re Estate of Foster*, 29 N.Y.S. 316, 316 (N.Y. Surr. Ct. 1894) (finding judgments should be paid in the order in which they were docketed); *In re Estate of Paige*, 262 N.Y.S. 870, 872 (N.Y. Surr. Ct. 1933) (holding "judgments in question are entitled to priority in order of their recovery"); *In re Estate of McCarty*, 285 N.Y.S. 641, 644 (N.Y. Surr. Ct. Feb. 13, 1936) (holding "judgments docketed against the deceased should be paid according to the priority thereof").  Thus, Plaintiff has lost priority in collecting judgment from Holmes's estate due to the Court's delay in entering judgment.  The Court finds that this lost priority to collect judgment from Holmes, especially given Holmes's decades-long evasion of the damages he owes Plaintiff, constitutes an injustice to Plaintiff that warrants *nunc pro tunc* relief.  *See Weil*, 898 F.2d at 200–01.  Therefore, the Court enters judgment against Defendant Holmes *nunc pro tunc*, rendered as of October 31, 2022.

**CONCLUSION**

Plaintiff prevails on all three causes of action. The Clerk of Court is respectfully directed to enter judgment *nunc pro tunc*, rendered as of **October 31, 2022**, in favor of Plaintiff and against Defendant Charles Holmes as follows:

(1) On Plaintiff's claim against AMA under DCL § 273-a: fraudulent conveyances in the amount of $2,194,744 from AMA to Holmes are voided;

(2) On Plaintiff's claim against AMA under DCL § 276: an award of reasonable attorneys' fees incurred by Plaintiff in this instant action;

(3) On Plaintiff's claim for piercing AMA's corporate veil against Holmes: Plaintiff is entitled to collect any judgments entered against AMA directly from Holmes, including (a) the $2,194,744 in voided fraudulent conveyances in this Memorandum and Opinion, (b) the remaining amount of the unsatisfied Judgments against AMA, which is the total of:

1. $1,965,081.40 and 9% *per annum* post-judgment interest calculated from January 9, 2014 (*see* No. 08-CV-2128, 1/9/2014 Judgment); *plus*

2. $1,966,246.35 and 9% *per annum* post-judgment interest calculated from August 13, 2015 (*see* No. 08-CV-1489, 8/13/2015 Judgment); *less*

3. The voided fraudulent transfer total of $2,194,744.

Moreover, Plaintiff shall file an application for attorney's fees within 30 days of this Order.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: July 28, 2023
      Brooklyn, New York